## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TYNDALE HOUSE PUBLISHERS, INC., a Delaware Corporation; MARK D. TAYLOR; | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )   Civil Action No. )        1:12-CV-1635-RBW |
| KATHLEEN SEBELIUS, in her official capacity as Secretary of the United States Department of Health and Human Services; HILDA SOLIS, in her official capacity as Secretary of the United States Department of Labor; TIMOTHY GEITHNER, in his official capacity as Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF LABOR; and UNITED STATES DEPARTMENT OF THE TREASURY; | ) ) ) ) ) ) ) ) )   Oral Argument Requested ) ) ) |
| Defendants. | ) ) ) |

## MOTION FOR PRELIMINARY INJUNCTION AND
## MEMORANDUM OF LAW IN SUPPORT

Pursuant to Fed. R. Civ. P. 65 and LCvR 65.1, Plaintiffs Tyndale House Publishers, Inc., and Mark D. Taylor hereby move for a preliminary injunction for the reasons set forth below in the memorandum of law.  Plaintiffs' counsel has conferred with Defendants' counsel, Ethan P. Davis, concerning this motion, and the motion is opposed. Plaintiffs respectfully request oral argument on this motion prior on or before October 29, 2012, as provided in LCvR 65.1(d). Plaintiffs respectfully request a decision on this motion no later than a week thereafter.  As described in the accompanying memorandum of law, Plaintiffs are already subject to the significant penalties under the challenged rules, and urgently need relief.

# TABLE OF CONTENTS

Table of Authorities ....................................................................................................... ii

Introduction ......................................................................................................................1

Factual Background ..........................................................................................................2

Argument ...........................................................................................................................7

I.     Tyndale Is Likely to Succeed on the Merits ........................................................7

       A.  The Mandate violates the Religious Freedom Restoration Act .....................7

            1.  Tyndale's abstention from providing abortion-inducing drugs in employee coverage qualifies as "religious exercise" under RFRA .........8

                 a.  Tyndale House Publishers exercises religious beliefs ........................9

                 b.  Tyndale's religious owners can exercise religion under RFRA .......13

            2.  The Mandate substantially burdens Tyndale's and its owners' religious exercise ..................................................................................14

            3.  The Mandate cannot satisfy strict scrutiny ...........................................21

                 a.  Defendants cannot identify a compelling interest............................22

                 b.  There is no "business exception" to RFRA's compelling interest test ......................................................................................26

                 c.  The government cannot meet its evidentiary burden........................28

                 d.  Defendants cannot show the Mandate is the least restrictive means of furthering their interests ....................................................32

       B.  The Mandate violates the Free Exercise Clause ..........................................35

       C.  The Mandate violates the Establishment Clause ..........................................38

       D.  The Mandate violates the Free Speech Clause .............................................38

       E.  The Mandate violates the Due Process Clause .............................................39

       F.  The Mandate violates the Administrative Procedure Act .............................41

II.    Tyndale Will Suffer Irreparable Harm in the Absence of Preliminary Relief .......42

III.   The Balance of Equities Tips in Tyndale's Favor. .................................................44

IV.    An Injunction is in the Public Interest ...................................................................45

Conclusion .......................................................................................................................45

Certificate of Service .......................................................................................................46

# TABLE OF AUTHORITIES

*Cases*

*Abood v. Detroit Bd. of Ed.*,
    431 U.S. 209 (1977)....................................................................................39

*Albemarle Paper Co. v. Moody*,
    422 U.S. 405 (1975)....................................................................................13

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004)......................................................................................8

*Blackhawk v. Pennsylvania*,
    381 F.3d 202 (3d Cir. 2004)........................................................................37

*Brown v. Entm't Merchs. Ass'n*,
    131 S. Ct. 2729 (2011)...............................................................21, 25–26, 28–30

*Cal. Democratic Party v. Jones*,
    530 U.S. 567 (2000)....................................................................................21

*Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*,
    556 F.3d 1021 (9th Cir. 2009) ....................................................................37

*City of Boerne v. Flores*,
    521 U.S. 507 (1997)..................................................................................8, 21

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)..............................................................13, 21, 23, 35–37

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)....................................................................................42

*Citizens United v. Federal Election Comm'n*,
    130 S. Ct. 876 (2010)..............................................................................12–13

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
    58 F.3d 738, (D.C. Cir. 1995) ....................................................................42

*Colo. Christian U. v. Weaver*,
    534 F.3d 1245 (10th Cir. 2008) ..................................................................38

*Commack Self-Service Kosher Meats, Inc. v. Hooker*,
    800 F. Supp. 2d 405 (E.D.N.Y. 2011) ......................................................11

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ................................................................7

*Dunn v. Blumstein*,
   405 U.S. 330 (1971) ...............................................................................32

*EEOC v. Townley Eng'g & Mfg. Co.*,
   859 F.2d 610 (9th Cir. 1988) .........................................................10, 14

*Elrod v. Burns*,
   427 U.S. 347, 373 (1976) .........................................................................43

*Employment Division v. Smith*,
   494 U.S. 872 (1990) .....................................................................8, 35, 37

*F.C.C. v. Fox Television Stations, Inc.*,
   132 S. Ct. 2307 (2012) ............................................................................40

*First National Bank of Boston v. Bellotti*,
   435 U.S. 765 (1978) ................................................................................11

*Fraternal Order of Police v. City of Newark*,
   170 F.3d 359 (3d Cir. 1999) .............................................................11, 36

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) ...............................................7–8, 21–27, 32, 34

*Grand Canyon Air Tour Coalition v. F.A.A.*,
   154 F.3d 455 (D.C. Cir. 1998) ..............................................................41

*Grutter v. Bollinger*,
   539 U.S. 306 (2003) ................................................................................32

*Henderson v. Kennedy*,
   265 F.3d 1072 (D.C. Cir. 2001) ..............................................................8

*Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Group of Boston*,
   515 U.S. 557 (1995) ................................................................................39

*Jasniowski v. Rushing*,
   678 N.E.2d 743 (Ill. App. Dist. 1, 1997) .....................................11, 20–21

*Johnson v. City of Cincinnati*,
   310 F.3d 484 (6th Cir. 2002) .................................................................32

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996).......................................................................43

*Kaemmerling v. Lappin*,
    553 F.3d 669 (D.C. Cir. 2008)...........................................8, 14–16, 19, 35

*Kikumura v. Hurley*,
    242 F.3d 950 (10th Cir. 2001) .............................................................43

*Knox v. Service Employees Intern. Union*,
    132 S. Ct. 2277 (2012)........................................................................39

*Larson v. Valente*,
    456 U.S. 228 (1982)...........................................................................38

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*,
    503 F.3d 217 (3d Cir. 2007).................................................................12

*Levitan v. Ashcroft*,
    281 F.3d 1313 (D.C. Cir. 2002) .............................................................8

*Lindahl v. Office of Personnel Management*,
    470 U.S. 768 (1985)...........................................................................13

*Maruani v. AER Services, Inc.*,
    2006 WL 2666302 (D. Minn. 2006) .......................................................11

*McClure v. Sports and Health Club, Inc.*,
    370 N.W.2d 844 (Minn. 1985)................................................10, 14, 20

*McLouth Steel Products Corporation v. Thomas*,
    838 F.2d 1317 (D.C. Cir. 1988).............................................................41

*Mead v. Holder*,
    766 F. Supp. 2d 16 (D.D.C. 2011)....................................................19–20

*Mitchell Cnty. v. Zimmerman*,
    810 N.W.2d 1 (Iowa 2012) ..................................................................37

*Monell v. Dept. of Social Services*,
    436 U.S. 658 (1978)............................................................................13

*Morr-Fitz, Inc. et al. v. Blagojevich*,
    No. 2005-CH-000495, 2011 WL 1338081 (Ill. Cir. Ct. 7th, Apr. 5, 2011)........11, 21

*Newland v. Sebelius*,
   2012 WL 3069154 (D. Colo. July 27, 2012) ................................1, 7 , 22, 34, 44–45

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964)...............................................................................13

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   132 S. Ct. 2566 (2012) ...........................................................................20

*Nat'l Treasuries Employees Union v. United States*,
   927 F.2d 1253 (D.C. Cir. 1991)..............................................................43

*NLRB v. Catholic Bishop of Chicago*,
   440 U.S. 490 (1979)...............................................................................36

*Norinsberg v. U.S. Dept. of Agric.*,
   162 F.3d 1194 (D.C. Cir. 1998)..............................................................12

*O'Brien v. U.S. Dep't of Health & Human Srvs.*,
   2012 WL 4481208 (E.D. Mo. 2012)................................................17–19

*O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*,
   389 F.3d 973, 975 (10th Cir. 2004) ........................................................45

*Prima Iglesia Bautista Hispana of Boca Raton v. Broward County*,
   450 F.3d 1295 (11th Cir. 2006) ..............................................................13

*Rader v. Johnston*,
   924 F. Supp. 1540 (D. Neb. 1996)..........................................................35

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
   487 U.S. 781 (1988)..........................................................................33–34

*Roberts v. Bradfield*,
   12 App. D.C. 453 (D.C. Cir. 1898).........................................................11

*Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*
   547 U.S. 47 (2006).................................................................................39

*Sampson v. Murray*,
   415 U.S. 61, 88 (1974)...........................................................................42

*Seven-Sky v. Holder*,
   661 F.3d 1 (D.C. Cir. 2011)..............................................................19–20

*Sherbert v. Verner*,
    374 U.S. 398 (1963)........................................................................7–10, 15–16, 28

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ....................................................................44

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ..............................................................10, 14, 20

*Thomas v. Collins*,
    323 U.S. 516 (1945)....................................................................................21

*Thomas v. Review Board*,
    450 U.S. 707 (1981)........................................................9–10, 15–16, 18–19

*United States v. Amedy*,
    24 U.S. 392, 11 Wheat. 392 (1826) ............................................................13

*United States v. Lee*,
    455 U.S. 252 (1982)..............................................10–11, 18–19, 26–28

*United States v. Philadelphia Yearly Meeting of the Religious Soc'y of Friends*,
    322 F. Supp. 2d 603 (E.D. Pa. 2004) ........................................................10

*United States v. United Foods*,
    533 U.S. 405 (2001)....................................................................................39

*United States v. Williams*,
    553 U.S. 285, 304 (2008)......................................................................39–40

*Univ. of Great Falls v. NLRB*,
    278 F.3d 1335 (D.C. Cir. 2001) ..................................................................36

*W. Presbyterian Church v. Bd. of Zoning Adjustment of Dist. of Columbia*,
    849 F. Supp. 77 (D.D.C. 1994) ..................................................................43

*Wilson v. NLRB*,
    920 F.2d 1282 (6th Cir. 1990) ....................................................................38

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)........................................................................7, 9, 16, 28

*Wisconsin Gas Co. v. F.E.R.C.*,
    758 F.2d 669 (D.C. Cir. 1985) ....................................................................42

*Wooley v. Maynard*,
    430 U.S. 705, 714 (1977) ....................................................................... 38

*W.V. State Bd. of Educ. v. Barnette*,
    319 U.S. 624, 637 (1943) ....................................................................... 38

*Statutes*

U.S. Const. 1st Am. .................................................................................. *passim*

U.S. Const. 5th Am. ........................................................................................ 1,

5 U.S.C. § 553 ............................................................................................... 41

5 U.S.C. § 701 ................................................................................................. 1

5 U.S.C. § 706 ......................................................................................... 41–42

20 U.S.C. § 1688 .......................................................................................... 12

26 U.S.C. § 4980D ................................................................................... 6, 15

26 U.S.C. § 4980H ............................................................................. 6, 15, 27

26 U.S.C. § 5000A ................................................................................. 23, 27

29 U.S.C. § 1132 ...................................................................................... 6, 15

42 U.S.C. § 238n .......................................................................................... 12

42 U.S.C. § 300a-7 ....................................................................................... 12

42 U.S.C. § 300gg-13 ........................................................................... *passim*

42 U.S.C. § 1395w-22(j)(3)(B) .................................................................... 12

42 U.S.C. § 1396u-2(b)(3)(B) ...................................................................... 12

42 U.S.C. §18023 ......................................................................................... 11

42 U.S.C. § 2000bb *et seq.* ................................................................... *passim*

42 U.S.C. § 2000cc-5 ............................................................................... 8, 10

42 U.S.C. § 2000e-1(a) ................................................................................ 12

42 U.S.C. § 2996f(b)(8) ...............................................................................................12

IRC § 6033 ...................................................................................................................4

Pub. L. 111-148, §1563(e)-(f) "Conforming Amendments" ......................................6

Pub. L. No. 112-74, Title VII, § 507(d) ....................................................................12

Pub. L. No. 112-74, Title VII, § 727.....................................................................12, 17

