**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                      )
TYNDALE HOUSE PUBLISHERS, INC.,   )
et al.,                                                )
                                                      )
             Plaintiffs,                        )
                                                      )
       v.                                            )          Civil Action No. 12-1635 (RBW)
                                                      )
KATHLEEN SEBELIUS, SECRETARY   )
OF THE UNITED STATES                    )
DEPARTMENT OF HEALTH AND        )
HUMAN SERVICES, et al.,                  )
                                                      )
             Defendants.                      )
_____)

**MEMORANDUM OPINION**

The plaintiffs, Tyndale House Publishers, Inc. and its president and CEO, Mark D.

Taylor, challenge the application of the regulations and penalties relating to an employer's

obligation to cover contraceptives under an employer health plan pursuant to the Patient

Protection and Affordable Care Act (the "ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010),[1] as

violating the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1 (2006), the

Free Exercise, Establishment, and Free Speech Clauses of the First Amendment, U.S. Const.

amend. I, the Due Process Clause of the Fifth Amendment, U.S. Const. amend. V, and the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553(b)-(c), 706(2)(A), 706(2)(D) (2006).

See generally Verified Complaint ("Compl."). Currently before the Court is the plaintiffs'

---

[1] The plaintiffs refer to the "collection of regulations and [] penalties" promulgated under the ACA as outlined in 77 Fed. Reg. 8725, 8729 (Feb. 15, 2012), as well as agency guidance issued in connection with the regulations, as "the Mandate." Plaintiffs' Memorandum of Law ("Pls. Mem.") at 4; see also Compl. ¶ 4 n.1 (specifying the statutes, regulations, and regulatory guidance that comprise "the Mandate"). For the sake of clarity, the Court will refer to these provisions collectively as the "contraceptive coverage mandate."

Motion for Preliminary Injunction ("Pls.' Mot.").  For the reasons explained below, the

plaintiffs' motion will be granted.[2]

# I.  BACKGROUND

## A.  The Affordable Care Act

Enacted in March 2010, the ACA requires group health plans to provide women with

"preventive care and screenings" without imposing any cost-sharing requirements on the plan

beneficiaries.  See 42 U.S.C. § 300gg-13(a)(4) (Supp. 2010).  Specifically, the ACA requires that

non-grandfathered[3] group or individual health plans and health insurance issuers cover without

"impos[ing] any cost sharing requirements . . . such additional preventive care and screenings

[for women] . . . as provided for in comprehensive guidelines supported by the Health Resources

and Services Administration [("HRSA")]."  Id.

The Department of Health and Human Services ("HHS") tasked the Institute of Medicine

("Institute") with developing recommendations to implement the requirement to provide

preventive services for women.  Institute of Medicine, Clinical Preventive Services for Women:

Closing the Gaps 2 (2011) ("Institute Report").  The HRSA adopted the Institute's

recommendations on August 1, 2011, which included a provision requiring "the full range of

[FDA]-approved contraceptive methods, sterilization procedures, and patient education and

---

[2] In addition to the filings already identified, the Court considered the following submissions made by the parties:
(1) the plaintiffs' Memorandum of Law in support of their motion ("Pls.' Mem."); (2) the Defendants' Opposition to
Plaintiffs' Motion for Preliminary Injunction ("Defs.' Opp'n"); (3) the plaintiffs' Reply in Support of Motion for
Preliminary Injunction ("Pls.' Reply"); (4) the Memorandum of the American Civil Liberties Union and the
American Civil Liberties Union of the National Capital Area, as Amici Curiae; and (5) the Plaintiffs' Response to
Third Parties the American Civil Liberties Union and the American Civil Liberties Union of the National Capital
Area, as Amici Curiae.

[3] Grandfathered plans are those that existed as of March 23, 2010, have continuously covered at least one person,
and have not since undergone any of the changes outlined in 45 C.F.R. § 147.140(g)(2) (2010).  Because of a
number of changes to the coverage provided to plan participants under the plaintiffs' health care plan, Compl. ¶¶
121-28, the plaintiffs' plan is not grandfathered.

counseling for women with reproductive capacity." Id. at 20-22, 109-10.  HHS subsequently promulgated regulations implementing the Institute's recommendations, under which all health insurance plans and policies (except those grandfathered or otherwise exempt) are required to comply with the contraceptive coverage mandate starting with the plan years beginning on or after August 1, 2012.  76 Fed. Reg. 46621-01 (Aug. 3, 2011).

Among other exemptions, the regulations exempt from the contraceptive coverage mandate certain "religious employers," defined as employers having each of the following characteristics:

(1) The inculcation of religious values is the purpose of the organization.
(2) The organization primarily employs persons who share the religious tenets of the organization.
(3) The organization serves primarily persons who share the religious tenets of the organization.
(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

45 C.F.R. § 147.130(a)(1)(iv)(B).  In response to concerns from various organizations with religious objections to the contraceptive coverage mandate but which did not fit the definition of religious employer, "the Departments of Health and Human Services, Labor, and the Treasury [] propose[d] amendments to regulations regarding" the contraceptive coverage mandate in an Advance Notice of Proposed Rulemaking ("Advance Notice").  77 Fed. Reg. 16501-01 (Mar. 21, 2012).  The agencies stated in the Advance Notice that the religious employer exemption would be broadened.  Id.  In addition to the Advance Notice, HHS also issued guidance outlining a safe harbor for certain non-profit employers with religious objections to the contraceptive coverage mandate.  See Ctr. for Consumer Info. & Ins. Oversight and Ctrs. for Medicare & Medicaid Servs., Guidance on the Temporary Enforcement Safe Harbor for Certain Employers (February

10, 2012), <u>available at</u> http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf, and (August 15, 2012), <u>available at</u> http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf.  The guidance grants certain non-profit employers with religious objections to the contraceptive coverage mandate an exemption from application of the mandate until August 1, 2013, by which time HHS expects to have finalized new rules and regulations broadening the definition of religious employer.  77 Fed. Reg. 16501-01.

Employers subject to the contraceptive coverage mandate face fines, penalties, and enforcement actions for non-compliance.  <u>See</u> 29 U.S.C. § 1132(a) (civil enforcement actions by the Department of Labor and insurance plan participants); 26 U.S.C. § 4980D(a), (b) (penalty of $100 per day per employee for noncompliance with coverage provisions of the ACA); 26 U.S.C. § 4980H (annual tax assessment for noncompliance with requirement to provide health insurance).

**B.  The Plaintiffs' Factual Allegations**

The first named plaintiff, Tyndale House Publishers, Inc. ("Tyndale"), is a Christian publishing company founded in 1962 by Dr. Kenneth Taylor and his wife, Margaret Taylor. Compl. ¶ 21.  Initially founded to publish "Kenneth Taylor's modern paraphrase of portions of the New Testament" of the Bible, the company today "publishes a wide array of Christian books ranging from Bible commentaries to books about family issues to Christian fiction."  <u>Id.</u> ¶ 24. The publishing company employs 260 full-time employees, and provides them with health insurance through a self-insured health plan.  <u>Id.</u> ¶¶ 71-73.

Tyndale is 96.5% owned by the Tyndale House Foundation (the "Foundation"), a non-profit religious entity.  Id. ¶¶ 41-42, 45.  Of the shares owned by the Foundation, "just over 8.4%" are voting shares.  Id. ¶ 45.  "The Foundation receives 96.5% of all of Tyndale's distributed profits," amounting to $38.8 million of the $40.2 million in profits since 2001.  Id. ¶ 47.  The Foundation directs much of its proceeds "to various charitable causes."  Id. ¶ 50.  In particular, "[t]he Foundation has used proceeds from Tyndale to benefit such ministries as: a Christian community center in the Chicago area . . . ; [the] Cabrini Green Legal Aid Clinic . . . ; and evangelistic work worldwide."  Pls.' Mem., Exhibit ("Ex.") 1 (Oct. 8, 2012 Affidavit of Mark D. Taylor) ¶ 3.

In addition to the shares owned by the Foundation, "a small percentage is owned by [the] Tyndale Trust."  Compl. ¶ 52.  Because the Tyndale Trust holds "84% of the voting shares," Tyndale is "primarily directed" by the Tyndale Trust.  Id. ¶¶ 2, 52.  The same group of individuals serves both as the trustees of the Tyndale Trust and as the board of directors of Tyndale House Publishers, and each individual is "required to sign a Statement of Faith each year to show that they hold certain religious beliefs, which are typically described as evangelical Christian beliefs."  Id. ¶¶ 55-56.