Pub. L. No. 112-74, Title VII, § 808.....................................................................12, 17


*Regulations*

26 C.F.R. § 54.9815-2713T ..........................................................................................4

26 C.F.R. § 2590.715-2713...........................................................................................4

45 C.F.R. § 147.130 ........................................................................................4, 35, 37

48 C.F.R. § 1609.7001(c)(7) .......................................................................................12

75 Fed. Reg. 34,538 ....................................................................................................24

75 Fed. Reg. 41,726 .................................................................................................3, 41

76 Fed. Reg. 46,621 .......................................................................................... *passim*

77 Fed. Reg. 8,725 ...............................................................................................4, 27, 41

77 Fed. Reg. 16,501 ...............................................................................4–5, 17, 33, 41


*Other Authorities*

American Hospital Association, *Fast Facts on U.S. Hospitals*,
     http://www.aha.org/research/rc/stat-studies/fast-facts.shtml ...................................11

Bible, Matthew 6:24.....................................................................................................10

Cooper, Helene & Laurie Goodstein, "Rule Shift on Birth Control Is Concession to
     Obama Allies" (Feb. 10, 2012), *available at* http://www.nytimes.com/
     2012/02/11/health/policy/obama-to-offer-accommodation-on-birth-control-
     rule-officials-say.html?pagewanted=all ...................................................................26

Ctr. for Consumer Info. and Insurance Oversight and Ctrs. for Medicare & Medicaid
    Services, "Guidance on the Temporary Enforcement Safe Harbor for Certain
    Employers . . ." February 10, 2012, *available at* http://cciio.cms.gov/resources/
    files/ Files2/02102012/20120210-Preventive-Services-Bulletin.pdf ; and
    August 15, 2012, *available at* http://cciio.cms.gov/resources/files/prev-
    services-guidance-08152012.pdf ("HHS Bulletin") ......................................4, 27, 44

Ctrs. for Disease Control and Prevention, Morbidity and Mortality Weekly Report,
    *Prepregnancy Contraceptive Use Among Teens with Unintended Pregnancies
    Resulting in Live Births — Pregnancy Risk Assessment Monitoring System
    (PRAMS), 2004–2008*, 61(02) at 25-29 (Jan. 20, 2012), *available at*
    http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6102a1.htm?s_cid=mm610
    2a1_e ..............................................................................................................29–30

Duenas, J.L., et al., "Trends in the Use of Contraceptive Methods and Voluntary
    Interruption of Pregnancy in the Spanish Population During 1997–2007,"
    *Contraception*, January 2011, at 82–87. ..................................................................31

Edgardh, K., et al., "Adolescent Sexual Health in Sweden," 78 *Sexual
    Transmitted Infections* 352-56 (2002) *available at*
    http://sti.bmjjournals.com/cgi/content/full/78/5/352 ................................................31

FDA Birth Control Guide (Oct. 19, 2011),
    http://www.fda.gov/downloads/forconsumers/byaudience/
    forwomen/freepublications/ucm282014.pdf .............................................................5

Finer, L. B., and S. K. Henshaw, "Disparities in rates of unintended pregnancy
    in the United States, 1994 and 2001," 38(2) *Perspectives on Sexual & Reprod.
    Health* 90–96 (2006) *available at* http://www.guttmacher.org/
    pubs/journals/3809006.html......................................................................................31

Girma, Sourafel, David Paton, "The Impact of Emergency Birth Control on Teen
    Pregnancy and STIs," *Journal of Health Economic*, March 2011,  at 373–80.........31

Glasier, A., "Emergency Contraception," British Medical Journal (Sept 2006): 560-
    561.............................................................................................................................31

Guttmacher Institute, *Facts on Contraceptive Use in the United States*
    (June 2010) http://www.guttmacher.org/pubs/fb_contr_use.html. ..........................29

Guttmacher Institute, *Facts on Publicly Funded Contraceptive Services in the
    United States* (May 2012), *available at*
    http://www.guttmacher.org/pubs/fb_contraceptive_serv.html ................................33

HealthCare.Gov, *"Keeping the Health Plan You Have: The Affordable Care
Act and "Grandfathered" Health Plans,* (June 14, 2010)
http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-
plan-you-have-grandfathered.html..............................................................23–24, 27

HHS, News Release (January 20, 2012), *available at*
http://www.hhs.gov/news/press/2012pres/01/20120120a.html ..............................17

HHS, News Release (July 31, 2012), *available at*
http://www.hhs.gov/news/press/2012pres/07/20120731a.html ..............................44

HRSA, "Women's Preventive Services," *available at*
http://www.hrsa.gov/womensguidelines/....................................................................3

Inst. of Med., *The Best Intentions*, (1995). ...................................................................30–31

Inst. of Med., *Clinical Preventive Services for Women:
Closing the Gaps* (2011) .................................................................................29–31

Jones, R., J. Darroch & S.K. Henshaw, "Contraceptive Use Among U.S.
Women Having Abortions," 34 *Perspectives on Sexual and Reproductive
Health* 294–303 (2002). .........................................................................................29

Laycock, Douglas & Oliver S. Thomas, "Interpreting the Religious Freedom
Restoration Act," 73 *Tex. L. Rev.* 209, 224 (1994).............................................28, 34

Mosher WD & Jones J, *Use of contraception in the United States: 1982–2008,*
Vital and Health Statistics, 2010, Series 23, No. 29, at 14 and Table E (2010)
http://www.cdc.gov/NCHS/data/series/sr_23/sr23_029.pdf....................................29

Wallace, Kelly, "Health and Human Services Secretary Kathleen Sebelius Tells
iVillage "Historic" New Guidelines Cover Contraception, Not Abortion,"
iVillage (Aug. 2, 2011), *available at* http://www.ivillage.com/kathleen-
sebelius-guidelines-cover-contraception-not-abortion/4-a-
369771#ixzz28Z8TIkIH ..........................................................................................5

WhiteHouse.gov, "Remarks by the President on Preventive Care" (Feb. 10, 2012),
*available at* http://www.whitehouse.gov/the-press-office/2012/02/10/remarks-
president-preventive-care......................................................................................17

## **MEMORANDUM OF LAW**

This action arises because the federal government has deemed devout publishers of the Bible to be insufficiently "religious" to enjoy freedom in America.  For 50 years Tyndale House Publishers has not only evangelized through its publishing of the Bible and other Christian literature, but it donates nearly all its profits to religious, charitable and evangelistic non-profit causes.  Yet Defendants are mandating that Tyndale House Publishers violate its and its owners' beliefs by covering items in their health plan that they believe to cause early abortion, in violation of the Good Book they publish.   Defendants have already been the subject of a preliminary injunction against this mandate, so as to protect a company owned by religious believers.  *See Newland v. Sebelius*, 2012 WL 3069154 (D. Colo. July 27, 2012).

Defendants' mandate of insurance coverage subjects Tyndale to draconian penalties, including lawsuits by Defendant Secretary of Labor as well as fines and penalties accruing in the millions. Forcing Tyndale to choose between its faith and such penalties is a blatant violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*. (RFRA), the First and Fifth Amendments to the United States Constitution, and the Administrative Procedure Act, 5 U.S.C. § 701, et seq.  Defendants cannot satisfy the strict scrutiny required under RFRA and these laws. Defendants "completely undermine[d]" their alleged interests by exempting tens of millions of Americans and staying enforcement against many others, *Newland*, 2012 WL 3069154 at *7–*8 , yet they refuse to exempt Tyndale.   And the government could pursue, and already does pursue, the less restrictive means of directly delivering the drug items at issue here.  *Id.*

Tyndale is faced with imminent harm under Defendants' mandate.  The government refuses to consent to this motion and instead fully threatens its penalties.  Immediate injunctive relief is needed to protect Tyndale's religious freedom and preserve the status quo.

1

## FACTUAL BACKGROUND

As is set forth in Plaintiffs' Verified Complaint (which is evidentiary support for this motion), Plaintiffs Tyndale House Publishers, Inc. and Mark D. Taylor (collectively, hereinafter, "Tyndale"), are a Bible publishing company and its President and CEO.   Verified Complaint ("VC") ¶¶ 21–24, 63 (Doc. # 1). Dr. Kenneth E. Taylor and his wife, the parents of Mark Taylor, founded Tyndale House Publishers 50 years ago to publish Bibles and other Christian literature and media.  *Id*.  The next year, in 1963, Dr. Taylor founded the Tyndale House Foundation ("the Foundation"), a religious non-profit organization, in order to donate the proceeds of Dr. Taylor's work to religious and charitable causes.  VC ¶¶ 41–44.  In Dr. Taylor's words

> I had a strong conviction that the ability to write *Living Letters* was a special gift from God, and, because it was His word, He should get all the royalties. So we called on [an attorney] to set up a foundation with a board of directors who would be responsible to give the money away to properly qualified charitable causes.

*Id*.   The Foundation owns 96.5% of Tyndale House Publishers and therefore receives that percentage of distributed profits, in addition to payments from Tyndale House Publishers for royalties on Dr. Taylor's books.  VC ¶¶ 45–49.   With the proceeds of Tyndale House Publishers, the Foundation has donated $21.5 million to religious and charitable non-profit causes in the last five years alone.  Aff. of Mark D. Taylor at 1, Exh. 1 (attached).   The Foundation has used proceeds from Tyndale to benefit such ministries as: a Christian community center in the Chicago area that provides after school programming for children from low-income families and housing for homeless teens; Cabrini Green Legal Aid Clinic which provides disadvantaged people with legal assistance; and evangelistic work worldwide.  *Id.*

Consistent with these practices, Tyndale House Publishers' articles of incorporation declare that it is organized to "engage as a publisher of Christian and faith-enhancing books, periodicals, tracts, pamphlets, and other media of communication; and to engage in any related

business that may be lawful."  VC ¶ 25.  Tyndale House Publishers' operations are extensively religious:  their mission and goals are religious, they conduct prayer, Bible studies, charitable and service outreach, they tithe their pre-tax income, and they engage in many other activities in an attempt to live and operate according to the Book they publish.  VC ¶¶ 26–39.  Tyndale House Publishers is controlled by another of its co-owning entities, Tyndale Trust, whose trustees adhere to an evangelical Christian statement of faith and who are required to be the same individuals as those who comprise the Tyndale House Publishers' Board of Directors.  VC ¶¶ 52–59.  A small percentage of Tyndale House Publishers is also owned by two trusts benefitting Dr. Kenneth Taylor's widow and children, who also share Tyndale's beliefs.  VC ¶¶ 60–62.

Despite being a thoroughly religious Bible publisher that donates nearly all its proceeds to religious non-profit efforts, the government in this case has deemed it not a "religious employer" so as to justify forcing it to violate its religious beliefs.  This odd classification arose during implementation of the Patient Protection and Affordable Care Act of 2010 (PPACA).  PPACA requires health plans to include coverage of preventive health services at no cost-sharing to patients, but does not define what is includes in those services.  42 U.S.C. § 300gg-13(a)(4).  Defendants issued regulations ordering HHS's Health Resources and Services Administration (HRSA) to decide what would be mandated as women's preventive care.  75 Fed. Reg. 41726–60 (July 19, 2010).  HRSA issued such guidelines in July 2011, mandating coverage of "All Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."  HRSA, "Women's Preventive Services," *available at* http://www.hrsa.gov/womensguidelines/ .

Thereafter, Defendants issued an "interim final rule" endorsing HRSA's guidelines as applied to plan years beginning after August 1, 2012, and granting "additional discretion" to

HRSA to exempt from this requirement what it defined as "religious employers."  76 Fed. Reg. 46621–26 (Aug. 3, 2011).  In this regulation, Defendants defined "religious employers" in such a narrow way that Tyndale the Bible publisher is not "religious."  To be a religious employer under Defendants' definition, an entity must meet *all* of the following four factors:

(1)     The inculcation of religious values is the purpose of the organization;

(2)     The organization primarily employs persons who share the religious tenets of the organization;

(3)     The organization serves primarily persons who share the religious tenets of the organization;

(4)     The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

45 C.F.R. § 147.130(a)(1)(iv)(B)(1)–(4) (HHS); *see also* 26 C.F.R. § 54.9815-2713T (Treasury); 29 C.F.R. § 2590.715-2713 (Labor).  Notably, this fourth factor only includes churches, church auxiliaries, and religious orders.  See IRC §§ 6033(a)(1), 6033(a)(3)(A)(i) & (iii).

Defendants finalized this mandate and exemption, "without change," in February 2012. 77 Fed. Reg. 8725, 8729 (Feb. 15, 2012).  (This collection of regulations and its penalties is referred to hereinafter as "the Mandate.").  Defendants likewise used their unfettered discretion on at least two occasions to issue rules that allow many religious organizations to avoid government enforcement of the Mandate for an extra year.[1]  However, both versions of those rules explicitly excluded Tyndale from this "safe harbor" by virtue of declaring that it only applies to non-profit entities.  *Id.*  And Defendants used their discretion to propose even more accommodations for some religious entities, but not for Tyndale because it is for-profit.  77 Fed.