Two additional Illinois trusts established to "benefit Dr. Kenneth Taylor's widow and children," own "just over 3.4%" of the publishing company's remaining shares.  Id. ¶ 60.  The two trusts "share the beliefs of Tyndale House Publishers, [the] Tyndale House Foundation, and [the] Tyndale Trust."  Id. ¶ 61.

Tyndale, the Foundation, and the three trusts[4] have each adopted almost identical "statement[s] of belief and policy" outlining their religious beliefs, which include "respect for the inviolable sanctity of the life of every human being as created in the image and likeness of God from the moment of conception/fertilization" such that each "supports Tyndale House Publishers, Inc.'s omission from its employee health plan of any coverage of abortions and of drugs (e.g., Plan B, ella[5]) or devices (e.g., intrauterine devices ["IUDs"]) that can cause the demise of an already conceived/fertilized human embryo." Id. ¶¶ 39, 51, 59, 62.

The second named plaintiff, Mark D. Taylor, is the son of Tyndale's founder, Kenneth Taylor. Id. ¶ 2. Mark Taylor is the president and CEO of Tyndale and the Foundation, and a trustee of both the Tyndale Trust and the Kenneth N. Taylor Trust. Id. ¶ 63. In his capacity as president and CEO of the publishing company and the Foundation, Mark Taylor "is responsible for their overall operations, including the provision of Tyndale's health insurance plan." Id. ¶ 65. He shares the same beliefs as the entities described above. Id. ¶ 67.

The contraceptive coverage mandate requires the plaintiffs "to provide and pay for drugs and devices . . . [that] violate [their] religious beliefs, and [] subjects [the plaintiffs] to heavy fines and penalties if [they] choose[] not to violate those beliefs." Id. ¶¶ 3, 5. In particular, the plaintiffs are required to pay for "drugs (e.g., Plan B, ella) or devices (e.g., intrauterine devices) that can cause the demise of an already conceived/fertilized human embryo." Id. ¶¶ 39, 81-82.

The plaintiffs instituted this action on October 2, 2012. By requiring the plaintiffs to provide for certain contraceptive care, the plaintiffs allege that the defendants have violated their

[4] Neither the Foundation, nor any of the trusts, trustees, officers, or directors (with the exception of Mark D. Taylor), are parties to this action. Instead, Tyndale "asserts its claims on behalf of itself as well as on behalf of its owners, all of whom share Tyndale's religious beliefs against the [contraceptive coverage mandate]'s application in this case." Compl. ¶ 10.

[5] Plan B is commonly known as the "morning after" pill, and ella as the "week after" pill. See Compl. ¶¶ 81-82.

rights under the RFRA, and the First and Fifth Amendments to the Constitution of the United States. Id. ¶ 7. The plaintiffs further allege that the defendants "violated the [APA] by imposing the [contraceptive coverage mandate] with deliberate disregard of public comments." Id.

The plaintiffs have now moved for a preliminary injunction. Pls.' Mot. at i. They assert that they face imminent harm because their refusal to comply with the ACA will subject them "to the [contraceptive coverage mandate's] draconian penalties." Compl. ¶ 8. Namely, the plaintiffs claim that they "face[], today, the certain prospect of lawsuits from the Secretary of Labor, fines and regulatory penalties." Pls.' Mem. at 43 (original emphasis). The plaintiffs represent that they "cannot afford to sustain the fines threatened by the [contraceptive coverage mandate] at issue in this case." Pls.' Mem., Ex. 1 ¶ 4.

## II. STANDARD OF REVIEW

"'A plaintiff seeking a preliminary injunction must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest.'" Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)) (some alterations in original). Because it is "an extraordinary remedy," a preliminary injunction "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004) (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)).

The District of Columbia Circuit has applied a "sliding scale" approach in evaluating the preliminary injunction factors. Sherley, 644 F.3d at 392. Under this analysis,

> [i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor. For example, if the movant makes a very strong showing of irreparable harm and

7

there is no substantial harm to the non-movant, then a correspondingly lower standard can be applied for likelihood of success . . . Alternatively, if substantial harm to the nonmovant is very high and the showing of irreparable harm to the movant very low, the movant must demonstrate a much greater likelihood of success.  It is in this sense that all four factors must be balanced against each other.

Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (internal

quotation marks and citations omitted).[6]

### III.  LEGAL ANALYSIS

Before addressing the merits of the plaintiffs' claims, the Court first turns to the question

of whether the plaintiffs have standing to pursue their RFRA claim.[7]

#### A.  Standing

"Because Article III limits the constitutional role of the federal judiciary to resolving

cases and controversies, a showing of standing 'is an essential and unchanging' predicate to any

exercise of [federal] jurisdiction."  Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir.

1996) (en banc) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  "'The

irreducible constitutional minimum of standing contains three elements: (1) injury-in-fact, (2)

causation, and (3) redressability.'"  Nat'l Ass'n of Home Builders v. EPA, 667 F.3d 6, 11 (D.C.

---

[6] Several members of the Circuit have read the Supreme Court's decision in Winter to cast doubt on the continued validity of the sliding scale approach.  See Davis, 571 F.3d at 1296 (Kavanaugh, J, joined by Henderson, J., concurring) ("[U]nder the Supreme Court's precedents, a movant cannot obtain a preliminary injunction without showing both a likelihood of success and a likelihood of irreparable harm, among other things" (emphasis in original)); Sherley, 644 F.3d at 393 ("Like our colleagues, we read Winter at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" (quoting Davis, 571 F.3d at 1296 (concurring opinion))).  But the Circuit has had no occasion to decide this question because it has not yet encountered a post-Winter case where a preliminary injunction motion survived the less rigorous sliding scale analysis.  See Sherley, 644 F.3d at 393 ("We need not wade into this circuit split today because, as in Davis, as detailed below, in this case a preliminary injunction is not appropriate even under the less demanding sliding-scale analysis.").  Thus, because it remains the law of this Circuit, the Court must employ the sliding scale analysis here.

[7] As will be explained below, the Court finds that the plaintiffs have shown a likelihood of success on the merits of their RFRA claim, and that the remaining preliminary injunction factors weigh in favor of granting the plaintiffs an injunction on the basis of that claim.  Accordingly, the Court will not address the merits of the plaintiffs' other claims.

Cir. 2011) (citation omitted).  "'Thus, to establish standing, a litigant must demonstrate a personal injury fairly traceable to the [opposing party's] allegedly unlawful conduct [that is] likely to be redressed by the requested relief.'"  Id. (citation omitted).

The parties initially dispute whether Tyndale has standing to raise RFRA and free exercise claims.[8]  According to the defendants, Tyndale is unable to assert such claims on its own behalf because it is a "for-profit corporation [that] does not exercise religion" within the meaning of the RFRA and the First Amendment.  Defs.' Opp'n at 8.  The plaintiffs respond that "[t]here is no business or corporation 'exception'" to the RFRA or the Free Exercise Clause, and that these provisions protect the religious exercise of any entity, regardless of for-profit status.  Pls.' Reply at 1-2.

This Court, like others before it, declines to address the unresolved question of whether for-profit corporations can exercise religion within the meaning of the RFRA and the Free Exercise Clause.  See, e.g., First Nat'l Bank v. Bellotti, 435 U.S. 765, 777-78 n.14 (1978) (recognizing that corporations have First Amendment speech rights, but declining to "address the abstract question whether corporations have the full measure of rights that individuals enjoy under the First Amendment"); Stormans, Inc. v. Selecky, 586 F.3d 1109, 1119 (9th Cir. 2009) ("We decline to decide whether a for-profit corporation can assert its own rights under the Free Exercise Clause . . ."); Church of Scientology of Cal. v. Cazares, 638 F.2d 1272, 1280 n.7 (5th Cir. 1981) (same).  Instead, the Court will assess whether Tyndale has standing to assert the free exercise rights of its owners.[9]

---

[8] The parties' briefs do not focus on plaintiff Mark Taylor's standing, so the Court will not discuss that issue either.