---

[1] *See* Center for Consumer Information and Insurance Oversight and Centers for Medicare & Medicaid Services, "Guidance on the Temporary Enforcement Safe Harbor for Certain Employers . . ." February 10, 2012, *available at* http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf , and August 15, 2012, *available at* http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf .

Reg. 16501 (Mar. 21, 2012).   The fact that Tyndale has always been a Bible publisher, pays out nearly all its profits to religious non-profit charities, and is owned by devout religious believers, still does not qualify it for Defendants' "religious" exemptions and accommodations.

The Mandate directly conflicts with the religious beliefs of Tyndale and its owners. Tyndale House Publishers has 260 full-time employees and offers them a generous health insurance plan in which Tyndale acts as a self-insurer.  VC ¶¶ 71–73.  Tyndale and its owners adhere to the centuries-old biblical view of Christians around the world, that every human being is made in the image and likeness of God from the moment of its conception/fertilization, and that to help destroy such an innocent being, including in the provision of coverage in health insurance, would be an offense against God.  VC ¶¶ 39, 51, 59, 62.  But the "FDA-approved contraceptive methods" imposed upon Tyndale's health plan include products such as IUDs, and "emergency contraceptives" such as Plan B (commonly known as the "morning-after pill") and Ella (commonly known as the "week-after pill").  VC ¶¶ 81.   Tyndale and its owners believe that these "contraceptive" items can also function—as their FDA-required labeling admits—in ways that cause the demise of recently fertilized embryos before they can *implant* into the mother's uterus.[2]  VC ¶¶ 81–83.  To Tyndale and its owners, this is not morally different than surgical abortion.  VC ¶¶ 75.  Therefore, based on this sincere religious objection, Tyndale and its owners have never included emergency contraception, IUDs, or abortion in their employee health plan.  *Id*.

---

[2] *See* FDA Birth Control Guide (Oct. 19, 2011), http://www.fda.gov/downloads/forconsumers/byaudience/forwomen/freepublications/ucm282014.pdf (last visited October 6, 2012) (describing action of various FDA-approved contraceptives).  Defendant Secretary Sebelius herself admits that these items, included in the FDA's "contraceptives" category, "prevent fertilization *and implantation*. . . .These covered prescription drugs are specifically those that *are designed to prevent implantation*."   Kelly Wallace, "Health and Human Services Secretary Kathleen Sebelius Tells iVillage "Historic" New Guidelines Cover Contraception, Not Abortion," iVillage (Aug. 2, 2011), *available at* http://www.ivillage.com/kathleen-sebelius-guidelines-cover-contraception-not-abortion/4-a-369771#ixzz28Z8TlkIH (last visited Oct. 6, 2012).  The government might believe that fertilized embryos are not persons, but it admits that FDA contraceptives cause their demise by preventing implantation.

Defendants have now mandated that Tyndale violate its deeply held religious beliefs by immediately inserting coverage of abortifacients (and education and counseling in favor of the same) into its employee health plan.  This is something Tyndale cannot comply with in good conscience.  VC ¶¶ 75, 88–89.  Tyndale would render itself a hypocrite to the world, to its authors, to Christians who hear Tyndale's message, and to God Himself, if they published God's Word while using their company to help destroy His image and likeness.  VC ¶¶ 112.

Tyndale's health plan began on October 1, 2012.  VC ¶ 74.  Therefore the Mandate— applicable to plans beginning after August 1, 2012—presently triggers a variety of harsh penalties against Tyndale for not violating its religious beliefs.  VC ¶ 90.  Section 1563 of PPACA incorporates the preventive care requirement into the Internal Revenue Code as well as ERISA.  See "Conforming Amendments," Pub. L. 111-148, §1563(e)–(f).  Thereunder, Department of Labor Defendants have authorized themselves to sue Tyndale for omitting the objectionable mandated coverage, and those suits could specifically force Tyndale to violate its beliefs by providing the abortifacient coverage.  29 U.S.C. § 1132.  PPACA also triggers penalties through the Treasury Department Defendants of approximately $100 per employee *per day* on Tyndale if it continues providing its employees with generous health insurance coverage but omits the mandated items to which it and its owners object.  26 U.S.C. § 4980D. Furthermore, the law imposes a $2,000 per employee per year penalty on Tyndale if it were to injure its employees by dropping health insurance altogether. 26 U.S.C. § 4980H; VC ¶ 94. Tyndale cannot afford to sustain the Mandate's penalties.  Exh, 1 at 2.

This Court is the only recourse to protect Tyndale and its owners from the Mandate's assault on the religious freedom and its absurd definition deeming a Bible publisher as not being religious.  VC ¶¶ 87, 144.  Tyndale has no adequate remedy at law.  VC ¶ 146.  It faces

immediate threat of the Mandate's penalties, and endangerment of its employees' health plan, unless this Court orders preliminary injunctive relief as soon as possible.  Tyndale is suffering irreparable harm by Defendants' coercion, which blatantly violates longstanding religious conscience, speech and other protections found in federal statutes and the constitution.  VC ¶ 145.    Recognizing it had no other options, Tyndale filed its complaint on October 2, 2012 to challenge the Mandate on a variety of federal law grounds and seek injunctive relief.

## ARGUMENT

In considering whether to grant a preliminary injunction, the Court balances "(1) the movant's showing of a substantial likelihood of success on the merits, (2) irreparable harm to the movant, (3) substantial harm to the non-movant, and (4) public interest."  *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291 (D.C. Cir. 2009).  As explained below, Tyndale meets these requirements and is therefore entitled to a preliminary injunction.  One court has already issued a preliminary injunction against Defendants and this Mandate, on behalf of a for-profit entity run by religious believers in Denver, Colorado.  *Newland v. Sebelius*, 2012 WL 3069154 (D. Colo. July 27, 2012).

## I.    TYNDALE IS LIKELY TO SUCCEED ON THE MERITS.

### A.    The Mandate violates the Religious Freedom Restoration Act.

Congress passed RFRA to subject government burdens on religious exercise to "the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)."  42 U.S.C. § 2000bb(b)(1); *see generally Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424, 431 (2006) (describing origin and intent of RFRA, 42 U.S.C. § 2000bb *et seq.*).  Under RFRA, the federal government may not "substantially burden" a person's exercise of religion unless the government "'demonstrates that

application of the burden to the person' represents the least restrictive means of advancing a compelling interest." *O Centro*, 546 U.S. at 423 (quoting 42 U.S.C. § 2000bb-1(b)); *see also Kaemmerling v. Lappin*, 553 F.3d 669, 677–79 (D.C. Cir. 2008) (discussing RFRA).[3]  Once a plaintiff demonstrates a substantial burden on his religious exercise, RFRA requires that the compelling interest test be satisfied not generically, but with respect to "the particular claimant." *O Centro*, 546 U.S. at 430–31.[4]

> 1. *Tyndale's abstention from providing abortion-inducing drugs in employee coverage qualifies as "religious exercise" under RFRA.*

RFRA broadly defines "religious exercise" to "include[] any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" 42 U.S.C. § 2000bb-2(4), *as amended by* 42 U.S.C. § 2000cc-5(7)(A).  A plaintiff's "claimed beliefs 'must be sincere and the practice[] at issue must be of a religious nature.'"  *Kaemmerling*, 553 F.3d at 678 (quoting *Levitan v. Ashcroft*, 281 F.3d 1313, 1320 (D.C. Cir. 2002).

To *refrain* from morally objectionable activity is part of the exercise of religion.  Both the Supreme Court and the D.C. Circuit have recognized that the "exercise of religion" encompasses a belief that one must avoid participation in certain acts.  *See, e.g.*, *Employment Division v. Smith*, 494 U.S. 872, 877 (1990) (explaining under the Free Exercise Clause that that "the 'exercise of religion' often involves not only belief and profession but the performance of (*or abstention from*) physical acts"); *Kaemmerling*, 553 F.3d at 678 (reasoning that "religious exercise" under RFRA embraces "action *or forbearance*") (emphases added).  Thus, a person

[3]"[T]he portion [of RFRA] applicable to the federal government…survived the Supreme Court's decision striking down the statute as applied to the States." *Henderson v. Kennedy*, 265 F.3d 1072, 1073 (D.C. Cir. 2001) (discussing *City of Boerne v. Flores*, 521 U.S. 507 (1997)).  RFRA applies "to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993." 42 U.S.C. § 2000bb-3(a) (2000).
[4] The government's burden to satisfy strict scrutiny under RFRA is the same at the preliminary injunction stage as at trial.  *See O Centro*, 546 U.S. at 429-30 (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)).

exercises religion by *avoiding* work on certain days (*see Sherbert*, 374 U.S. at 399), or by *refraining* from sending children over a certain age to school (*see Wisconsin v. Yoder*, 406 U.S. 205, 208 (1972)).  *See* 42 U.S.C. § 2000bb(b)(1) (incorporating *Sherbert* and *Yoder* in RFRA). Similarly, a person's religious convictions may compel her to *refrain* from facilitating prohibited conduct by others. *See, e.g.*, *Thomas v. Review Bd.*, 450 U.S. 707, 714–16 (1981) (recognizing religious exercise in refusing to "produc[e] or directly aid[] in the manufacture of items used in warfare").

As explained above, Tyndale's religious beliefs direct it to not only respect embryonic human life, but also to refrain from providing and covering methods that could cause what they believe to be early abortions (as well as late ones).  To offer such coverage through its employee insurance policy would violate Tyndale's faith.  As a self-insurer, if Tyndale's plan covered items that it believes cause early abortions, Tyndale itself would be buying those abortifacient items for its employees.  Tyndale cannot credibly maintain its religious identity and integrity as an evangelical Christian Bible publisher that directs its proceeds to Christian ministry and charity, while at the same time covering and paying for practices contrary to the Good Book that it publishes.  *See generally* VC ¶¶ 39, 88, 89, 112.  Accordingly, Tyndale's abstention from doing what the mandate requires qualifies as "religious exercise" within the meaning of RFRA.

a.   Tyndale House Publishers exercises religious beliefs.

In several lawsuits against this Mandate, the government has argued that a for-profit entity is categorically incapable of exercising religion.  This position is flawed on a number of levels.  First, Tyndale is undeniably and thoroughly religious and thus can exercise religious beliefs.  It is and has always been a publisher of Bibles and other Christian media.  VC ¶¶ 21–24. Its articles of incorporation explicitly state its purpose to publish "Christian and faith-enhancing"

media.  VC ¶ 25.  Moreover, Tyndale was founded not as an effort to sell things to Christians, but to evangelize through publishing, to share the "gift" from God that Dr. Kenneth Taylor believed he was given to communicate the Gospel's message to the world, and then to direct nearly all its profits to religious, charitable and evangelistic non-profit endeavors.  VC ¶ 44.  And Tyndale has undertaken these efforts from an evangelistic motive and method, making extensive charitable contributions and operating in a Christian workplace.  VC ¶¶ 26–38, 44–49.

Second, the "free exercise of religion" in RFRA, and in the First Amendment that RFRA explicitly seeks to enhance, has always been recognized as including the exercise of religion in all areas of life including in business and "profitable" enterprise.  There is simply no "business exception" to RFRA to the First Amendment.  RFRA protects "any" exercise of religion.  42 U.S.C. § 2000bb-2(4); 42 U.S.C. § 2000cc-5(7)(A); *see also United States v. Philadelphia Yearly Meeting of the Religious Soc'y of Friends*, 322 F. Supp. 2d 603 (E.D. Pa. 2004) (Quaker Church's refusal to levy its employee's wages was an exercise of religion under RFRA).  The government's proposal that a business corporation has no capability to exercise religion is "conclusory" and "unsupported." *McClure v. Sports and Health Club, Inc.*, 370 N.W.2d 844, 850 (Minn. 1985).   Both *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119–20 & n.9 (9th Cir. 2009), and *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 620 n.15 (9th Cir. 1988), recognized that a for-profit and even "secular" corporation could assert free exercise claims.