[9] The RFRA "was enacted to reestablish a constitutional test with the expectation that courts would look to constitutional precedent for guidance."  Vill. of Bensenville v. FAA, 457 F.3d 52, 62 n.3 (D.C. Cir. 2006).  Where appropriate, then, the Court will apply free exercise jurisprudence in determining the plaintiffs' standing to raise

(continued . . . )

i.      **Tyndale's Standing to Assert its Owners' Free Exercise Rights**

At least one Circuit Court of Appeals has "held that a corporation has standing to assert the free exercise right of its owners." Stormans, 586 F.3d at 1120 (citing EEOC v. Townley Eng'g & Mfg. Co., 859 F.2d 610, 620 n.15 (9th Cir. 1988)).  The Ninth Circuit first recognized this theory of standing in Townley.  The plaintiff in that case was a closely-held manufacturing company whose owners made a "covenant with God requir[ing] them to share the Gospel with all of their employees." Townley, 859 F.2d at 620.  It sought an exemption, on free exercise grounds, from a provision of Title VII of the Civil Rights Act that required it to accommodate employees asserting religious objections to attending the company's mandatory devotional services. Id. at 620.  Although the plaintiff urged "the court to hold that it [was] entitled to invoke the Free Exercise Clause on its own behalf," the Ninth Circuit deemed it "unnecessary to address the abstract issue whether a for profit corporation has rights under the Free Exercise Clause independent of those of its shareholders and officers" because, in its view, "Townley [was] merely the instrument through and by which Mr. and Mrs. Townley express[ed] their religious beliefs." Id. at 619-20.  The court reasoned that "Townley present[ed] no rights of its own different from or greater than its owners' rights" because the corporation was an "extension of the beliefs" of the owners, and "the beliefs of [the owners were] the beliefs and tenets of the Townley Company." Id. at 620 (internal quotation marks omitted).  The court therefore held that "Townley ha[d] standing to assert Jake and Helen Townley's [f]ree [e]xercise rights," and examined the rights at issue as those of the corporation's owners. Id. at 620 n.15 (citing Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 303 n.26 (1985)).

---

( . . . continued)
their RFRA claims.  The Court will also use the phrase "free exercise rights" to refer collectively to rights protected by the Free Exercise Clause and the RFRA.

The Ninth Circuit subsequently applied <u>Townley</u>'s reasoning in <u>Stormans</u>.  There, a pharmacy brought a free exercise challenge to a state regulation requiring it to dispense Plan B, an emergency contraceptive drug.  <u>Stormans</u>, 586 F.3d at 1117.  In analyzing whether the pharmacy had standing to assert the free exercise rights of its owners, the court emphasized that the pharmacy was a "fourth-generation, family-owned business whose shareholders and directors [were] made up entirely of members of the Stormans family," and that "Kevin Storman's opposition to Plan B [was] that of [the pharmacy's] and all the owners."  <u>Id.</u> at 1120.  The court thus found that the pharmacy was "an extension of the beliefs of members of the Stormans family, and that the beliefs of the Stormans family [were] the beliefs of" the pharmacy.  <u>Id.</u> Because the pharmacy did "not present any free exercise rights of its own different from or greater than its owners' rights," the court held, as it had in <u>Townley</u>, that the company had "standing to assert the free exercise rights of its owners."  <u>Id.</u>

Applying the principles of <u>Townley</u> and <u>Stormans</u> here, as this Court deems it appropriate to do, it is first necessary to dissect Tyndale's corporate structure.  Tyndale is a "closely-held entity" owned by four other entities: the Foundation, the Tyndale Trust, the Kenneth N. Taylor Trust, and the Margaret W. Taylor Trust.  <u>See</u> November 7, 2012 Affidavit of Mark D. Taylor [ECF No. 24] ("Taylor Aff.") ¶ 2; <u>id.</u>, Ex. A.  All five entities were created by Dr. Kenneth Taylor, the father of plaintiff Mark D. Taylor and Tyndale's founder.  <u>Id.</u> ¶ 2.  Dr. Taylor designed Tyndale's ownership structure to accomplish two goals: "to direct [Tyndale's] proceeds to religious charity and educational non-profit work" and "to ensure that the direction of [Tyndale] will remain . . . faithful to his religious beliefs and Christian educational vision even after his passing."  <u>Id.</u> ¶ 3.  To these ends, Dr. Taylor separated the stock of Tyndale into non-

voting shares and voting shares.  Id. ¶ 5.  The Foundation, a "non-profit religious entity," owns 96.5% of Tyndale's total shares.  Id. ¶ 4; Compl. ¶ 45.  Not only is the Foundation the primary recipient of Tyndale's profits, "Tyndale also pays royalties to the Foundation in amounts exceeding $1 million annually, because Dr. Taylor had donated his author rights to the Foundation."  Compl. ¶ 49.  The Foundation distributes the funds it receives from Tyndale "to various charitable causes," primarily "other Christian charities."  Id. ¶¶ 42, 50.  The Tyndale Trust owns 84% of Tyndale's voting shares, and its trustees must "be the same people as the directors of [Tyndale]" to ensure that Tyndale maintains "its religious identity, beliefs, and mission."  Taylor Aff. ¶ 5.  Less than 3.5% of Tyndale's shares are owned by two trusts created for the benefit of Dr. Taylor's widow, Margaret Taylor, and their children.  Id. ¶ 6.  "These family trusts also possess some voting shares so that the religious beliefs of Dr. Taylor's family will continue to influence [Tyndale's] direction."  Id.

The plaintiffs' submissions to the Court indicate that all five Tyndale entities, as well as their directors, trustees, and even many of their employees, share the same religious beliefs:

- Tyndale's Articles of Incorporation declare that its purpose is "[t]o engage as a publisher of Christian and faith-enhancing books."  Id., Ex. B.  And its "Corporate Purpose is 'to minister to the spiritual needs of people, primarily through literature consistent with biblical principles.'"  Compl. ¶ 26.

- Tyndale "holds a weekly chapel service for its employees"; although attendance is voluntary, "well over 50% of the employee population" attends each week.  Id. ¶ 29.  Christian prayer is also a routine practice at meetings of Tyndale's executives and board of directors.  See id. ¶¶ 30-32.

12

- Tyndale's primary owner, the Foundation, has the mission of "'minister[ing] to the spiritual needs of people, primarily through grants to other Christian charities.'"  Id. ¶ 42. Due to "the Foundation's nearly total ownership of Tyndale," the "religious missions" of Tyndale and the Foundation "are largely overlapping and mutually reinforcing."  Id. ¶ 46.

- The Tyndale Trust's trustees, who are also Tyndale's board of directors, "are required to sign a Statement of Faith each year to show that they hold to certain religious beliefs, which are typically described as evangelical Christian beliefs."  Id. ¶ 56.  By signing this "Statement of Faith," the trustee-directors agree that, among other things, they "believe in the divine inspiration, truthfulness, and authority of both Old and New Testament Scriptures in their entirety as the only written word of God, without error in all that it affirms, and the only infallible rule of faith and practice."  Id. ¶ 57.  These measures are designed to ensure that the Tyndale Trust "continue[s] the biblical focus" of Tyndale's mission.  Id. ¶ 54.

- All five entities—Tyndale, the Foundation, the Tyndale Trust, the Margaret W. Taylor Trust, and the Kenneth N. Taylor trust—share the same religious beliefs "in general and with respect to Tyndale's provision of health insurance and omission of [certain contraceptives] therefrom."  Id. ¶ 61.

Thus, as in Townley and Stormans, the beliefs of Tyndale and its owners are indistinguishable.  Tyndale is a closely-held corporation owned by four entities united by their Christian faith, each of which plays a distinct role in achieving shared, religious objectives. Christian principles, prayer, and activities are pervasive at Tyndale, and the company's ownership structure is designed to ensure that it never strays from its faith-oriented mission.  The

13

Court has no reason to doubt, moreover, that Tyndale's religious objection to providing

insurance coverage for certain contraceptives reflects the beliefs of Tyndale's owners.  Nor is

there any dispute that Tyndale's primary owner, the Foundation, can "exercise religion" in its

own right, given that it is a non-profit religious organization; indeed, the case law is replete with

examples of such organizations asserting cognizable free exercise and RFRA challenges.  See,

e.g., Jimmy Swaggart Ministries v. Bd. of Equalization of Cal., 493 U.S. 378, 381, 384 (1990);

Bob Jones Univ. v. United States, 461 U.S. 574, 579-85, 602-04 (1983); EEOC v. Catholic Univ.

of Am., 83 F.3d 455, 467-70 (D.C. Cir. 1996).  Accordingly, because Tyndale does "not present

any free exercise rights of its own different from or greater than its owners' rights," it has

"standing to assert the free exercise rights of its owners."[10]  Stormans, 586 F.3d at 1120.

     The defendants argue that nothing in Townley or Stormans suggests that a regulation that

burdens a corporation alone can also constitute a burden on its owners.  Defs.' Opp'n at 17-18.