The government's premise seems to be that one cannot exercise religion while engaging in business.[5]  But judicially the context of free exercise has usually involved the pursuit of financial gain.  In *Sherbert*, 374 U.S. at 399, an employee's religious beliefs were burdened by

---

[5] The government appears to adopt a literal interpretation of the Bible's injunction that you "cannot serve both God and money," Matthew 6:24.  But no federal law enacts the government's particular reading of the Gospel of Matthew as a limitation on religious exercise.

not receiving unemployment benefits; likewise in *Thomas*, 450 U.S. at 709.  In *United States v. Lee*, 455 U.S. 252, 257 (1982), the Court held an employer's religious beliefs were sufficiently burdened by paying taxes for workers so as to require the government to justify its burden.  In *Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 360 (3d Cir. 1999), an employee's bid to continue his employment was burdened by discriminatory grooming rules.  Many other cases have recognized that business corporations can exercise religion.  *See, e.g., Jasniowski v. Rushing*, 678 N.E.2d 743, 749 (Ill. App. Dist. 1, 1997) (for profit corporation may assert free exercise claim), *vacated*, 685 N.E.2d 622 (Ill. 1997).  *Morr-Fitz, Inc. et al. v. Blagojevich*, No. 2005-CH-000495, slip op. at 6–7, 2011 WL 1338081 (Ill. Cir. Ct. 7th, Apr. 5, 2011) (ruling in favor of the free exercise rights of three pharmacy corporations and their owners); *Roberts v. Bradfield*, 12 App. D.C. 453, 464 (D.C. Cir. 1898) (recognizing that the right of "free exercise of religion" inheres in "an ordinary private corporation").  *See also Commack Self-Service Kosher Meats, Inc. v. Hooker*, 800 F. Supp. 2d 405 (E.D.N.Y. 2011) (analyzing free exercise claims without regard profit motive); *Maruani v. AER Services, Inc.*, 2006 WL 2666302 (D. Minn. 2006) (analyzing religious First Amendment claims by a for-profit business).  A court analyzing a free exercise claim does not ask whether the claimant is the right category of person; it asks "whether [the challenged statute] abridges [rights] that the First Amendment was meant to protect."  *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978).

Congress has rejected the government's restrictive view in many ways.  PPACA itself lets employees and "facilit[ies]" assert religious beliefs for or against "provid[ing] coverage for" abortions generally, without requiring them to be non-profits.[6]  42 U.S.C. § 18023.  Congress has

---

[6] One out of every five community hospitals is for-profit.  American Hospital Association, http://www.aha.org/research/rc/stat-studies/fast-facts.shtml (last visited October 6, 2012).

repeatedly authorized similar objections, including to contraceptive insurance coverage.[7]  These protections cannot be reconciled with the government's view that anything connected with commerce excludes religion.

Third, the government has tended to confuse the protection of "any" "exercise of religion" under RFRA, with narrower categories such as "religious employer" in Title VII employment discrimination.  See 42 U.S.C. § 2000e–1(a).  This argument cannot help the government in this case, for two reasons.  Initially, the text Congress used in RFRA did not limit its protections to a "religious corporation, association, or society" as stated in its previously enacted statute of Title VII.  Congress instead protected the "exercise of religion," period, by anyone.  To read a "religious employer" limit into RFRA would violate the text of the statute.  *Cf. Norinsberg v. U.S. Dept. of Agric.*, 162 F.3d 1194, 1200 (D.C. Cir. 1998) ("Congress' different wording from past indicates intent that new word has different meaning"; citation omitted).  And more specific to this case, Tyndale *is* a "religious corporation" under Title VII.  *Cf. LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007) (using totality of the circumstances approach, citing multiple circuits).  The government can point to nothing but Tyndale's for-profit corporate status to argue otherwise—but Tyndale directs nearly all its proceeds to religious charity, negating even that factor.  In any event, RFRA protects "free exercise of religion," which does not turn on whether the plaintiff is a "religious corporation."

Fourth, to the extent that the government might argue RFRA only protects religious exercise by "persons," and that persons do not include corporations, this argument contradicts clear Supreme Court precedent.  "First Amendment protection extends to corporations," and a

---

[7] *See, e.g.,* Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, Title VII, Div. C, § 727; *id.* at Title VIII, Div. C, § 808; *see also* 42 U.S.C. § 300a-7; 42 U.S.C. § 2996f(b)(8); 20 U.S.C. § 1688; 42 U.S.C. § 238n; 42 U.S.C. § 1396u-2(b)(3)(B); 42 U.S.C. § 1395w-22(j)(3)(B); and Pub. L. 112-74, Title V, § 507(d). See also 48 C.F.R. § 1609.7001(c)(7).

First Amendment right "does not lose First Amendment protection simply because its source is a corporation." *See Citizens United v. Federal Election Comm'n*, 130 S. Ct. 876, 899 (2010). The lead plaintiff in *O Centro* itself was an entity rather than a natural person, and the Supreme Court vindicated free exercise rights on behalf of *Church of the Lukumi Babalu Aye, **Inc.** v. City of Hialeah*, 508 U.S.520 (1993) (emphasis added). "[I]t is well understood that corporations should be treated as natural persons for virtually all purposes of constitutional and statutory analysis." *Monell v. Dept. of Social Services*, 436 U.S. 658, 687 (1978). "That corporations are in law, for civil purposes, deemed persons is unquestionable." *United States v. Amedy*, 24 U.S. 392, 11 Wheat. 392 (1826). "[C]orporations possess Fourteenth Amendment rights . . . through the doctrine of incorporation, [of] the free exercise of religion." *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295 (11th Cir. 2006). It must be presumed that when Congress passed RFRA to build on the First Amendment's protection of free exercise of religion, it was aware of the centuries-old judicial interpretation that corporations are "persons" with constitutional rights. *See Lindahl v. Office of Personnel Management*, 470 U.S. 768 (1985) ("Congress is presumed to be aware of an administrative or judicial interpretation . . . ." (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n. 8 (1975))). If for-profit corporations can have no First Amendment "purpose," this would overturn the Supreme Court's vindication of First Amendment rights for for-profit companies such as the New York Times. *See New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

<u>b.</u>    <u>Tyndale's religious owners can exercise religion under RFRA.</u>

Tyndale can and is bringing free exercise of religion claims on behalf of not only itself but its religious owners. VC ¶¶ 10, 40. Tyndale's 96.5% owner is Tyndale House Foundation, a religious non-profit organization. VC ¶¶ 41, 42, 45. The government cannot maintain that such

an entity is not religious or cannot exercise religious beliefs, since it has conceded as much in its accommodations, exemptions and non-enforcement for religious non-profit organizations. Tyndale is also controlled by Tyndale Trust, which is an explicitly religious entity requiring a Christian statement of faith, and which exists to maintain the religious identity of Tyndale House Publishers.  VC ¶¶ 52–59.  The remaining small portion of shares are owned by the widow and children of Dr. Kenneth Taylor as trustees, who are natural persons sharing Tyndale's beliefs. VC ¶¶ 60–62.  Co-plaintiff Mark D. Taylor, as president/board member/trustee involved in all these entities, is a religious person.  VC ¶¶ 64–67.  All of these owners share Tyndale's religious beliefs against abortifacient provision in Tyndale's health plan.  VC ¶¶ 39, 51, 59, 62.

Several cases recognize a corporation can assert religious beliefs on behalf of its owners when the government requires the corporation to do things in violation of the owners' religious beliefs.  This is because a business is an extension of the moral activities of its owners and operators.  Both *Stormans*, 586 F.3d at 1119–20 & n.9, and *Townley*, 859 F.2d at 620 n.15, affirm that the owners of a for-profit and even "secular" corporation had their religious beliefs burdened by regulation of that corporation, and that the corporation could sue on behalf of its owners to protect those beliefs.  *See also McClure*, 370 N.W.2d at 850.  To the extent the government argues that Tyndale's owners are "free" to abandon their Bible publishing enterprise and sell it to a secular company that will comply with the Mandate, such expulsion from Bible publishing would be an extreme form of government burden.

2.   *The Mandate substantially burdens Tyndale's and its owners' religious exercise.*

Not only does the Mandate burden Tyndale's and its owners exercise of religious beliefs, but the burden is substantial.  The government "substantially burdens" religious exercise when it

puts "'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling*, 553 F.3d at 678 (quoting *Thomas*, 450 U.S. at 718).

The mandate directly orders Tyndale to provide employees with insurance coverage that Tyndale and its owners believe implicate them in facilitating early abortion.   If Tyndale continues to offer insurance lacking the mandated coverage, which it is doing now, it faces a penalty of $100 per day per employee, as well as the prospect of lawsuits by the Defendant Secretary of Labor and by its own plan participants.   26 U.S.C. § 4980D(a), (b) (financial penalties); 29 U.S.C. § 1132(a) (providing for civil enforcement actions by the Secretary of Labor, as well as by plan participants).   Alternatively, if Tyndale ceased offering employee insurance altogether, this would not only harm its 260 employees but subject it to an annual assessment of $2,000 per employee.   26 U.S.C. § 4980H.   These mandates violate Tyndale's beliefs and religious integrity, and subject it to competitive disadvantages.   VC ¶¶ 108–13.

To call these burdens "substantial" is an understatement.   The Supreme Court has struck down religious burdens far less dramatic.   For instance, *Sherbert* involved a plaintiff who was not required to work on the Sabbath, but was merely denied unemployment benefits for refusing such work, and the Court deemed this an "unmistakable" substantial pressure on the plaintiff to abandon that observance.   *Sherbert*, 374 U.S. at 404 (reasoning that the law "force[d] [plaintiff] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand," and that "the pressure on her to forego that practice is unmistakable"); *see also Thomas*, 450 U.S. at 717–18 (finding burden on religious exercise "[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith. . . thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs").   *Sherbert* and *Thomas*

therefore declared even "indirect" pressure to be a substantial burden.  *See Thomas*, 450 U.S. at 718 (explaining "[w]hile the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial").

With "direct" pressure, the Supreme Court has been even more exacting.  For instance, *Yoder* struck down a *five dollar fine* on Amish parents for not sending their children to high school.  *See, e.g.*, *Yoder*, 406 U.S. at 208 (observing that the parents were "fined the sum of $5 each").  The Court reasoned that "[t]he [law's] impact" on religious practice was "not only severe, but inescapable, for the. . . law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Id.* at 218.  This exactly describes the Mandate on its face: it "affirmatively compels" Tyndale, under threat of severe consequences—lawsuits by the Defendants, fines, regulatory penalties, a prohibition on providing employee health benefits, competitive disadvantage—"to perform acts undeniably at odds with the fundamental tenets of their religious beliefs."  *Yoder*, 406 U.S. at 218.  Tyndale could avoid this steep price, of course, by abandoning its religious convictions about participating in activities it believes destructive of nascent human life.  But it is black letter law that "[a] substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs[.]'"  *Kaemmerling*, 553 F.3d at 678 (quoting *Thomas*, 450 U.S. at 718); *see also Lee*, 455 U.S. at  254 ($27,000 penalty).

Defendants themselves have acted as if they understand this kind of burden.  The Mandate contains an exemption for certain churches and religious orders, in order to "take[] into account the effect on the religious beliefs of certain religious employers."  76 Fed. Reg. at 46623. And both Defendant Sebelius and President Obama have publicly recognized that the Mandate burdens religious believers.  In her January 20 announcement previewing the one-year safe

16

harbor, Secretary Sebelius stated that the extension "strikes the appropriate balance between respecting religious freedom and increasing access to important preventative services."[8] Likewise, in his February 10 press conference President Obama acknowledged that religious liberty is "at stake here" because some institutions "have a religious objection to directly providing insurance that covers contraceptive services."[9]   The President explained that this religious liberty interest is why "we originally exempted all churches from this requirement." Finally, the basic premise of the Defendants' most recent rule-making on the Mandate is to explore alternate insurance arrangements that would avoid burdening religious organizations' consciences.   *See* 77 Fed. Reg. 16501, 16503. These statements candidly acknowledge that coercing religious objectors substantially burdens their religious exercise.[10]

The United States District Court for the District of Colorado ruled that the Mandate threatens a substantial burden on the religious beliefs of a for-profit company run by religious believers, such that a preliminary injunction is warranted.  *Newland*, 2012 WL 3069154 at *6.  A court in Missouri disagreed, however, and accepted the government's argument that health insurance provision of abortion-inducing pills, contraception or sterilization is not a substantial burden.  *O'Brien v. U.S. Dep't of Health & Human Srvs.*, 2012 WL 4481208 (E.D. Mo. 2012). The *O'Brien* decision is both incorrect and inapplicable to Tyndale.

*O'Brien* said that payment into a health insurance plan that covers objectionable practices is merely "indirect financial support of a practice," in contrast to "directly and inevitably

---

[8] The Secretary's statement regarding the one-year extension can be found at: http://www.hhs.gov/news/press/2012pres/01/20120120a.html (last visited October 6, 2012).

[9] A transcript of the President's remarks is available at http://www.whitehouse.gov/the-press-office/2012/02/10/remarks-president-preventive-care (last visited October 6, 2012).