But, at least for the purposes of standing in the free exercise context, that is precisely what those

cases held.  Specifically, Townley and Stormans recognize that when the beliefs of a closely-held

corporation and its owners are inseparable, the corporation should be deemed the alter-ego of its

owners for religious purposes.  See Stormans, 586 F.3d at 1120.  In such circumstances, courts

must "consider the rights of the owners as the basis for the [f]ree [e]xercise claim" brought by

---

[10] Tyndale's unique corporate structure serves to distinguish this case from other recent decisions involving free exercise and RFRA challenges to the contraceptive coverage mandate brought by secular, for-profit corporations. See, e.g., Legatus v. Sebelius, __ F. Supp. 2d __, 2012 WL 5359630 (E.D. Mich. 2012); O'Brien v. HHS, __ F. Supp. 2d __, 2012 WL 4481208 (E.D. Mo. 2012); Newland v. Sebelius, __ F. Supp. 2d __, 2012 WL 3069154 (D. Colo. 2012).

the corporation, even if the regulation technically applies only to the corporation.[11]  See id. at

1120-22 (emphasis added).

Viewing the rights of Tyndale's owners (in particular, those of the Foundation) as the

basis for its RFRA claim, the Court finds that Tyndale has made a satisfactory showing of

Article III standing.  According to the complaint, Tyndale has been subject to the contraceptive

coverage mandate since it became effective on October 1, 2012, and, based on its noncompliance

with the law on religious grounds, it currently faces heavy fines and penalties that accrue daily,

as well as likely governmental enforcement actions.  See Compl. ¶¶ 87-99.  The defendants do

not dispute these allegations.  Tyndale has therefore shown an "actual or imminent" injury-in-

fact that is "concrete and particularized" and "'fairly . . . traceable'" to the contraceptive

coverage mandate.  Lujan, 504 U.S. at 560 (citations and brackets omitted).  This injury would,

moreover, be redressed by a court decision holding the contraceptive coverage mandate unlawful

and enjoining its enforcement against Tyndale.  Article III requires no more.

**ii.     Third-Party Standing**

Even if this Court were not inclined to adopt the Townley-Stormans theory of free

exercise standing,[12] it would nonetheless find that Tyndale has standing to assert its owners' free

---

[11] The defendants caution that accepting the Townley-Stormans theory of standing "would expand [the] RFRA's scope in an extraordinary way" by allowing "owner[s'] religious beliefs [to be] automatically imputed to [their] compan[ies]."  Defs.' Opp'n at 16.  This, in the defendants' estimation, would allow "millions of shareholders of publicly traded companies [to] assert RFRA claims on behalf of those companies."  Id.  But Townley and Stormans are far more limited than the defendants indicate—the cases only permit a corporation to assert the free exercise rights of its owners when it is closely-held and the beliefs of the corporation are an extension of the owners' beliefs.  See Stormans, 586 F.3d at 1120.  Furthermore, Townley has been the law of the Ninth Circuit since 1988, yet nothing has been presented to show that courts in that Circuit have been flooded with free exercise and RFRA claims by for-profit corporations.

[12] Although the plaintiffs rely heavily on Townley and Stormans, see Pls.' Mem. at 10, 14, 20, the defendants do not attack the reasoning of those decisions apart from stating, without elaboration, that the Ninth Circuit's standing analysis was "probably incorrect[.]"  Defs.' Opp'n at 16.  The Court is therefore left to guess where the defendants

(continued . . . )

exercise rights under the third-party standing doctrine, despite the defendants' arguments to the contrary.  <u>See</u> Defs.' Opp'n at 14.  The standing inquiry "involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'"  <u>Kowalski v. Tesmer</u>, 543 U.S. 125, 128 (2004) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975)).  One of the standing doctrine's "prudential limitations" is "the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"  <u>Id.</u> at 128-29 (quoting <u>Warth</u>, 422 U.S. at 499).  The Supreme Court has, however, "recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied": (1) "[t]he litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute"; (2) "the litigant must have a close relation to the third party"; and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests."  <u>Powers v. Ohio</u>, 499 U.S. 400, 410-11 (1991) (citations omitted).

       The Court will thus analyze whether Tyndale has satisfied the third-party standing criteria with respect to its primary owner, the Foundation.  As discussed above, Tyndale has shown a sufficient injury-in-fact that is fairly traceable to the contraceptive coverage mandate, and therefore has satisfied the first criterion.  Regarding the "close relationship" requirement, <u>Powers</u> states that courts should examine whether the plaintiff and third party have a "congruence of interests" such that the plaintiff will be a "motivated, effective advocate for the [third party's] rights."  <u>Id.</u> at 414.  These conditions are present here, as Tyndale and the Foundation are closely-linked entities that share common religious objections to the contraceptive coverage

---

( . . . continued)
believe <u>Townley</u> and <u>Stormans</u> went wrong.  In any event, the Court's third-party standing analysis provides an independent basis for finding that Tyndale has standing to assert its owners' free exercise rights.

mandate.  <u>See</u> Compl. ¶ 46 ("By virtue of the Foundation's nearly total ownership of Tyndale,"

the "religious missions" of Tyndale and the Foundation "are largely overlapping and mutually

reinforcing."); <u>id.</u> ¶ 61 (alleging that all five Tyndale entities hold the same religious beliefs "in

general and with respect to Tyndale's provision of health insurance and omission of [certain

contraceptives] therefrom").  There can be little doubt, then, that Tyndale will effectively

advocate for the Foundation's rights.

     Turning to the "hindrance" prong of the third-party standing analysis, the Court must

examine the "likelihood and ability of the third parties . . . to assert their own rights."  <u>Powers</u>,

499 U.S. at 414.  The defendants take a perplexing, self-defeating position on this issue.  They

initially argue that Tyndale's owners are not "hindered" from asserting their own rights and that

the owners' absence as parties to this action is "[i]nexplicabl[e]."  Defs.' Opp'n at 13.  But then,

in the same breath, the defendants contend that Tyndale's owners are <u>not</u> the parties allegedly

injured by the contraceptive coverage mandate—Tyndale is.  <u>See id.</u> at 14.  Thus, by the

defendants' own admission, the Foundation faces a legal impediment to challenging the

contraceptive coverage mandate in court, i.e., lack of a direct injury-in-fact.  This suffices to

satisfy the "hindrance" criterion.  <u>See</u> <u>Powers</u>, 499 U.S. at 414-15 (indicating that inability to

show a cognizable injury under Article III is one of the potential "barriers to suit" for a third

party (citing <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 105-110 (1983)).

     It bears emphasizing that if the Court accepted the defendants' position, no Tyndale

entity would have standing to challenge the contraceptive coverage mandate—not even the

Foundation.  This is because, in the defendants' view, Tyndale—though directly injured by the

regulation—cannot exercise religion, and the Foundation—though capable of exercising

religion—is not directly injured by the regulation.  The third-party standing doctrine serves to avoid such conundrums.  Indeed, the Supreme Court has "been quite forgiving with [the third-party standing] criteria" where, as here, "'enforcement of the challenged restriction <u>against the litigant</u> would result indirectly in the violation of third parties' rights.'"  <u>Kowalski</u>, 543 U.S. at 130 (quoting <u>Warth</u>, 422 U.S. at 510) (emphasis in original).  Because Tyndale has satisfied all three requirements of third-party standing, it may assert the Foundation's free exercise rights in this case.[13]

### B.   Likelihood of Success on the Merits

#### 1.   The Plaintiff's RFRA claim

The RFRA forbids the government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the government can "demonstrate[] that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a), (b).  Congress enacted the RFRA in response to the Supreme Court's decision in <u>Employment Division, Department of Human</u>

---

[13] Another one of the defendants' arguments warrants brief mention: they contend that allowing a for-profit corporation such as Tyndale to assert a RFRA claim would undermine the enforcement of federal anti-discrimination laws—namely, Title VII of the Civil Rights Act of 1964.  <u>See</u> Defs.' Opp'n at 10-11.  This contention is based on the defendants' view that Tyndale does not qualify as an exempt "religious corporation" under Title VII, and is instead a covered "employer" under that statute.  <u>Id.</u> at 10.  The defendants argue that permitting the corporation to assert a RFRA claim would effectively exempt it from Title VII, thus "overriding the congressionally prescribed scope of the Title VII religious exemption."  <u>Id.</u>  The Court finds several flaws in this reasoning.  First, it is unclear that Tyndale would <u>not</u> qualify as an exempt "religious corporation" under Title VII.  <u>See LeBoon v. Lancaster Jewish Comm. Ctr. Ass'n</u>, 503 F.3d 217, 226 (3d Cir. 2007) (setting forth several, non-dispositive factors that courts must consider in determining whether an entity qualifies as a religious corporation).  Second, even assuming Tyndale is a covered employer under Title VII, allowing it to assert a RFRA challenge (at least on behalf of its owners, as the Court has done here) would not necessarily exempt the corporation from Title VII.  That is just the first step in the analysis.  If, hypothetically, the corporation were sued under Title VII and then raised the RFRA as a defense, a court would proceed to analyze whether the application of Title VII substantially burdened religious exercise, whether the law advanced compelling governmental interests, and whether the law was the least restrictive means of advancing those interests.  <u>See</u> 42 U.S.C. § 2000bb-1(a), (b).  In other words, just because a corporation is <u>allowed</u> to assert a RFRA claim does not mean that it will <u>succeed</u> on the claim.