[10] Congress has elsewhere recognized the need to accommodate the same burden.  *See, e.g.,* Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, Title VII, Div. C, § 727 (protecting religious health plans in the federal employees' health benefits program from being forced to provide contraceptive coverage); *id.* at Title VIII, Div. C, §  808 (affirming that the District of Columbia must respect the religious and moral beliefs of those who object to providing contraceptive coverage in health plans).

prevent[ing] plaintiffs from acting in accordance with their religious beliefs." *Id.* at *6. This is not factually true regarding Tyndale, because while the plaintiff in *O'Brien* paid an insurance company, Tyndale's health plan is self-insured. The Mandate is forcing Tyndale to directly pay for objectionable items itself, not to pay an external insurance company for coverage—there is no factual separation from the payment. And Tyndale contends that coverage of abortifacients itself— not merely use—is a violation of their religious beliefs. VC ¶¶ 39, 51, 59, 62, 75. More fundamentally, *O'Brien* is an impermissible judicial decision of moral theology: a determination that promotion of abortifacients is morally acceptable if it is not too proximate. The Supreme Court rejected the same attempt in *Thomas*, where the government deemed the armament manufacturing activity to which the plaintiff objected "sufficiently insulated" from his objection to war. 450 U.S. at 715. "Thomas drew a line, and it is not for us to say that the line he drew was an unreasonable one. Courts should not undertake to dissect religious beliefs . . . ." *Id.*

O'Brien likewise contradicts *Lee*, which explicitly held that the for-profit religious plaintiff had met its showing to establish a sufficient burden for a free exercise of religion claim. 455 U.S. at 257. In doing so, the Court rejected the government's attempt to insist that despite the plaintiff's sincerity of beliefs, there was no substantial burden on "the integrity of the Amish religious belief or observance." *Id.* Instead the Supreme Court found the burden sufficiently "interferes with the free exercise rights of the Amish." *Id.* *Lee* said that determining the burden did not sufficiently violate the faith to satisfy a free exercise claim would be an interpretation of faith that is "not within 'the judicial function and judicial competence'" *Id.* (quoting *Thomas*, 450 U. S. at 716). *O'Brien*'s attempt to judge between different levels of moral culpability is incompatible with the Supreme Court's and this Circuit's definition of substantial burden, by which it is not a measure of religious beliefs, but is a measure of the "pressure" the government

18

applies against beliefs. *Kaemmerling*, 553 F.3d at 678 (quoting *Thomas*, 450 U.S. at 718). As explained above, the Mandate here explicitly orders a violation of beliefs and imposes intense penalties as pressure to do so.

The Mandate here is even more proximate than the substantial burden found in *Lee*, because the plaintiffs here must provide objectionable coverage directly to other private citizens, whereas in *Lee* they sent the money to a multi-trillion dollar budget in Washington. Likewise, the mere fact that if Tyndale pays for abortifacient drugs, they are first obtained by employees, is a theological distinction that does not undermine the substantiality of a burden on religious exercise. *O'Brien* would constrain free exercise to "ritual," the "Sabbath" and child-rearing, but would allow the government to coerce believers to help other people engage in objectionable activities. *O'Brien*, 2012 WL 4481208 at *6. This idea severely constricts the First Amendment and RFRA (which protects "any" free exercise of religion, not merely freedom of worship). Instead, *Lee* requires that the Court recognize a sufficient burden showing and apply the applicable scrutiny level, which is strict scrutiny under RFRA and *O Centro*.

Similarly inapplicable to this case is *Mead v. Holder*, 766 F. Supp. 2d 16 (D.D.C. 2011), and *Seven-Sky v. Holder*, 661 F.3d 1, 5 n.4 (D.C. Cir. 2011). In *Mead*, the Court reasoned that because "Plaintiffs routinely contribute to other forms of insurance, such as Medicare, Social Security, and unemployment taxes," they could not object to being required to purchase insurance for themselves. 766 F. Supp. 2d at 42. But *Mead* is distinct for several reasons. First, *Mead* observed that the law allowed plaintiffs to enter a "health sharing ministry" and that plaintiffs were willing to do so. *Id.* Here the government does offer "escape clauses," even to religious organizations—but it denies them to Tyndale, instead forcing Tyndale to choose between violating its conscience and being penalized. In this respect, as noted above, the federal

government has already conceded that this particular Mandate substantially burdens religious exercise.   No similar selective regime was considered in *Mead/Seven-Sky*.   Second, in *Mead* the requirement was deemed no different than paying a tax.   *Id.*; see also *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2595–97 (2012) ("individual mandate" is simply a tax, is mild in cost, is not punitive, involves no other penalties, and non-compliance is not "illegal").   But the Mandate in the present case is a substantive Mandate first and foremost (42 U.S.C. § 300gg-13) rendering its violation illegal and multiple penalties as discussed above.   This Mandate is not analogous to paying taxes, which sustain the government's own programs—it instead requires Tyndale to buy abortifacient coverage and items for private parties.   The *Mead* plaintiffs' objection was broader and applied to paying into any insurance, but Tyndale's objection is not so broad.   Third, the fact that everyone is required to pay taxes does not give the government a license to coerce citizens to *do* whatever it *funds*, from capital punishment to war to animal vivisection.   Otherwise, *Thomas* could not have recognized a free exercise right not to manufacture tank turrets, since all citizens pay taxes to purchase those same tanks.   450 U.S. at 709–11, 718.   *Lee*, too, found the objection to paying taxes a sufficient burden.

The government is also foreclosed from arguing that merely because a corporation provides its owners limited liability, there is no religious burden on the owners.   That conclusion does not follow.   Limited liability is merely one characteristic of a business corporation, and it is not the morally relevant one here.   Tyndale's religious owners have adopted beliefs that make it immoral for them to implement the Mandate's commands through the entity they own for religious purposes.   This is why *Stormans* and several other cases concluded matter-of-factly that a government burden on a business corporation is a burden on its close holding family owners and directors.   586 F.3d at 1119–20; *McClure*, 370 N.W.2d at 850; *Jasniowski*, 678 N.E.2d at

20

749; *Morr-Fitz, Inc.*, No. 2005-CH-000495, slip op. at 6–7. Limited liability is not a talisman by which the government may trample on the religious beliefs of business owners.

      *3.   The Mandate cannot satisfy strict scrutiny.*

Defendants cannot establish that their coercion of Tyndale is "in furtherance of a compelling governmental interest."  RFRA, with "the strict scrutiny test it adopted," *O Centro Espirita*, 546 U.S. at 430, imposes "the most demanding test known to constitutional law." *City of Boerne*, 521 U.S. at 534.  A compelling interest is an interest of "the highest order," *Lukumi*, 508 U.S. at 546, and is implicated only by "the gravest abuses, endangering paramount interests," *Thomas v. Collins*, 323 U.S. 516, 530 (1945).

  Defendants cannot propose such a generalized interest "in the abstract," but must show a compelling interest "in the circumstances of this case" by looking at the particular "aspect" of the interest as "addressed by the law at issue."  *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000); *O Centro Espirita*, 546 U.S. at 430–32 (RFRA's test can only be satisfied "through application of the challenged law 'to the person'—the particular claimant"); *see also Lukumi,* 508 U.S. at 546 (rejecting the assertion that protecting public health was a compelling interest "in the context of these ordinances").  The government must "specifically identify an 'actual problem' in need of solving" and show that coercing Tyndale is "actually necessary to the solution." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (June 27, 2011).   If Defendants' "evidence is not compelling," they fail their burden.  *Id.* at 2739.  To be compelling, the government's evidence must show not merely a correlation but a "caus[al]" nexus between their Mandate and the grave interest it supposedly serves.  *Id.*  The government "bears the risk of uncertainty . . . ambiguous proof will not suffice."  *Id.*

Defendants' interest in coercing Tyndale to provide coverage of abortifacients is not compelling. In other cases the government has attempted to identify two interests—women's health and equality by reducing unintended pregnancy—as justifying the Mandate under RFRA. But these interests are generic and abstract. In *O Centro Espirita*, the Court held evidence to be insufficient showing that Schedule I controlled substances were "extremely dangerous," because that "categorical" support could not meet the government's RFRA burden to consider the "particular" exception requested by Tyndale. *Id.* at 432.

The simple fact is that even if abortifacient drugs are assumed to provide health and equality to women, Defendants have not shown a compelling interest to deliver those benefits by means of coercing Tyndale itself. As discussed below, the government already delivers and subsidizes abortifacients to women and could do so here as well without forcing Tyndale to do it.

It is also notable at the outset that Tyndale only objects to abortifacient "emergency contraception" and IUDs. VC ¶¶ 89, 136. Whatever interests Defendants claim in the generic need to provide women with contraception, they have no evidence to insist that a plan providing most contraception and sterilization still triggers a compelling interest to coerce the remainder.

    a. <u>Defendants cannot identify a compelling interest.</u>

The most striking obstacle to Defendants' assertion of a compelling interest is that the government itself has voluntarily omitted 191 million people from the Mandate. *Newland*, 2012 WL 3069154 at *1. This amounts to nearly two-thirds of the nation, and is being offered by the government for secular reasons. But Defendants still refuse to exempt Tyndale.

The Mandate does not apply to thousands of plans that are "grandfathered" under PPACA. See 76 Fed. Reg. at 46623 & n.4. Also, the Mandate does not apply to members of a "recognized religious sect or division" that conscientiously objects to acceptance of public or

private insurance funds.  26 U.S.C. §§ 5000A(d)(2)(a)(i) and (ii).  And the Mandate exempts from its requirements "religious employers" defined as churches or religious orders that primarily hire and serve their own adherents and that have the purpose of inculcating their values.  76 Fed. Reg. at 46626.  The federal government has decided that employers in any of these categories simply do not have to comply with the Mandate.

These are massive exemptions that cannot coexist with a compelling interest against Tyndale.  "[A] law cannot be regarded as protecting an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited."  *Lukumi*, 508 U.S. at 520.  Defendants cannot claim a "grave" or "paramount" interest to impose the Mandate on Tyndale or other religious objectors while allowing the identical "appreciable damage" to 191 million people.  No compelling interest exists when the government "fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort."  *Id*. at 546–47.  The exemptions to the Mandate "fatally undermine[] the Government's broader contention that [its law] will be 'necessarily . . . undercut'" if Tyndale is exempted too.  *O Centro Espirita*, 546 U.S. at 434.

Defendants' immense grandfathering exemption has nothing to do with a determination that those 191 million people do not need contraceptive coverage, whereas Tyndale's employees somehow do.  The exemption was instead a purely political maneuver to garner votes for PPACA by letting "President Obama ma[k]e clear to Americans that 'if you like your health plan, you can keep it.'"[11]  The grandfathering rule is in no way temporary.  There is no sunset on grandfathering status in PPACA or its regulations.  Instead, a plan can keep grandfathered status

---

[11] HHS, HealthCare.Gov, "Keeping the Health Plan You Have: The Affordable Care Act and "Grandfathered" Health Plans," *available at* http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-plan-you-have-grandfathered.html (last visited October 5, 2012).

in perpetuity, even if it raises fixed-cost employee contributions and, for several items, even if the increases exceed medical inflation plus 15% every year. *Id.* The government repeatedly calls it a "right" for a plan to maintain grandfathered status. See 75 Fed. Reg. 34,538, at 34,540, 34,558, 34,562, & 34,566.

Notably, grandfathered plans *are* subject to a variety of mandates under PPACA: no lifetime limits on coverage; extension of dependent coverage to age 26; no exclusions for children with pre-existing conditions; and others.[12] But Congress deemed the Mandate in this case *not important enough* to impose it on grandfathered plans. Defendants therefore contradict the text of PPACA when they take a litigation position, contrary to Congress, that the Mandate of abortifacient coverage is an interest "of the highest order."

The flaw of Defendants' supposed compelling interest is even more fatal here because Tyndale is a large employer of 260 employees, and according to Defendants, "[m]ost of the 133 million Americans with employer-sponsored health insurance through large employers will maintain the coverage they have today." *Id.* In other words, Defendants have voluntarily excluded most Americans situated alongside the employees of Tyndale. They cannot demonstrate they have a paramount interest to force it to comply in violation of its beliefs. Defendants are completely content to leave 2/3 of the nation's women without "health and equality" flowing from this Mandate. Yet they would insist those same interests can pass the most demanding test known to constitutional law. They cannot. If the government can toss aside such a massive group of employees for political expediency, their "interest" in mandating cost-free birth control coverage cannot possibly be "paramount" or "grave" enough to justify coercing Tyndale to violate its and its owners' religious beliefs. *See O Centro Espirita*, 546 U.S.

---

[12] HealthCare.Gov, *supra* note 11.

at 434 ("Nothing about the unique political status of the [exempted peoples] makes their members immune from the health risks the Government asserts").