Resources of Oregon v. Smith, 494 U.S. 872 (1990), in which the Court held that the right to free

exercise of religion under the First Amendment does not exempt an individual from a law that is

neutral and of general applicability, and explicitly disavowed the test used in earlier decisions,

which prohibited the government from substantially burdening a plaintiff's religious exercise

unless the government could show that its action served a compelling interest and was the least

restrictive means to achieve that interest.  See 42 U.S.C. § 2000bb(a); Smith, 494 U.S. at 879-80,

883-85.  In Congress' estimation, Smith had "virtually eliminated the requirement that the

government justify burdens on religious exercise imposed by laws neutral to religion."  42

U.S.C. § 2000bb(a)(4).  The stringent requirements imposed by the RFRA reflect Congress'

judgment that "governments should not substantially burden religious exercise without

compelling justification" and are intended "to restore the compelling interest test as set forth in

Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972)."  Id. §§

2000bb(a)(3), (b)(1).  Accordingly, courts look to pre-Smith free exercise jurisprudence in

assessing RFRA claims.  See Vill. of Bensenville v. FAA, 457 F.3d 52, 62 (D.C. Cir. 2006).

### i.     The Substantial Burden Prong

Under the RFRA, "exercise of religion" is defined as "any exercise of religion, whether

or not compelled by, or central to, a system of religious belief."  See 42 U.S.C. § 2000bb-2

(defining "exercise of religion" as defined in 42 U.S.C. § 2000cc-5 (2006)).  The plaintiffs assert

that they "have a sincere conscientious religious objection to providing coverage for

abortifacients[14] and related education and counseling in Tyndale's health insurance plan,"

---

[14] The plaintiffs use the term "abortifacients" to refer to the three contraceptives at issue in this case—Plan B, ella, and intrauterine devices—which they state "cause the demise of an already conceived/fertilized human embryo." See, e.g., Compl. ¶¶ 59, 75, 81-83.

Compl. ¶ 88, and that they "cannot in good conscience violate their religious beliefs by providing coverage for emergency contraception, IUDs, or counseling or education in furtherance of the same, in Tyndale's health insurance plan," id. ¶ 89.  The defendants concede that the plaintiffs' religious belief is sincere, but dispute that the contraceptive coverage mandate substantially burdens this religious belief.[15]  Defs.' Opp'n at 14.

To determine whether the contraceptive coverage mandate substantially burdens the plaintiffs' religious exercise, the Court must consider whether the government action "puts 'substantial pressure on [the] adherent[s] to modify [their] behavior and to violate [their] beliefs.'"  Kaemmerling v. Lappin, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting Thomas v. Review Bd. of Ind. Employ. Sec. Div., 450 U.S. 707, 718 (1981)).  For example, in Wisconsin v. Yoder, the Supreme Court held that a state's compulsory school-attendance law substantially burdened the Amish plaintiffs' religious exercise because the "law affirmatively compel[led] them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs."  406 U.S. at 218.  Similarly, the imposition of significant added expense to a religious practice can, under some circumstances, rise to the level of a substantial burden.  See Jimmy Swaggart Ministries, 493 U.S. at 392 (declining to find that the plaintiff's religious exercise was substantially burdened, but noting that "it is of course possible to imagine that a more onerous tax rate, even if generally applicable, might effectively choke off an adherent's religious practices").

Government action can substantially burden a plaintiff's religious exercise even if the law only results in the plaintiff being forced to forego a government benefit.  In Sherbert, the

---

[15] Because the Court has already held that the plaintiffs have standing to assert their RFRA claim, the Court will confine its analysis in this section to a consideration of whether the circumstances here constitute a substantial burden.

Supreme Court found that the state had substantially burdened the plaintiff's religious exercise by denying her unemployment benefits because, in accordance with the tenets of her faith, she was unwilling to work on Saturdays.  374 U.S. at 403-04.  The Court held that "the pressure upon [the plaintiff] to forego that practice is unmistakable" because the government's action "forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand."  Id. at 404.  In Thomas, the Court applied similar reasoning to conclude that the plaintiff's religious exercise was substantially burdened by the state's denial of unemployment benefits because the plaintiff, citing religious objections, voluntarily quit his job at a manufacturing plant after the factory began producing weapons.  450 U.S. at 717-18.  And, the Court found that the "indirect" nature of the burden did not render the burden insubstantial.  See id. at 718.

As in Yoder, the contraceptive coverage mandate affirmatively compels the plaintiffs to violate their religious beliefs in order to comply with the law and avoid the sanctions that would be imposed for their noncompliance.  Indeed, the pressure on the plaintiffs to violate their religious beliefs is "unmistakable."  Sherbert, 374 U.S. at 404.  The plaintiffs contend that compliance with the contraceptive coverage mandate would violate their sincerely-held religious beliefs, Pl.'s Mem. at 8-9, but if the plaintiffs adhere to their religious beliefs and do not comply with the contraceptive coverage mandate, they are subject to suit, see 29 U.S.C. § 1132(a) (providing for civil enforcement actions by the Department of Labor and insurance plan participants), and to considerable financial penalties, see 26 U.S.C. § 4980D(a), (b) (providing for penalty of $100 per day per employee for noncompliance with coverage provisions of the

ACA); 26 U.S.C. § 4980H (providing for annual tax assessment for noncompliance with requirement to provide health insurance).  And the plaintiffs assert that the penalties to which Tyndale may be subject under the law would result in the ultimate closure of the business.  See Compl. ¶¶ 112-15; Pls.' Mem., Ex. 1, ¶ 4 ("Tyndale House Publishers cannot afford to sustain the fines threatened by the Mandate at issue in this case.").

In Thomas v. Anchorage Equal Rights Commission, the Ninth Circuit considered an analogous dilemma involving the choice between compliance with a state law prohibiting discrimination in housing based on marital status and the plaintiffs' exercise of their religious beliefs prohibiting their facilitation of the cohabitation of unmarried couples.  165 F.3d 692, 696-97 (9th Cir. 1999), rev'd on other grounds en banc, 220 F.3d 1134 (9th Cir. 2000).  The court found that the effect of the law was to "put [the plaintiffs] out of business" by effectively banning them from the rental market due to their inability to comply with the law in accordance with their religious belief, and, relying on the Supreme Court's reasoning in cases considering the denial of unemployment benefits, held that the law therefore substantially burdened the plaintiffs' exercise of religion.  Id. at 712-14.

The Thomas court's reasoning is persuasive here.  The contraceptive coverage mandate similarly places the plaintiffs in the untenable position of choosing either to violate their religious beliefs by providing coverage of the contraceptives at issue or to subject their business to the continual risk of the imposition of enormous penalties for its noncompliance.  Such a threat to the very continued existence of the plaintiffs' business necessarily places substantial pressure on the plaintiffs to violate their beliefs.  Government action that creates such a Hobson's

choice for the plaintiffs amply shows that the contraceptive coverage mandate substantially

burdens the plaintiffs' religious exercise.

The defendants nonetheless urge the Court to adopt the reasoning of O'Brien v. HHS, __

F. Supp. 2d __, 2012 WL 4481208 (E.D. Mo. 2012).  There, the court considered the application

of the contraceptive coverage mandate to plaintiffs Frank O'Brien and O'Brien Industrial

Holdings, LLC, "a secular, for-profit company in St. Louis, Missouri, that is engaged in the

business of mining, processing, and distributing refractory and ceramic materials and products,"

of which Mr. O'Brien is the chairman and managing member.  Id. at __, *1.  Mr. O'Brien is

Catholic and "tries to manage and operate [his company] in a manner consistent with his

religion."  Id.  The company's lobby contains a religious statue, the company's mission and

statement of values contain religious references, and the company and its subsidiaries pledge to

tithe the earnings generated by the companies.  Id. __, *1 n.3.  The company also provides health

insurance to its employees through a group plan.  Id. at __, *2.  The O'Brien plaintiffs brought a

RFRA claim against the same six defendants currently before this Court, alleging that inclusion

of contraceptive coverage in the company's group plan would violate the plaintiffs' religious

belief that requires the "condemnation of contraception."  Id. at __, *4.