In *O Centro Espirita* the Supreme Court held that no compelling interest existed behind a law that had a much more urgent goal—regulating extremely dangerous controlled substances— and that had many fewer exemptions than the broad swath of omissions from the Mandate.  In that case the Court dealt with the Controlled Substances Act's prohibition on "all use," with "no exception," of a hallucinogenic ingredient in a tea along with other Schedule I substances.  546 U.S. at 423, 425.  But because elsewhere in the statute there was a narrow religious exemption for Native American use of a different substance, peyote, the Court held that the government could not meet its compelling interest burden even in its generalized interest to regulate Schedule I substances as applied to the plaintiffs in that case.  *Id.* at 433.  Even moreso here, the government cannot satisfy its burden by pointing to general health benefits of contraception. Halting the use of extremely dangerous drugs is far more urgent than forcing religious objectors to provide contraception coverage.  Defendants' grant of secular and religious exemptions for millions of other employees betrays any alleged compelling interest they may have in forcing Tyndale to comply with the Mandate against their religious beliefs.

The government cannot satisfactorily explain why employees of Tyndale must be subject to its Mandate while the government itself voluntarily omits 191 million people.  The government has no data showing how many religious employers objecting to the Mandate exist, but their total number of employees could only constitute a fraction of a percent of the tens of millions of employees the government is voluntarily omitting.  This is a quintessential illustration of *Brown v. Entm't Merchs.*'s insistence that the "government does not have a compelling interest in each marginal percentage point by which its goals are advanced."  131 S.

Ct. at 2741. As in *O Centro*, where government exclusions apply to "hundreds of thousands" (here, millions), RFRA requires "a similar exception for the 130 or so" and even less affected here. 546 U.S. at 433.

The Mandate on its face also is inconsistent with a compelling interest rationale. Defendants have used their discretion to write a "religious employer" exemption into the Mandate for certain churches. 76 Fed. Reg. at 46626. But there is no nexus between the Mandate exemption's criteria and Defendants' alleged interest, such that a compelling interest exists for non-exempt religious entities like Tyndale but is absent for exempt ones like churches. On the contrary, Defendants have simply engaged in political line-drawing based on what the president's political base will accept, weighed against how much election-year resistance he may encounter.[13] Under RFRA, Tyndale cannot be denied a religious exemption on the premise that Defendants can pick and choose between religious objectors. *See O Centro Espirita*, 546 U.S. at 434 (since the law does "not preclude exceptions altogether; RFRA makes clear that it is the obligation of the courts to consider" other exemptions).

### b. There is no "business exception" to RFRA's compelling interest test.

In other cases the government has attempted to use *United States vs. Lee* to characterize RFRA's scrutiny as not being very strict in commercial contexts. But *O Centro Espirita* does not allow the Court to apply a "strict scrutiny lite" for a business RFRA claim, or indeed for any RFRA claim. "[T]he compelling interest test" of "RFRA challenges should be adjudicated in the same manner as constitutionally mandated applications of the test," such as in speech cases. 546 U.S. at 430. *O Centro* explicitly cabined *Lee* to its context of a tax that was nearly universal, and

---

[13] The New York Times describes in great detail the politically-driven deliberation that led to the Mandate. Helene Cooper & Laurie Goodstein, "Rule Shift on Birth Control Is Concession to Obama Allies" (Feb. 10, 2012), *available at* http://www.nytimes.com/ 2012/02/11/health/policy/obama-to-offer-accommodation-on-birth-control-rule-officials-say.html?pagewanted=all (last visited Oct. 6, 2012).

the court did not allow the government to claim "that a general interest in uniformity justified a substantial burden on religious exercise." *Id.* at 435.

Lee does discuss "statutory schemes which are binding on others in that activity." 455 U.S. at 261. But the Mandate here is emphatically not "binding on others in th[e] activity" of large employers providing insurance. Whereas *Lee*'s tax contained only a tiny exemption for some Amish, the Mandate here excludes:

- 191 million Americans in "grandfathered" plans are not subject to the Mandate, including "most" large employers, of which Tyndale is one. "Keeping the Health Plan You Have," *supra* note 11.

- Members of certain objecting religious groups need not carry insurance at all. *See, e.g.*, 26 U.S.C. § 5000A(d)(2)(a) ("recognized religious sect or division"); *id.* § 5000A(d)(2)(b)(ii) ("health care sharing ministries").

- Small employers (*i.e.*, those with fewer than 50 employees) can drop employee insurance with no government penalty. 26 U.S.C. § 4980H(c)(2).

- Churches, church auxiliaries, and religious orders enjoy a blanket exemption from the mandate. 77 Fed. Reg. 8725, 8726 (Feb. 15, 2012).

- Certain religiously affiliated non-profits were recently given an additional year before the mandate would be enforced against them. *See* HHS Bulletin, *supra* note 1.

The Mandate is many things, but "uniform" is not one of them. *O Centro* was impatient with the government's uniformity argument:

> The Government's argument echoes the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions. But RFRA operates by mandating consideration, under the compelling interest test, of exceptions to "rule[s] of general applicability."

546 U.S. at 436. *Lee*'s universal tax is not comparable to the Mandate and its exceptions.

The law upheld in *Lee* was a tax to raise government funding. Governments cannot function without taxes. *Lee* ruled that if exemptions were allowed "[t]he tax system could not function." 455 U.S. at 260. But the United States has functioned for over 200 years without a

federal mandate compelling Tyndale or anyone else to cover abortifacients in insurance.  The

Mandate is not a "government program," as discussed in *Lee*.   It requires Tyndale to give

specific abortifacient services to private citizens, not to pay money to the government for use in

the government's own activities. This Mandate is private, not governmental. In fact, the

government has decided *not* to pursue its goals with a government program offering

contraception—of which many exist—but instead to conscript religiously objecting citizens.

     *Lee* does not apply the scrutiny test applicable under RFRA.   *Lee* was a precursor to

*Smith*, which expanded on *Lee* to adopt the standard that RFRA affirmatively rejected.   RFRA

specifies that it is codifying its test "as set forth in *Sherbert*, 374 U.S. 398 and *Wisconsin v.*

*Yoder*, 406 U.S. 205 (1972)." 42 U.S.C. § 2000bb.   RFRA omits *Lee* from this list.   *Lee* itself

never says it is requiring a "compelling interest" or "least restrictive means."   But *Sherbert* and

*Yoder did* apply RFRA's test.   *Sherbert* involved a plaintiff's bid for financial gain, despite the

government's generally applicable law.  As scholars note:

> The standard thus incorporated [by RFRA] is a highly protective one. . . .  The
> cases incorporated by Congress explain "compelling" with superlatives:
> "paramount," "gravest," and "highest." Even these interests are sufficient only if
> they are "not otherwise served," if "no alternative forms of regulation would
> combat such abuses". . . .

Douglas Laycock and Oliver S. Thomas, "Interpreting the Religious Freedom Restoration Act,"

73 Tex. L. Rev. 209, 224 (1994).

     <u>c.</u>   <u>The government cannot meet its evidentiary burden.</u>

     The government also fails the compelling interest test because its "evidence is not

compelling." *Brown v. Entm't Merchs.*, 131 S. Ct. at 2739.  It points only to generic interests,

marginal benefits, correlation not causation, and uncertain methodology.   The Institute of

Medicine Report on which the Mandate is based ("2011 IOM"),[14] does not demonstrate the government's conclusions. At best, its studies argue for a generic health benefit from contraception. But the Mandate's evidence must be tailored to the effect of exempting Tyndale, not to generic health interests.   *O Centro*, 546 U.S. at 430–31.   Tyndale is willing to provide nearly all "contraception," just not abortifacients.   None of the government's studies demonstrate a compelling interest to coerce that small margin of contraception when the rest is provided. Likewise the government cites no pandemic of unwanted births at Tyndale or similar entities, which cause catastrophic consequences for health and employees.   It could be that employees of such entities experience zero negative health consequences absent the Mandate, for any number of reasons.   At best, Defendants do not know.   But Defendants "bear the risk of uncertainty," *Brown*, 131 S. Ct. at 2739.   Speculation and generalizations will not suffice.

Nowhere does the IOM cite evidence showing that the Mandate would even increase contraception use—which is a necessary corollary to saying health and equality from unintended births would result.   Instead, the IOM's sources show:   89% of women avoiding pregnancy are already practicing contraception;[15] among the other 11%, lack of access is not a statistically significant reason why they do not contracept;[16] even among the most at-risk populations, cost is not the reason those women do not contracept.[17]   The studies cited at 2011 IOM pp. 109 do not

---

[14] Inst. of Med., *Clinical Preventive Services for Women:Closing the Gaps* (2011), *available at* http://www.nap.edu/catalog.php?record_id=13181 (last visited October 5, 2012).

[15] The Guttmacher Institute, "Facts on Contraceptive Use in the United States (June 2010)," *available at* http://www.guttmacher.org/pubs/fb_contr_use.html (last visited October 6, 2012).

[16] Mosher WD and Jones J, "Use of contraception in the United States: 1982–2008," Vital and Health Statistics, 2010, Series 23, No. 29, at 14 and Table E, *available at* http://www.cdc.gov/NCHS/data/series/sr_23/sr23_029.pdf (last visited October 6, 2012).

[17] R. Jones, J. Darroch and S.K. Henshaw "Contraceptive Use Among U.S. Women Having Abortions," *Perspectives on Sexual and Reproductive Health* 34 (Nov/Dec 2002): 294–303 (*Perspectives* is a publication of the Guttmacher Institute).   The Centers for Disease Control released a study this year showing that even among those most a risk for unintended pregnancy, only 13% cite cost as a reason for not using contraception. CDC, "Prepregnancy Contraceptive Use Among Teens with Unintended Pregnancies Resulting in Live Births —

show that cost leads to non-use generally, but relate only to women switching from one contraception method to another.

The government's evidence also does not apply universally.  Women who suffer "unintended pregnancy" are primarily young, unmarried, and low income.  2011 IOM at 102. Tyndale's employees by definition have jobs and health insurance.  The government asserts that women incur more preventive care costs generally, citing 2011 IOM at 19–20. But the IOM does not say those studies specifically include contraception as part of "preventive care."  Nor, if they do, does the IOM say what percentage of the preventive care gap contraception accounts for. PPACA erases most if not all of this gap by mandating other coverage to which Tyndale does not object, including most contraception.  42 U.S.C. § 300gg-13. There is no evidence that any gap will remain *at Tyndale*, much less a compelling one.

The government cannot show that the Mandate would prevent negative health consequences.  "Nearly all of the research is based on correlation, not evidence of causation, and most of the studies suffer from significant, admitted flaws in methodology." *Brown v. Entm't Merchs.*, 131 S. Ct. at 2739 (quotation marks omitted). The IOM admits that for negative outcomes from unintended pregnancy, "research is limited." 2011 IOM at 103.  The IOM therefore cites its own 1995 report, which similarly emphasizes the fundamental flaws in determining which pregnancies are "unintended," and "whether the effect is caused by or merely associated with unwanted pregnancy."[18]  The 1995 IOM admits that no causal link exists for most of its alleged factors.  This makes sense, since the intendedness or unintendedness of a

Pregnancy Risk Assessment Monitoring System (PRAMS), 2004–2008," Morbidity and Mortality Weekly Report 61(02);25-29 (Jan. 20, 2012), *available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/ mm6102a1.htm?s_cid=mm6102a1_e (last visited October 6, 2012).

[18] Institute of Medicine, *The Best Intentions* (1995) ("1995 IOM"), available at http://books.nap.edu/openbook.php?record_id=4903&page=64 (last visited October 6, 2012).

pregnancy cannot itself physiologically change its health effect.  Thus, a delay in seeking prenatal care upon unintended pregnancy is "no longer statistically significant" for women not already disposed to delay or who have a "support network"[19]—which exists in Tyndale's plan. The IOM's recital of possible health consequences show that the evidence is not compelling:

- The alleged increase in smoking and drinking drops significantly where studies control for other causes; while data on domestic violence and depression "provide little systematic assessment" and merely "suggest" association (not causation).[20]

- The alleged reduction in low birth weight and prematurity overlooks the fact that, like other cited factors, these are merely "associated" with, not caused by, unintended pregnancy (1995 IOM at 70; 2011 IOM at 103).  Several studies show no connection between it and pregnancy-spacing in the U.S.[21]  And several studies show that low birth weight is associated not with contraception but with shorter pregnancy *intervals*, further distancing itself from a contraception connection.  2011 IOM at 103

- Evidence is not compelling that the Mandate against Tyndale would certainly cause pregnancy-prevention.  In 48% of all unintended pregnancies, contraception was used.[22] Multiple peer-reviewed studies demonstrate that there is no scholarly consensus that increased contraception use reduces either abortion (which occurs upon pregnancy) or sexually transmitted diseases.[23]

Notably, no evidence shows that the Mandate is the only method to provide the items in question.  Tyndale suggests that such evidence would not be possible, since government-provided abortifacients are just as free and effective as any other kind.