The court dismissed the plaintiffs' RFRA claim, holding that the plaintiffs had failed to

show that the contraceptive coverage mandate substantially burdened their religious exercise.  Id.

at __, *6-7.  Describing the burden at issue as the "funds, which plaintiffs will contribute to a

group health plan, [that] might, after a series of independent decisions by health care providers

and patients covered by [the company's] plan, subsidize someone else's participation in an

activity that is condemned by plaintiffs' religion," the court reasoned that the burden on the

plaintiffs' religious exercise was simply too attenuated to qualify as "substantial."  Id. at __, *6
(emphasis in original).  The court emphasized that the decision to use contraceptives, the
objectionable act, was ultimately in the hands of a third party, the plan participant, and that such
a burden was not within the contemplation of the RFRA.  See id. (stating that the RFRA
"protects individuals from substantial burdens on religious exercise that occur when the
government coerces action one's religion forbids, or forbids action one's religion requires; it is
not a means to force one's religious practices upon others").  The court therefore found that this
"slight" burden of requiring the plaintiffs to contribute to a group plan that provides
contraceptive coverage "has no more than a de minimus impact on the plaintiff's [sic] religious
beliefs than paying salaries and other benefits to employees."  Id. at __, *6-7.

       The Court finds the facts of the instant case to be sufficiently distinguishable from
O'Brien to warrant a different result.  One crucial distinction lies in the method by which the
companies in each case provide health insurance.  In O'Brien, the plaintiffs provided health
insurance to their employees through a group health insurance policy which was separately
administered by an insurance company.  See id. at __, *2.  Here, the plaintiffs provide direct
coverage to Tyndale employees through a self-insured plan in which "Tyndale acts as its own
insurer."  Compl. ¶ 73.  This difference in the manner in which coverage is provided is
significant because while the company in O'Brien contributes to a health insurance plan which
ultimately pays for the services used by the plan participants, Tyndale itself directly pays for the
health care services used by its plan participants, thereby removing one of the "degrees" of
separation that the court deemed relevant in O'Brien, __ F. Supp. 2d at __, 2012 WL 4481208  at
*7.

If O'Brien is intended to stand for the proposition that a plaintiff can never demonstrate that its religious exercise is substantially burdened by a law that forces it to pay for services to which it objects that are ultimately chosen and used by third parties, this Court must respectfully disagree.  As noted, a substantial burden exists when government action places "'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"  Kaemmerling, 553 F.3d at 678 (quoting Thomas, 450 U.S. at 718).  The plaintiffs' specific objection is not simply to the use of the contraceptives at issue, but to "providing coverage for abortifacients and related education and counseling in Tyndale's health insurance plan."  Compl. ¶¶ 88-89.  As discussed at length above, the contraceptive coverage mandate puts substantial pressure on the plaintiffs to violate their religious beliefs against the provision of coverage for the three contraceptives at issue.  Therefore, the requirement to provide such coverage directly burdens the plaintiffs' religious objection to providing such coverage.  Because it is the coverage, not just the use, of the contraceptives at issue to which the plaintiffs object, it is irrelevant that the use of the contraceptives depends on the independent decisions of third parties.  And even if this burden could be characterized as "indirect," the Supreme Court has indicated that indirectness is not a barrier to finding a substantial burden.  Thomas, 450 U.S. at 718.

Finally, the O'Brien court's statement that the RFRA "is not a means to force one's religious practices upon others," __ F. Supp. 2d at __, 2012 WL 4481208 at *6, is not relevant to whether a plaintiff's religious exercise is substantially burdened, but rather applies to the issue of whether the government's interest is sufficiently compelling to justify the substantial burdening of a plaintiff's religious exercise.  The statutory language of the RFRA does not contain the limitation suggested in O'Brien, and this Court finds no justification to read such a limitation

into the statute.  Under the RFRA, substantially burdening a plaintiff's religious exercise is only justified if the law serves a compelling government interest and is the least restrictive means to accomplish that interest.  42 U.S.C. § 2000bb-1(b).  Third party harm may rise to the level of a compelling interest, but absent such a showing, it is not the proper role of this Court to question the solicitude given to religious exercise embodied by the RFRA.

The holding in Mead v. Holder, 766 F. Supp. 2d 16 (D.D.C. 2011), aff'd, Seven-Sky v. Holder, 661 F.3d 1 (D.C. Cir. 2011), does not change the Court's analysis either.  The RFRA claim in Mead concerned the application of the ACA's individual coverage mandate to two plaintiffs who asserted a religious belief "that God will provide for [their] physical, spiritual, and financial well-being," 766 F. Supp. 2d at 42 (citation omitted), and that the individual coverage mandate therefore "conflicts with their Christian faith because it requires them to perform an act that implies that they doubt God's ability to provide for their health," id.  The Mead court held that the plaintiffs had failed to show that the individual mandate provision substantially burdened their religious exercise because the law provided the plaintiffs the option of making a shared responsibility payment in lieu of obtaining health insurance and therefore did not pressure them to violate their beliefs.  Id.  Further, the Mead court noted that the plaintiffs "routinely contribute to other forms of insurance, such as Medicare, Social Security, and unemployment taxes, which present the same conflict with their belief that God will provide for their medical and financial needs."  Id.

The circumstances of this case are considerably different.  Unlike the plaintiffs in Mead, the only alternative offered to the plaintiffs here is noncompliance with the contraceptive coverage mandate and its attendant risk of suit and enormous financial penalties.  The

availability of a reasonable alternative for the plaintiffs in <u>Mead</u> eliminated the pressure on them to violate their religious beliefs; the plaintiffs here have no such alternative, and therefore, the pressure to violate their religious beliefs remains undiminished.  The <u>Mead</u> court's reasoning regarding the plaintiffs' contribution to programs such as Medicare and Social Security is irrelevant here.  The objection raised in <u>Mead</u> to participation in a health insurance plan is implicated in the exact same manner with respect to the plaintiffs' participation in other social welfare programs that provide for their medical and financial needs, whereas the objection raised here to directly providing coverage of the contraceptives at issue is easily distinguished from generally contributing to federal programs that provide the contraceptives at issue.  As discussed above, one of the reasons this Court declines to adopt the reasoning in <u>O'Brien</u> is that the burden placed on the plaintiffs here is considerably more direct because Tyndale's health plan is self-insured.

Moreover, the Supreme Court has cautioned courts to avoid parsing a plaintiff's religious beliefs for inconsistency, and this Court will heed that warning.  <u>See</u> <u>Thomas</u>, 450 U.S. at 715-16 (admonishing that "[c]ourts should not undertake to dissect religious beliefs").  In <u>Thomas</u>, the Supreme Court rejected an argument that the plaintiff's claimed objection to working in a facility that produced armaments was inconsistent with his prior work in the same facility producing sheet metal that may have been ultimately used in the production of armaments, stating "[w]e see . . . that Thomas drew a line, and it is not for us to say that the line he drew was an unreasonable one."  <u>Id.</u>  The plaintiffs here have similarly drawn a line.  To hold that the plaintiffs' belief regarding direct coverage of the contraceptives at issue requires the plaintiffs to also object to contributing to federal programs that provide the same contraceptives is to engage in exactly the

kind of impermissible interrogation of religious beliefs that the Supreme Court warned against.
See Thomas, 450 U.S. at 715-16.

The plaintiffs have therefore shown that the contraceptive coverage mandate substantially
burdens their religious exercise.  The Court will now consider whether the mandate can
nevertheless be applied to the plaintiffs because it serves a compelling interest and is the least
restrictive means to accomplish the government's interest.

### ii.    The Compelling Interest Prong

If a plaintiff demonstrates a substantial burden on its religious exercise, the RFRA
requires that the government then demonstrate that it has "a compelling governmental interest"
justifying the burden.  42 U.S.C. § 2000bb-1(a), (b).  At the preliminary injunction stage, as at
trial, the burden is on the government to demonstrate a compelling interest.  Gonzales v. O
Centro Espirita Beneficente Uniao Do Vegetal, 546 U.S. 418, 429 (2006) (citing Ashcroft v.
ACLU, 542 U.S. 656 (2004)).  "The statute makes clear that the term 'demonstrates' means
meets the burdens of going forward with the evidence and of persuasion."  Potter v. District of
Columbia, 558 F.3d 542, 546 (D.C. Cir. 2009) (quoting 42 U.S.C. § 2000bb-2(3)) (quotation
marks omitted).