---

[19] *Id.* at 68.

[20] *Id.* at 69, 73, 75.

[21] *Id.* at 70–71.

[22] Finer, L. B., and S. K. Henshaw, "Disparities in rates of unintended pregnancy in the United States, 1994 and 2001," 38(2) *Perspectives on Sexual & Reprod. Health* 90–96 (2006) *available at* http://www.guttmacher.org/pubs/journals/3809006.html (last visited October 6, 2012).

[23] K. Edgardh, et al., "Adolescent Sexual Health in Sweden," Sexual Transmitted Infections 78 (2002): 352-6 (http://sti.bmjjournals.com/cgi/content/full/78/5/352); Sourafel Girma, David Paton, "The Impact of Emergency Birth Control on Teen Pregnancy and STIs," Journal of Health Economic, (March 2011): 373-380; A. Glasier, "Emergency Contraception," British Medical Journal (Sept 2006): 560-561; 37 J.L. Duenas, et al., "Trends in the Use of Contraceptive Methods and Voluntary Interruption of Pregnancy in the Spanish Population During 1997–2007," Contraception (January 2011): 82-87

       <u>d.</u>  <u>Defendants cannot show the Mandate is the least restrictive means of furthering their interests.</u>

Even if a compelling interest existed, the government could not possibly show that the Mandate against Tyndale is "the least restrictive means of furthering" it under 42 U.S.C. 2000bb-1. The fact that the government could subsidize contraception itself to give it to employees at exempt entities, and that it already does so on a wide scale, shows that the government fails RFRA's least restrictive means requirement. Defendants bear the burden to show both of these elements—compelling interest and least restrictive means—including at the preliminary injunction stage. *O Centro Espirita*, 546 U.S. at 428–30.

"[I]f there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, [the Government] may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'" *Johnson v. City of Cincinnati*, 310 F.3d 484, 503 (6th Cir. 2002) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 343 (1971)). Strict scrutiny requires a "serious, good faith consideration of workable . . . alternatives that will achieve" the alleged interests. *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). "[W]ithout some affirmative evidence that there is no less severe alternative," the Mandate cannot survive RFRA's requirements. *Johnson*, 310 F.3d at 505.

Defendants fail the least restrictive means test because the government could, if the political will existed, achieve its desire for free coverage of birth control *by providing that benefit itself*. Rather than coerce Tyndale to provide abortifacient coverage in their plan, the government could possibly create its own "abortifacient insurance" plan covering the few items to which Tyndale objects, and then allow free enrollment in that plan for whomever the government seeks to cover. Or the government could directly compensate providers of abortifacients. Or the government could offer tax credits or deductions for abortifacient

purchases.  Or the government might impose a mandate on the abortifacient manufacturing industry to give its items away for free.[24]  These and other options could fully achieve Defendants' goal while being less restrictive of Tyndale's beliefs.  There is no essential need to coerce Tyndale to provide the objectionable coverage itself.

Defendants cannot deny that the government could pursue its goal more directly.  This conclusion is not only dictated by common sense, but is also proven because the federal government and many states already directly subsidize birth control coverage for many citizens through Title XIX (Medicaid) and Title X (Family Planning Services) funding, among others. [25] Thus the Court's RFRA inquiry could end here: the Mandate is not the least restrictive means of furthering Defendants' interest.  Other options may be more difficult to pass as a political matter (which further illustrates the public's disbelief that the Mandate's interest is "compelling").  Indeed PPACA itself does not require the Mandate.  42 U.S.C. § 300gg-13(a)(4).  But political difficulty does not exonerate the Mandate's burdens on Tyndale's religious beliefs, nor can it allow the Mandate to pass RFRA's strict scrutiny.  The availability of many alternative methods fatally undermines Defendants' burden under RFRA and the Mandate from applying to Tyndale.

The government cannot propose a watered-down least restrictive means test.  RFRA requires the Mandate to be "the least restrictive means," not the least restrictive means among only what the government wants to select.  In *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988), the Supreme Court required alternative means instead of fundamental rights violations.  There, North Carolina sought to curb fraud by requiring

---

[24] And by virtue of Defendants' recent attempts to quell political backlash by claiming they may create an "accommodation" for some additional religious entities (but still not for Plaintiffs), Defendants are necessarily admitting that the Mandate is not the least restrictive means to achieve their goals. See 77 Fed. Reg. 16501–08 (Mar. 21, 2012)

[25] See *Facts on Publicly Funded Contraceptive Services in the United States* (Guttmacher Inst. May 2012) (citations omitted), *available at* http://www.guttmacher.org/pubs/fb_contraceptive_serv.html (last visited October 6, 2012)

professional fundraisers to disclose during solicitations how much of the donation would go to them.  487 U.S. at 786.  Applying strict scrutiny, the Supreme Court declared that the state's interest could be achieved by publishing the same disclosures itself online, and by prosecuting fraud.  *Id.* at 799–800.  Although these alternatives would be costly, less directly effective, and a restructuring of the governmental scheme, strict scrutiny demanded they be prioritized.  *See id.* Here RFRA similarly requires full consideration of other ways the government can and does provide women free abortifacients. "The lesson" of RFRA's pedigree of caselaw "is that the government must show something more compelling than saving money." Laycock at 224.

The government attempted in *Newland* to argue that it has an alleged need to impose the Mandate within the employer-based insurance market.  But this fails the compelling interest/least restrictive means test because it *redefines the government's interest* from securing health and equality to accomplishing those goals in a specific way.  The government has zero evidence, much less compelling evidence, that it has a "paramount" and "grave" need to achieve its alleged health and equality interests *by coercion of* Tyndale, instead of by providing abortifacients itself. The government does not even have a hint of evidence that its interests would *not* be served if the government itself provided the abortifacients it desires.  In other words, the government cannot possibly show that even if all women in Tyndale's plan received the Mandated items free from the government, they would *still* suffer adverse health consequences and an inability to be free from work-interrupting pregnancy, solely because the Mandated items have not been delivered *by* their religiously objecting employers, but by the government's coverage.  "[T]he Government has not offered evidence demonstrating" compelling harm from an alternative that is available and less restrictive of religion.  *O Centro*, 546 U.S. at 435–37.

The Mandate substantially burdens the religious exercise of Tyndale and its owners, and Defendants fail strict scrutiny.  Tyndale has a likelihood of success under its RFRA claim.

### B.        The Mandate violates the Free Exercise Clause.

In addition to violating RFRA, the mandate violates the Free Exercise Clause because it is not "neutral and generally applicable." *Lukumi*, 508 U.S. 20 at 545 (citing *Smith*, 494 U.S. at 880; *see also, e.g., Kaemmerling*, 553 F.3d at 677 (discussing *Smith*).  The mandate is therefore subject to strict scrutiny, *Lukumi*, 508 U.S. at 546, which as discussed above, it cannot meet.[26]

The mandate is not neutral on its face because it explicitly discriminates among religious organizations on a religious basis.  It thus fails the most basic requirement of facial neutrality. *See, e.g., Lukumi*, 508 U.S. at 533 (explaining that "the minimum requirement of neutrality is that a law not discriminate on its face").  Indeed, the mandate is more patent violation of neutrality than the ordinances unanimously struck down in *Lukumi*.  That case involved ostensibly neutral animal cruelty laws structured to target religiously-motivated practices only. By contrast, on its face the religious employer exemption to the mandate divides religious objectors into favored and disfavored classes, forgetting *Lukumi*'s warning that "[a] law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context." *Lukumi*, 508 U.S. at 533 (emphasis added).

The religious employer exemption protects the consciences only of *certain* religious bodies, which it defines with reference to their internal *religious* characteristics.  Namely, it exempts only those organizations whose "purpose" is to inculcate religious values; who

---

[26] Neutrality and general applicability overlap and "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531; *see also id.* (noting that "[n]eutrality and general applicability are interrelated"); *id.* at 557 (Scalia, J., concurring) (observing that the concepts "substantially overlap").  Still, each merits separate analysis, and "strict scrutiny will be triggered" if the law at issue "fails to meet *either* requirement."  *Rader v. Johnston*, 924 F. Supp. 1540, 1551 (D. Neb. 1996) (emphasis supplied) (citing *Lukumi*, 508 U.S. at 531-33, 544-46).

"primarily" employ and serve co-religionists; and who qualify as churches or religious orders under the tax code.  *See* 45 C.F.R. § 147.130(a)(iv)(B)(1)–(4).  These criteria openly do what *Lukumi* says a neutral law cannot do:  refer to religious qualities without any discernible secular reason.  *Lukumi*, 508 U.S. at 533.  There is no conceivable secular purpose, for instance, in limiting conscience protection to religious groups that "primarily serve" co-religionists while denying it to those who serve persons regardless of their faith.  These criteria practice religious "discriminat[ion] on [their] face" and therefore trigger strict scrutiny.  *Lukumi*, 508 U.S. at 533; *cf. Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1337 (D.C. Cir. 2001) (rejecting "substantial religious character" test for NLRB jurisdiction as contrary to both the Free Exercise and Establishment Clauses because it would effectively exempt only "religious institutions with hard-nosed proselytizing, … that limit their enrollment to members of their religion") (relying on *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979)).

The mandate is also subject to strict scrutiny under the Free Exercise Clause because it is not generally applicable.  A law is not generally applicable if it regulates religiously-motivated conduct, yet leaves unregulated similar secular conduct.  *See, e.g., Lukumi*, 508 U.S. at 544–45. As explained above, the Mandate here exempts 191 million Americans on a variety of grounds, including "most" large employer like Tyndale, but refuses to exempt Tyndale based on its religious objections.  In *Fraternal Order of Police*, the Third Circuit held that a police department's no-beard policy was not generally applicable because it allowed a medical exemption but refused religious exemptions.  "[T]he medical exemption raises concern because it indicates that the [police department] has made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not." 170 F.3d at 366 (Alito, J.). *See also*

*Blackhawk v. Pennsylvania*, 381 F.3d 202, 210–11, 214 (3d Cir. 2004) (Alito, J.) (rule against religious bear-keeping violated Free Exercise Clause due to categorical exemptions for zoos and circuses); *Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1035 (9th Cir. 2009) (Noonan, J., concurring) (campaign finance requirements were not generally applicable where they included categorical exemptions for newspapers and media, but not for churches); *Mitchell Cnty. v. Zimmerman*, 810 N.W.2d 1, 16 (Iowa 2012) (categorical exemptions for secular conduct allowed Mennonite farmers to use steel-wheeled tractors on county roads).

The religious exemption from the Mandate in particular is not generally applicable because PPACA itself awards Defendants unlimited discretion to shape its scope.  Defendants "*may* establish exemptions,"  45 C.F.R. § 147.130 (emphasis added), and pursuant to 42 U.S.C. § 300gg-13 Defendants' discretion to craft its exemptions is unlimited.  76 Fed. Reg. at 46623 (asserting that § 300gg-13 grants HHS/HRSA "authority to develop comprehensive guideless" under which Defendants believe "it is appropriate that HRSA, in issuing these Guidelines, takes into account the effect on the religious beliefs of certain religious employers")  Using their unfettered assessments, Defendants continue to change their exemptions and accommodations. This is evidenced by two different versions of a "safe harbor" they issued *in addition to* the religious exemption itself, and the fact that in recent rulemaking, yet another category of non-profit religious entities subject to different treatment than the Mandate will be created, 77 Fed. Reg. 16501.  This built-in discretion means that Defendants have broad discretion to create exemptions based on an "individualized … assessment of the reasons for the relevant conduct," a feature that deprives the mandate of general applicability and subjects it to strict scrutiny. *Lukumi*, 508 U.S. at 537 (quoting *Smith*, 494 U.S. at 884).

**C.** **The Mandate violates the Establishment Clause.**

The Mandate also violates the Establishment Clause of the First Amendment. The Mandate's "religious employer" exemption, as discussed above, sets forth Defendants' notion of what "counts" as religion and what doesn't for the purposes of who will be exempt under the Mandate. But the government may not adopt a caste system of different religious organizations and belief-levels when it imposes a burden. Instead it "must treat individual religions and religious institutions 'without discrimination or preference.'" *Colo. Christian U. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008); *Larson v. Valente*, 456 U.S. 228 (1982); *see also Wilson v. NLRB*, 920 F.2d 1282 (6th Cir. 1990) (holding that section 19 of the National Labor Relations Act, which exempts from mandatory union membership any employee who "is a member of and adheres to established and traditional tenets or teachings of a bona fide religion, body, or sect which has historically held conscientious objections to joining or financially supporting labor organizations," is unconstitutional because it discriminates among religions and would involve an impermissible government inquiry into religious tenets), *cert. denied*, 505 U.S. 1218 (1992). The Mandate's four-pronged religious exemption deems religious organizations insufficiently "religious" if they do not focus on co-religionists in hiring and service, which would involve the government's probing of what exactly count as the organization's religious "tenets."