The defendants claim that the government has two compelling interests regarding the
application of the contraceptive coverage mandate.  First, the defendants claim an interest in
promoting public health, Defs.' Opp'n at 20-21, and this Circuit has recognized that the
government "has a compelling interest in safeguarding the public health by regulating the health
care and insurance markets," Mead, 766 F. Supp. 2d at 43 (citing Olsen v. DEA, 878 F.2d 1458,
1462 (D.C. Cir. 1989)).  Second, the defendants claim an interest in providing employed women
with access to health care on par with employed men, Defs.' Opp'n at 21-22, and the Supreme

Court has recognized the "importance, both to the individual and to society, of removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women," Roberts v. United States Jaycees, 468 U.S. 609, 626 (1984). There is undoubtedly a compelling interest in "[a]ssuring women equal access to . . . goods, privileges, and advantages" enjoyed by men. Id.

While the defendants have broad, compelling interests in both promoting public health and ensuring that women have equal access to health care, the question that this Court must answer under the RFRA here is whether the government has shown that the application of the contraceptive coverage mandate to the plaintiffs furthers those compelling interests. 42 U.S.C. § 2000bb-1(b)(1). That is, the defendants must show that requiring the plaintiffs to provide the contraceptives to which they object—Plan B, ella, and intrauterine devices (as well as education and counseling regarding the same)—will further the government's compelling interests in promoting public health and in providing women equal access to health care.

The defendants object to the Court limiting its focus to "the specific characteristics of Tyndale's work force and health plan." Defs.' Opp'n at 22. However, it is upon exactly those specific characteristics that the Court's RFRA analysis must turn. "[The] RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." O Centro, 546 U.S. at 430 (quoting 42 U.S.C. § 2000bb-1(b)) (emphasis added). The Court is required to "look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." Id. at 431 (emphasis added); see

also Yoder, 406 U.S. at 236 ("[I]t was incumbent on the State to show with more particularity

how its admittedly strong interest in compulsory education would be adversely affected by

granting an exemption to the Amish.") (emphasis added); Kaemmerling, 553 F.3d at 682 ("We

must look beyond the broadly formulated interests justifying the general applicability of the

[RFRA] to examine the interests the government seeks to promote as applied to [the plaintiff]

and the impediment to those objectives that would flow from granting him a specific

exemption.") (internal citation and quotation marks omitted) (emphasis added).[16]

      The defendants primarily rely on the Institute Report as the basis for demonstrating that

requiring employers to provide contraceptives to their employees will further the government's

stated interests.  Defs.' Opp'n at 21 (citing the Institute Report for the proposition that

"[i]ncreased access to contraceptive services is a key part of these predicted health outcomes, as

a lack of contraceptive use has proven to have negative health consequences for both women and

a developing fetus.").  The Institute Report, in turn, broadly defines "[p]reventive services for

women" as those "that prevent conditions harmful to women's health and well-being."  Institute

Report at 20.  Among the conditions discussed in the Institute Report is "[u]nintended

pregnancy[, which] is defined as a pregnancy that is either unwanted or mistimed at the time of

conception."  Id. at 102.  The Institute Report goes on to discuss the health risks associated with

unintended pregnancy, including the failure to seek prenatal care in a timely manner as a result

of not being aware of the pregnancy and the lack of "motivat[ion] to discontinue behaviors that

---

[16] The defendants try to minimize the RFRA's demanding requirements by contending that "[i]n practice, courts have not required the government to analyze the impact of a regulation on the single entity seeking an exemption, but have expanded the inquiry to all similarly situated individuals or organizations."  Defs.' Opp'n at 22.  They then go on to cite several cases pre-dating the Supreme Court's decision in O Centro.  See id. at 22-23.  Regardless of what those courts held, O Centro made clear that, under the RFRA, "courts should strike sensible balances[] pursuant to a compelling interest test that requires the Government to address the particular practice at issue."  O Centro, 546 U.S. at 439 (emphasis added).

present risks for the developing fetus," as well as "depression, anxiety, or other conditions." Id.
at 103. The Institute Report further points to "the increased risk of adverse pregnancy outcomes
for pregnancies that are too closely spaced," id. at 103, as well as the risks that women with
certain health conditions might face as a result of becoming pregnant, id. at 103-04. The
preventive services prescribed in the Institute Report for unintended pregnancies "include
contraception (i.e., all FDA-approved contraceptive drugs and devices, sterilization procedures)
as well as patient education and counseling." Id. at 102. On the recommendation of the
Institute, those same services are required to be provided under the contraceptive coverage
mandate. 76 Fed. Reg. 46621-01.

    Lacking from the Institute Report and from the defendants' brief is any proof that
mandatory insurance coverage for the specific contraceptives to which the plaintiffs object—
Plan B, ella, and intrauterine devices—furthers the government's compelling interests, or that
granting the plaintiffs' requested exemption would meaningfully impede the government's
interests. See Kaemmerling, 553 F.3d at 682. This omission is noteworthy because the plaintiffs
do provide coverage of some contraceptives through their health care plan, namely those that do
not "cause the demise of an already conceived/fertilized human embryo." Compl. ¶ 39. The
Institute Report states only that, in order to promote public health and equalize access to health
care, "[p]reventive services may . . . include the provision of . . . Food and Drug Administration-
approved medications and devices," Institute Report at 20 (emphasis added), including
contraceptives, id. at 102-105. There is no specific finding that the government must ensure that
Plan B, ella, and intrauterine devices, as opposed to other forms of contraception, be covered
under the plaintiffs' health plan in order to further the government's compelling interests. Given

that the plaintiffs object to providing a very specific subset of contraceptive drugs and devices, while consenting to provide many others, it is not clear, and the defendants have not made it clear, how the government's compelling interests in promoting health care and equalizing access to health care are furthered by requiring the provision of the contraceptives at issue.[17]  Because the defendants have failed at this stage to demonstrate why the plaintiffs in this case must be required to comply with the entirety of the contraceptive coverage mandate, the Court is forced to conclude that the government has not shown that the application of the contraceptive coverage mandate to the plaintiffs furthers its compelling interests.  "The [g]overnment's mere invocation of the general characteristics" of contraceptives as promoting public health or of their provision as equalizing access to health care "cannot carry the day."  O Centro, 546 U.S. at 432; see also 42 U.S.C. § 2000bb-1(b)(1).

The defendants point also to the government's interest in avoiding the potential harm that could "befall female employees (and covered spouses and dependents) who do not necessarily share their employer's religious beliefs."  Defs.' Opp'n at 24.  They argue that granting an exemption to the plaintiffs would effectively hoist the plaintiffs' religious beliefs above those of the plaintiffs' employees.  Id.  The plaintiffs, in response, point to the fact that "the government itself has voluntarily omitted 191 million people from the" contraceptive coverage mandate.  Pls.' Mem. at 22.  In particular, the contraceptive coverage mandate does not apply to grandfathered plans, 42 U.S.C. § 18011; 45 C.F.R. § 147.140, employers with fewer than 50

---

[17] Indeed, the contraceptive coverage mandate makes up only a part of the "comprehensive package of clinical preventive services for women" recommended by the Institute.  Institute Report at 22.  The recommendations address the need for women to have equal access to preventive services relating to diabetes and gestational diabetes; cervical cancer; sexually transmitted infections; HIV; unintended pregnancy and healthy birth spacing; breastfeeding; interpersonal and domestic violence; and well-woman preventive visits.  Id. at 79-134.  The plaintiffs here challenge only a portion of the "comprehensive package" meant to further the government's compelling interests.  Id. at 22.

employees, 42 U.S.C. § 300gg-13(a); 76 Fed. Reg. at 46621-01 n.1, "member[s] of a recognized religious sect or division thereof" who have religious objections to the concept of health insurance, 26 U.S.C. § 5000A(d)(2)(A), or religious employers, as defined above, 45 C.F.R. § 147.130(a)(1)(iv).

      "[A] law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." Church of the Lukumi Bablu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 547 (1993) (quotation marks omitted). The very purpose of a law is undermined where it is "so woefully underinclusive as to render belief in [its] purpose a challenge to the credulous." Republican Party of Minn. v. White, 536 U.S. 765, 780 (2002). Indeed, where the government's proffered compelling interest exists both with respect to employers subject to a law and with respect to those exempt from the law, "it is difficult to see how [the] same findings [supporting the government's interest] alone can preclude any consideration of a similar exception" for a similarly-situated plaintiff. O Centro, 546 U.S. at 433.