**D.** **The Mandate violates the Free Speech Clause.**

The Mandate additionally violates the First Amendment by coercing Tyndale to provide for speech that is contrary to its and its owners' religious beliefs. The "right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (quoting *W.V. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)). Accordingly, the First Amendment

protects the right to "decide what not to say."  *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557, 573 (1995) (internal quotation marks omitted).

The Mandate compels expressive speech.  It requires Tyndale to cover "education and counseling" in favor of abortifacients.  Education and counseling are, by definition, speech.  As a self-insurer, Tyndale is required to pay for this speech directly.  The Supreme Court has explained that its compelled speech jurisprudence is triggered when the government forces a speaker to fund objectionable speech. *See, e.g, Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 234– 35 (1977) (forced contributions for union political speech); *United States v. United Foods*, 533 U.S. 405, 411 (2001) (forced contributions for advertising).  The Supreme Court recently reaffirmed that "compulsory subsidies for private speech" violate the First Amendment unless they involve a "mandated association" that meets the compelling interest / least restrictive means test.  *Knox v. Service Employees Intern. Union*, 132 S. Ct. 2277, 2289 (June 21, 2012).  Here there is no "mandated association" because the government omits many employers from the Mandate, and the Mandate violates the compelling interest test.  These factors, and because the Mandate is not a condition on government funding, distinguish it from *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47 (2006).  *Rumsfeld* does not negate *Knox*, *Abood*, and *United Foods*.

### E.    The Mandate violates the Due Process Clause.

The Mandate violates the rights of Tyndale and its owners under the Due Process Clause of the Fifth Amendment.  As referenced in the Free Exercise Clause argument, the Mandate creates a standardless, blank check for Defendants to discriminatorily select whatever they want to call "religious" and offer or withhold whatever accommodations they choose.  That is exactly what Defendants have done.   When a law is so "standardless that it authorizes or encourages seriously discriminatory enforcement," the law does not comport with due process.  *United*

*States v. Williams*, 553 U.S. 285, 304 (2008); *see also F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).  If a law is so vague that it "fails to provide a person of ordinary intelligence fair notice of what is prohibited," it fails to provide constitutional due process. *Williams*, 553 U.S. at 304.

42 U.S.C. § 300gg-13 gives Defendants unlimited discretion to pick and choose what religious groups to impose its Mandate against, and to what extent.  76 Fed. Reg. at 46623 The statute literally contains no standards regarding these decisions; it offers zero guidance, not even key words or phrases, about who counts as religious and what kind of accommodation such religious persons or entities should be provided.  No person can read § 300gg-13 and have any notion of who Defendants may impose their Mandate against, and to what extent.

Section 300gg-13 is therefore a quintessential law so "standardless that it authorizes or encourages seriously discriminatory enforcement."  Defendants could literally decide that Buddhists get exemptions while Sikhs do not, without running afoul of the standards of that section, because the section has no standards.  The law practically invites discriminatory enforcement, and that is exactly what Defendants have done with it.  Defendants have used their discretion to create: an arbitrary four-part "religious employer" exemption; two different "safe harbors" of non-enforcement; and a proposed "accommodation" for some non-exempt entities yet to be determined in new rulemaking, 77 Fed. Reg. 16501.  Tyndale has suffered exclusion from all these discretionary decisions.  These discriminatory decisions involve the government deciding who the religious are and what religion is; what levels of moral participation should be acceptable to conscience; whose religion gets put into different levels of accommodation; and who is allowed to convert to religious views against birth control based on whether they did so by February 10.

**F.      The Mandate violates the Administrative Procedure Act.**

The Mandate was finalized while transparently, even admittedly, refusing to satisfy Defendants' statutory duty to actually "consider" objections issued during the comment period. Section 706 of the APA provides that courts "shall hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law." 5 U.S.C. § 706(2)(D).   Defendants must follow the procedure found in § 553, which requires administrative agencies to: (1) publish notice of proposed rulemaking in the Federal Register; (2) "give interested parties an opportunity to participate in the rule making through submission of written data, views, or arguments"; and (3) consider all relevant matter presented before adopting a final rule that includes a statement of its basis and purpose. 5 U.S.C. § 553(b) & (c).

"An agency is required to provide a meaningful opportunity for comments, which means that the agency's mind must be open to considering them."  *Grand Canyon Air Tour Coalition v. F.A.A.*, 154 F.3d 455, 468 (D.C. Cir. 1998) (citing *McLouth Steel Products Corporation v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988)). The Court need not engage in any subjective judgment about whether Defendants provided due consideration to objections to the Mandate.  In this case Defendants essentially admit that they did not do so.  Central to this implicit concession are three facts acknowledged by Defendants themselves:

(1) PPACA prohibits the Mandate from going into effect until one year after it is in final, unchanged form.  75 Fed. Reg. at 41726; 76 Fed. Reg. at 46624.

(2) Defendants themselves insisted, in August 2011, prior to the comment period, that they believed the Mandate must exist in final form unchanged from as it was written on August 1, 2011, in order to deliver Mandated items to college women by August 2012.  76 Fed. Reg. 46621–26.

(3) Defendants delivered on their promise to ignore comments by finalizing their rule "without change" in February 2012.  77 Fed. Reg. 8725–30

(4) Due to public outcry Defendants then admitted in a new regulatory process in March 2012, 77 Fed. Reg. 16501, that the same objections offered in the 2011

comment period actually did require alterations that they had refused to consider in 2011 but would now pursue.

(5) Yet Defendants continue to impose their Mandate on Tyndale and others as if their rule had actually been finalized in August 2011 *in a process that meaningfully considered suggested changes prior to finalization*.

If Defendants had not been close-minded about their Mandate, it would not have been finalized without change in February 2012, and would still not be finalized (because the March 2012 process continues indefinitely). Thus if the government had complied with the APA, Tyndale would not be subject to it now; they would be more than a year away from its effect.

Defendants' mockery of the notice and comment process has led to palpable injury to Tyndale. The Mandate's adoption of HRSA's preventive services guidelines against religious objectors should be vacated and remanded to the Defendant agencies until they actually finalize a Mandate after meaningful consideration, and *then* wait an additional year to impose it.

The Mandate also violates the APA for being "contrary to law" and "constitutional right" under 5 U.S.C. § 706(2)(A) & (B). *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–17 (1971). It is contrary to law and constitutional right for all the reasons stated above: its violation of RFRA, the First Amendment clauses, and the Due Process Clause.

## II. TYNDALE WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF.

Granting preliminary injunctive relief is necessary to prevent Tyndale from suffering harm that is irreparable and imminent. *See, e.g., CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (noting that '[t]he basis of injunctive relief in the federal courts has always been irreparable harm'") (quoting *Sampson v. Murray,* 415 U.S. 61, 88 (1974)); *Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) (explaining that "[t]he injury complained of [must be] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm").

42

Application of the mandate to Tyndale will violate its rights under the First Amendment and RFRA.  It is settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Nat'l Treasuries Employees Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (Thomas, J.).  Deprivation of rights secured by RFRA—which affords even greater protection to religious freedom than the Free Exercise Clause—also constitutes irreparable harm. *See, e.g., Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (noting that "courts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA"); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (explaining under RFRA that "although the plaintiff's free exercise claim is statutory rather than constitutional, the denial of the plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately compensated monetarily"); *W. Presbyterian Church v. Bd. of Zoning Adjustment of Dist. of Columbia*, 849 F. Supp. 77, 79 (D.D.C. 1994) (granting a preliminary injunction against a zoning ordinance prohibiting a church's feeding of the homeless based on likely violations of the First Amendment and RFRA).  The District Court in Colorado reached the same conclusion in the *Newland* case. *See Newland*, 2012 WL 3069154 at *4 (noting "it is well-established that the potential violation of Plaintiffs' constitutional and RFRA rights threatens irreparable harm") (citation omitted).

Finally, these irreparable harms apply to Tyndale already.  Tyndale does not qualify for any of Defendants' exemptions or non-enforcement.  Tyndale is therefore subject to the Mandate starting October 1, 2012.  VC ¶ 87.  But their conscience has forbid them from complying and violating their commitment to the Bible.  VC ¶¶ 88–89.  Thus Tyndale faces, *today*, the certain prospect lawsuits from the Secretary of Labor, fines and regulatory penalties.  By virtue of the fact that the law applies to Tyndale now and Defendants have expressed opposition to this very

43

motion, Tyndale's harm is already upon it.   Defendants have made it clear that they are enthusiastically enforcing the Mandate as of August 1, 2012.[27]

## III.      THE BALANCE OF EQUITIES TIPS IN TYNDALE'S FAVOR.

Here, the balance of equities overwhelmingly favors Tyndale.   Granting preliminary injunctive relief will merely prevent Defendants from enforcing the Mandate against one religious entity.   This will simply preserve the *status quo* between the parties, counseling in favor of granting preliminary relief.   *Cf. Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) (reasoning that balance of equities tilted against plaintiff where preliminary injunction would "upend the *status quo*").   Defendants have already exempted a number of churches and church-related entities from the mandate.   Even more notably, Defendants have granted what nearly amounts to its own voluntary "injunction" by granting delayed enforcement of the Mandate against a broad array of religious organizations until their first plan years start after August 2013.   HHS Bulletin, *supra* note 1.   Omission of Tyndale from that "safe harbor" is arbitrary and unwarranted in the first place.   Defendants cannot possible show that applying the Mandate to *one* other religious entity would "substantially injure" others' interests.

Balanced against this *de minimis* injury to Defendants is the real and immediate threat to Tyndale's and its owners' integrity of religious belief.   Tyndale faces the imminent prospect of penalties that Defendants obstinately declare they intend to apply.   In sum, any minimal harm in not applying the Mandate against one additional entity, in light of Defendants' willingness to not enforce it against thousands of others, "pales in comparison to the possible infringement upon Plaintiffs' constitutional and statutory rights."   *Newland*, 2012 WL 3069154 at *4.

---

[27] HHS, News Release (July 31, 2012), *available at* http://www.hhs.gov/news/press/2012pres/07/20120731a.html (last visited October 6, 2012).

## IV.      AN INJUNCTION IS IN THE PUBLIC INTEREST.

Finally, a preliminary injunction will serve the public interest by protecting Tyndale's First Amendment and RFRA rights.  The public can have no interest in enforcement of a regulation against a religious college that coerces it to violate its own faith.  *See, e.g., Newland*, 2012 WL 3069154 at *5 (finding "'there is a strong public interest in the free exercise of religion even where that interest may conflict with [another statutory scheme]'") (quoting *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc), aff'd and remanded, *O Centro*, 546 U.S. 418).  Furthermore, any interest of Defendants in uniform application of the mandate "is … undermined by the creation of exemptions for certain religious organizations and employers with grandfathered health insurance plans and a temporary enforcement safe harbor for non-profit organizations."  *Newland*, 2012 WL 3069154 at *4.

## CONCLUSION

Tyndale asks the Court to enter a preliminary injunction against the HHS mandate in accordance with its accompanying motion and proposed order.

Respectfully submitted this 8th day of October, 2012.

*Attorneys for Plaintiffs*:

David A. Cortman, Esq.
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@alliancedefendingfreedom.org

Kevin H. Theriot, Esq.
Erik W. Stanley, Esq.
ALLIANCE DEFENDING FREEDOM

  s/ Matthew S. Bowman
Steven H. Aden, Esq.
Gregory S. Baylor, Esq.
Matthew S. Bowman, Esq.
  (D.C. Bar # 993261)
ALLIANCE DEFENDING FREEDOM
801 G Street NW, Suite 509
Washington, DC 20001
(202) 393-8690
(202) 237-3622 (facsimile)
saden@alliancedefendingfreedom.org
gbaylor@alliancedefendingfreedom.org
mbowman@alliancedefendingfreedom.org

15192 Rosewood
Leawood, KS 66224
(913) 685-8000
(913) 685-8001 (facsimile)
ktheriot@alliancedefendingfreedom.org
estanley@alliancedefendingfreedom.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was electronically filed with the Court's ECF system on October 8, 2012, and was thereby electronically served on counsel for Defendants who have appeared in the case.  Moreover, the document was emailed and mailed to counsel for Defendants as follows:

Ethan P. Davis
U.S. Department of Justice
Civil Division Federal Programs Branch
20 Massachusetts Avenue, NW, Rm. 6118
Washington, D.C. 20001
(202) 514-9242
Ethan.P.Davis@usdoj.gov

*s/ Matthew S. Bowman*_____
Matthew S. Bowman