      In O Centro, the government sought to enforce the Controlled Substances Act, 21 U.S.C. § 801 (2006), as to an American branch of a Christian Spiritist Sect based in Brazil. 546 U.S. at 425. The plaintiffs there "receiv[ed] communion through hoasca . . . , a sacramental tea made from two plants unique to the Amazon region," one of which contained a substance regulated by the Controlled Substances Act. Id. The Controlled Substances Act, in turn, imposes "criminal sentence[s] for simple possession" of the substance, which the government conceded imposed a substantial burden on the plaintiffs' exercise of religion within the meaning of the RFRA. Id. at 425-26. Applying the RFRA's compelling interest test, the Supreme Court held that "the

Government failed to demonstrate, at the preliminary injunction stage, a compelling interest in barring the [plaintiffs'] sacramental use of hoasca." Id. at 439.  In so holding, the Supreme Court pointed to the broad exemption for the use of peyote—a drug which also contained a regulated, controlled substance—that the Act granted "for hundreds of thousands of Native Americans practicing their faith."  Id. at 433.  The Court observed that "[e]verything the Government says about [the dangers of hoasca] . . . applies in equal measure to . . . peyote, yet both the Executive and Congress itself have decreed an exception from the Controlled Substances Act for Native American religious use of peyote."  Id.  Thus, the Court concluded that the existence of an exemption for a similarly dangerous drug undermined the government's interest in prohibiting the plaintiffs from using hoasca.  Id.

As outlined above, and as in O Centro, the defendants have already granted exemptions to other employers—either by way of an explicit "religious employer" exemption or another broad provision that functionally excludes other sets of employers from the scope of the contraceptive coverage mandate.  Indeed, the 191 million employees excluded from the contraceptive coverage mandate include those covered by grandfathered plans alone.  75 Fed. Reg. 34538-01, 34,550 (June 17, 2010).  The defendants have provided no information whatsoever about the number of employees excluded under the other exemptions or exclusions. From all indications, the government's findings (through the Institute Report) supporting its compelling interests in the promotion of public health and in equalizing women's access to health care "appl[y] in equal measure," O Centro, 546 U.S. at 433, to both the large number of employers and employees falling outside, as well as to those, like the plaintiffs, falling within the

contraceptive coverage mandate.  The existence of these exemptions significantly undermines the defendants' interest in applying the contraceptive coverage mandate to the plaintiffs.

Thus, because the government has not "assess[ed] the particulars of the [plaintiffs']" objections, nor "weigh[ed] the impact of an exemption for [their] specific" objection, O Centro, 546 U.S. at 430, and considering the myriad of exemptions to the contraceptive coverage mandate already granted by the government, the defendants have not shown a compelling interest in requiring the plaintiffs to provide the specific contraceptives to which they object. The Court therefore does not reach the third prong of the RFRA test—whether the government has chosen the least restrictive means to further its compelling interest.  See generally id. (discussing only the compelling interest prong of the RFRA test where the government failed to show a compelling interest in enforcing the Controlled Substances Act as to the plaintiffs).

In sum, the plaintiffs have shown a strong likelihood of success on the merits of their RFRA claim.

### C.   Irreparable Harm

It is well settled that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Elrod v. Burns, 427 U.S. 347, 373 (1976).  By extension, the same is true of rights afforded under the RFRA, which covers the same types of rights as those protected under the Free Exercise Clause of the First Amendment. See O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 995 (10th Cir. 2004), aff'd, O Centro, 546 U.S. at 429 (2006) ("[The plaintiff] would certainly suffer an irreparable harm, assuming of course that it is likely to succeed on the merits of its RFRA claim.").  As outlined above, the plaintiffs have established a strong likelihood of success on the

merits of their RFRA claim.  Accordingly, the plaintiffs have adequately demonstrated that they will suffer irreparable harm absent the issuance of a preliminary injunction.[18]

### D.   The Balance of Equities

The defendants argue only that granting the plaintiffs' motion for a preliminary injunction "would undermine the government's ability to achieve Congress's goals of improving the health of women and children and equalizing the coverage of preventive services for women and men."  Defs.' Opp'n at 43.  The plaintiffs counter that granting them a preliminary injunction "will simply preserve the status quo between the parties."  Pls.' Mem. at 44.

As discussed above, the defendants have not carried their burden of persuading the Court that the government must ensure that these particular plaintiffs provide their employees with the specific contraceptives at issue in order to advance the government's stated compelling interests. Further, the denial of a preliminary injunction here "would[,] in fact[,] upend the status quo." Sherley, 644 F.3d at 398.  The plaintiffs currently continue to provide their employees with the same level and manner of contraceptive coverage as they did before the implementation of the contraceptive coverage mandate.  Compl. ¶ 75 ("Consistent with the religious commitments of Tyndale and its owners, Tyndale's self-insured plan does not and has never covered abortions or abortifacient drugs or devices such as emergency contraception and intrauterine devices.")

---

[18] The defendants' argument that the plaintiffs have not suffered irreparable harm due to their "delay" in filing this lawsuit, Defs.' Opp'n at 42, is disingenuous.  The contraceptive coverage mandate did not apply to the plaintiffs until October 1, 2012, and they filed this lawsuit on October 2, 2012.  Pls.' Reply at 24.  The plaintiffs state that they filed this case when they did on the basis of the defendants' representations "[i]n other pending cases against this [contraceptive coverage mandate] . . . that no irreparable harm exists until the date the [m]andate is applicable to the plaintiff."  Id. at 25 (original emphasis) (citing Defendants' Amended Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction at 57, Newland v. Sebelius, __ F. Supp. 2d __, 2012 WL 3069154 (D. Colo. 2012) (Civ. No. 12-01123, ECF # 26)).  In any event, to the extent that the plaintiffs here delayed in filing this case, they did not wait so long as to undermine their showing of irreparable harm; the cases cited by the defendants involved delay much more substantial than the delay here.  Defs.' Opp'n at 42 (citing, among others, delays of forty-four days, two months, and ten weeks as indicative of a lack of irreparable harm).  The plaintiffs here waited only one day after the contraceptive coverage mandate applied to them before filing this action.  Pls.' Reply at 24.

(emphasis added).  Absent a preliminary injunction, the plaintiffs are at the risk of being sued, in addition to either being subject to the considerable financial penalties stemming from the failure to comply with the contraceptive coverage mandate, or being forced to violate their stated religious beliefs by changing the nature of the contraceptive coverage provided under their health care plan.  Because any of these consequences would result in a change in the status quo, Sherley, 644 F.3d at 398, the Court finds that the balance of equities tips in favor of the plaintiffs.

### E.   Public Interest

The defendants point to the deprivation of preventive services to the 260 employees covered by the plaintiffs' health plan, as well as those employees' spouses and dependents, as harming the public interest.  Defs.' Opp'n at 43.  In so arguing, the defendants point to the purpose of the contraceptive coverage mandate, "which is to improve the health of women and children and promote gender equality by equalizing coverage of preventive services for women." Id. (citing 75 Fed. Reg. 41726-01, 41733 (July 19, 2010) and 77 Fed. Reg. 8725-01, 8728 (Feb. 15, 2012)).  However, as discussed above, the defendants have failed to demonstrate a compelling interest in applying the contraceptive coverage mandate to the plaintiffs.  They have thus also failed to show the harm to the public that they claim.

Although there is arguably a public interest in the uniform application of the ACA and the contraceptive coverage mandate, see, e.g., Allina Health Servs. v. Sebelius, 756 F. Supp. 2d 61, 71 (D.D.C. 2010) ("The public interest is served by the consistent and uniform application of regulations to similarly-situated parties"), there is undoubtedly also a public interest in ensuring that the rights secured under the First Amendment and, by extension, the RFRA, are protected,

42 U.S.C. § 2000bb(a) ("The Congress finds that . . . the framers of the Constitution, recognizing free exercise of religion as an inalienable right, secured its protection in the First Amendment to the Constitution[.]").  Indeed, First Amendment rights are among the most precious rights guaranteed under the Constitution.  Lee v. Weisman, 505 U.S. 577, 589 (1992).  Where, as here, the regulations at issue include exemptions and other provisions excluding a large number of people from the scope of the regulations, and the government has failed to show a compelling interest furthered by the enforcement of those regulations as to the plaintiffs in this case, the public has little interest in the "uniform application" of the regulations.  The public interest instead weighs in favor of the plaintiffs.

## IV.  CONCLUSION

For the reasons set forth above, the plaintiffs' motion for a preliminary injunction is granted.[19]

**SO ORDERED** this 16th day of November, 2012.

REGGIE B. WALTON
United States District Judge

---

[19] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.