**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TYNDALE HOUSE PUBLISHERS, INC., a Delaware Corporation; MARK D. TAYLOR; TYNDALE HOUSE FOUNDATION, INC. an Illinois Not-for-profit Corporation; TYNDALE TRUST, an Illinois Trust; KENNETN N. TAYLOR TRUST, an Illinois Trust; and MARGARET W. TAYLOR TRUST, an Illinois Trust; ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) | |
| v. ) ) | Civil Action No. 1:12-CV-1635-RBW |
| KATHLEEN SEBELIUS, in her official capacity as Secretary of the United States Department of Health and Human Services; THOMAS PEREZ, in his official capacity as Secretary of the United States Department of Labor; JACOB J. LEW, in his official capacity as Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF LABOR; and UNITED STATES DEPARTMENT OF THE TREASURY; ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

**FIRST AMENDED VERIFIED COMPLAINT[1]**

Plaintiffs, Tyndale House Publishers, Inc., and Mark D. Taylor (collectively, hereinafter "Tyndale"), with Tyndale House Foundation, Inc., Tyndale Trust, Kenneth N. Taylor Trust, and Margaret W. Taylor Trust (collectively, hereinafter "owners"), by their attorneys¸ allege:

---

[1] Filed pursuant to Fed. R. Civ. P. 15(a)(2), with consent of Defendants, given in writing by counsel for Defendants to counsel for Plaintiffs.  The complaint adds the owners of Tyndale House Publishers as explicit co-plaintiffs. All other allegations are substantially unchanged, and the paragraph numbering has not changed as referenced by documents previously filed. Plaintiffs believe this amendment simply reinforces the arguments already asserted for the owners.

## I.  INTRODUCTION

1.      This action arises because the federal government has deemed devout publishers of the Bible to be insufficiently "religious" to enjoy religious freedom in America.  The federal government is mandating that Tyndale House Publishers violate its and its owners' beliefs by covering morally objectionable items in their health plan pursuant to the Patient Protection and Affordable Care Act of 2010 (Pub. L. 111-148 (March 23, 2010), and Pub. L. 111-152 (March 30, 2010) (hereinafter "PPACA").  The government has defined "religious employer" to exclude these Bible publishers from exemptions that the government otherwise provides.  Defendants have already been the subject of preliminary injunctions against the Mandate.

2.      Tyndale House Publishers originated with the vision of Dr. Kenneth N. Taylor, a publisher and Bible translator.  To promote his paraphrases and translations of the Bible, he and his wife started Tyndale House Publishers, Inc. in 1962.  In 1963, Dr. Taylor assigned his royalties from his books to the religious non-profit entity Tyndale House Foundation, which now owns 96.5% of Tyndale House Publishers, Inc. and as of 2012 has contributed more than $76 million to charitable causes using proceeds from Tyndale House Publishers.  Dr. Taylor structured Tyndale to be primarily owned by the religious Foundation, and primarily directed by Tyndale Trust, whose trustees adhere to a biblical statement of faith and are the same individuals who serve as the board members of Tyndale House Publishers.  Dr. Taylor's son Mark D. Taylor is President and CEO of Tyndale House Publishers and is a member of the board of directors of Tyndale House Publishers and the Foundation, as well as being a trustee of the Tyndale Trust.

3.      Tyndale and its owners are Christians who are committed to biblical principles, including the belief that all human beings are created in the image and likeness of God from the moment of their conception/fertilization.  But Defendants' recently enacted regulatory mandate under PPACA forces Tyndale to provide and pay for drugs and devices that it and its owners'

believe can cause the death of human beings created in the image and likeness of God shortly after their conception/fertilization.  The government's mandate exempts what it calls "religious employers," but denies that status to Tyndale House Publishers through its arbitrary definition.

4.      The mandate challenged in this case (collectively referred to hereinafter as the "Preventive Services Mandate" or the "Mandate")[2] was created and is enforced by Defendants the Departments of HHS, Labor and Treasury and their respective Secretaries.

5.      The Mandate illegally and unconstitutionally requires Tyndale to violate its and its owners' religious beliefs, and it subjects Tyndale to heavy fines and penalties if it chooses not to violate those beliefs. Defendants' coercion tramples on the freedom of conscience, freedom of religious exercise, and freedom of speech of Tyndale and its owners.  These believers, as well as millions of other Americans, simply wish to abide by religious convictions decreed by God Himself through His Word, and to contribute to society in a way that is consistent with their religious ethics.

---

[2] The Mandate consists of a conglomerate of authorities, including: "Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act," 77 Fed. Reg. 8725–30 (Feb. 15, 2012); the prior interim final rule found at 76 Fed. Reg. 46621–26 (Aug. 3, 2011) which the Feb. 15 rule adopted "without change"; the guidelines by Defendant HHS's Health Resources and Services Administration (HRSA), http://www.hrsa.gov/womensguidelines/ , mandating that health plans include no-cost-sharing coverage of "All Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity" as part of required women's "preventive care"; regulations issued by Defendants in 2010 directing HRSA to develop those guidelines, 75 Fed. Reg. 41726 (July 19, 2010); the statutory authority found in 42 U.S.C. § 300gg-13(a)(4) requiring unspecified preventive health services generally, to the extent Defendants have used it to mandate coverage to which Tyndale and other employers have religious objections; penalties existing throughout the United States Code for noncompliance with these requirements; and other provisions of PPACA or its implementing regulations that affect exemptions or other aspects of the Mandate.

6.     Defendants' refusal to accommodate the conscience of Tyndale is highly selective. PPACA not only contains a multitude of exemptions from the Mandate, but one of those exclusions renders the Mandate inapplicable to 191 million Americans.  *Newland*, 2012 WL 3069154 at *1.  Defendants cannot possibly claim they have a compelling interest to violate Tyndale's beliefs when they have voluntarily chosen to omit nearly two-thirds of the nation from that interest for secular reasons.  The multitude of exemptions to which this Mandate is subject further shows it is not generally applicable.

7.     Tyndale therefore seeks declaratory and injunctive relief from Defendants' discriminatory violation of its religious beliefs by bringing claims under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*. (RFRA), the First and Fifth Amendments to the United States Constitution, and the Administrative Procedure Act, 5 U.S.C. § 701, et seq. (APA). Defendants' actions violate Tyndale's right to freely exercise religion, protected by the Religious Freedom Restoration Act and the Religion Clauses of the First Amendment to the United States Constitution.  Defendants' actions also violate Tyndale's right to the freedom of speech, as secured by the Free Speech Clause of the First Amendment to the United States Constitution, and their due process rights secured by the Fifth Amendment to the United States Constitution. Additionally, Defendants violated the Administrative Procedure Act by imposing the Mandate with deliberate disregard of public comments, and for other reasons.

8.     Tyndale is faced with imminent harm due to Defendants' Mandate. The Mandate by its terms compels Tyndale to obtain and pay for insurance coverage of the objectionable items in their October 1, 2012 plan. Therefore Tyndale will suffer imminent and irreparable harm by being subject to the Mandate's draconian penalties, unless the Court enters declaratory and

injunctive relief to protect Tyndale against Defendants' deliberate attack on its and its owners' consciences and religious freedoms.

### IDENTIFICATION OF PARTIES

9.      Plaintiff Tyndale House Publishers, Inc. (herein "Tyndale"), is a Delaware corporation located at 351 Executive Drive, Carol Stream, Illinois.

10.      Tyndale asserts its claims on behalf of itself as well as on behalf of its owners, all of whom share Tyndale's religious beliefs against the Mandate's application in this case. Tyndale's owners also assert the claims in their capacity as owners of Tyndale. Tyndale's owners include Tyndale House Foundation, an Illinois not-for-profit corporation; Tyndale Trust, an Illinois trust; the Kenneth N. Taylor Trust, an Illinois trust; and the Margaret W. Taylor Trust, an Illinois trust. All are located at 351 Executive Drive, Carol Stream, Illinois.

11.      Plaintiff Mark D. Taylor is a resident of Wheaton, Illinois. He is President and CEO of Tyndale House Publishers, and is the son of Tyndale founder Dr. Kenneth Taylor. Mark Taylor is a member of the boards of directors of Tyndale House Publishers and its primary owner Tyndale House Foundation, and is a trustee of Tyndale Trust and the Kenneth N. Taylor Trust, which are also owners of Tyndale House Publishers.

12.      Defendants are appointed officials of the United States government and United States Executive Branch agencies responsible for issuing and enforcing the Mandate.

13.      Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services (HHS). In this capacity, she has responsibility for the operation and management of HHS. Sebelius is sued in her official capacity only.

14.      Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration and enforcement of the Mandate.

15.     Defendant Thomas Perez is the Secretary of the United States Department of Labor. In this capacity, he has responsibility for the operation and management of the Department of Labor.  Perez is sued in his official capacity only.

16.     Defendant Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

17.     Defendant Jacob J. Lew is the Secretary of the Department of the Treasury. In this capacity, he has responsibility for the operation and management of the Department.  Lew is sued in his official capacity only.

18.     Defendant Department of Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Mandate.

### JURISDICTION AND VENUE

19.     This action arises under the Constitution and laws of the United States.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1361, jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 & 2202, 42 U.S.C. § 2000bb-1, 5 U.S.C. § 702, and Fed. R. Civ. P. 65, and to award reasonable attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and 42 U.S.C. § 1988.

20.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e).  The United States Defendants are located in this district.

### FACTUAL ALLEGATIONS

21.     Tyndale House Publishers, Inc. is a Christian publishing company that was founded by Kenneth and Margaret Taylor.  Tyndale was founded in 1962 to publish, at first, a

single book called *Living Letters*, which was Kenneth Taylor's modern paraphrase of portions of the New Testament.

22.     In the ensuing years, Kenneth Taylor paraphrased the rest of the text of the Holy Bible. Tyndale published the entire project in 1971 as *The Living Bible*, sales of which have exceeded 40 million copies.

23.     In 1996 Tyndale published an entirely new translation of the Holy Bible, called the *Holy Bible: New Living Translation*, of which 27 million copies have been sold as of 2012.

24.     Tyndale also publishes a wide array of Christian books ranging from Bible commentaries to books about family issues to Christian fiction. Tyndale's authors include Dr. James Dobson (founder of Focus on the Family), the Rev. Dr. Tim LaHaye, Dr. Bill Bright (the founder of Campus Crusade for Crusade), the Rev. Josh McDowell (a world-renowned Christian apologist), and hundreds of other Christian authors.

25.     Tyndale's Articles of Incorporation declare that Tyndale's purpose is "1. To engage as a publisher of Christian and faith-enhancing books, periodicals, tracts, pamphlets, and other media of communication; and to engage in any related business that may be lawful."

26.     Tyndale's Corporate Purpose is "to minister to the spiritual needs of people, primarily through literature consistent with biblical principles."

27.     Tyndale's Core Values are to be "Dependent on God's leading," "Anchored in the Bible," "Driven to make God's Word accessible," "Trustworthy," and "Committed to excellence."

28.     Tyndale's Corporate Goals are to "Honor God," "Excel in business," "Sustain controlled economic growth," "Operate profitably," and "Help employees grow."

29.     Tyndale holds a weekly chapel service for its employees—a practice that was started in 1967.  Attendance is voluntary, paid as work time, and attended by well over 50% of the employee population each week.

30.     Tyndale opens most business meetings with prayer, asking God for wisdom.

31.     Since 1984 Tyndale's executive team has spent half an hour together in prayer each Tuesday morning.

32.     Tyndale House Publishers' Board of Directors' meetings begin with a devotional prepared by one of the directors, followed by prayer, a practice they started in 1977.

33.     Tyndale sends groups of employees on mission projects each year to provide support to Christian mission organizations. Tyndale pays the employee's salary and expenses for these trips because it models generosity, one of Tyndale's core values. This practice began in 2006, and Tyndale has sponsored at least one such trip per year.

34.     Tyndale has hosted monthly "build days" with Habitat for Humanity each month for the last 3 years for its employees.

35.     Tyndale House Publishers makes charitable contributions at the rate of 10% of its pretax profits each year. Most of the contributions go to Christian organizations like Wycliffe Bible Translators, Wheaton College (Illinois), Outreach Community Ministries, Habitat for Humanity, Casa Viva, and dozens of churches where Tyndale's employees attend.  Tyndale also sponsors a matching gift program for its employees.  Since 2005, Tyndale's corporate contributions have amounted to more than $5 million total.

36.     As part of Tyndale's investment portfolio, as of 2012, it has outstanding loans totaling $5.3 million made to a Christian school and to a church in its community.

37.     As part of its commitment to running its business from a biblical perspective, Tyndale pays its employees well above minimum wage and provides them with excellent benefits. In addition to a very good health plan, the company shares profits with all employees through a strong bonus program and a generous 401(k) and profit sharing plan which regularly contributes 9–11% of employees' salary.

38.     Every book Tyndale publishes has to have ministry value, otherwise it will not publish it.

39.     The Board of Directors of Tyndale House Publishers has adopted the following statement of belief and policy: "The first of five corporate goals of Tyndale House Publishers, Inc. is to 'Honor God.' The company's corporate purpose is to 'Minister to the spiritual needs of people, primarily through literature consistent with biblical principles.' Among the biblical principles the company is committed to following is respect for the inviolable sanctity of the life of every human being as created in the image and likeness of God from the moment of conception/fertilization (cf. Jeremiah 1:5; Genesis 1:26). Consistent with this belief, Tyndale House Publishers, Inc. omits from its employee health plan any coverage of abortions and of drugs (e.g., Plan B, ella) or devices (e.g., intrauterine devices) that can cause the demise of an already conceived/fertilized human embryo."

40.     Tyndale brings its claims on its own behalf and on behalf of its owners. Tyndale's owners also assert the claims in their capacity as owners of Tyndale.

41.     Tyndale's primary owner, Tyndale House Foundation (hereinafter "the Foundation"), was incorporated as an Illinois not-for-profit corporation by Kenneth and Margaret Taylor in 1963.

42.     The Foundation's Mission is "to minister to the spiritual needs of people, primarily through grants to other Christian charities."

43.     Starting with the publication of *Living Letters* and continuing through the very successful publication of *The Living Bible* and the *Holy Bible: New Living Translation*, Kenneth Taylor assigned his author royalties to the Foundation.

44.     As Kenneth Taylor wrote in his autobiography, *My Life: A Guided Tour*, "I had a strong conviction that the ability to write *Living Letters* was a special gift from God, and, because it was His word, He should get all the royalties. So we called on [an attorney] to set up a foundation with a board of directors who would be responsible to give the money away to properly qualified charitable causes."

45.     The Foundation owns 96.5% of all shares of Tyndale House Publishers, which includes just over 8.4% of its voting shares.

46.     By virtue of the Foundation's nearly total ownership of Tyndale House Publishers, Tyndale's and the Foundation's religious missions are largely overlapping and mutually reinforcing.

47.     The Foundation receives 96.5% of all of Tyndale's distributed profits.  From 2001 to 2012, the Foundation received $38.8 million of Tyndale's $40.2 million in distributed profits.

48.     Tyndale's non-distributed profits are reinvested into Tyndale for the benefit of its religious publishing mission.

49.     In addition to dividends, Tyndale also pays royalties to the Foundation in amounts exceeding $1 million annually, because Dr. Taylor had donated his author rights to the Foundation.

50.     Since its inception through 2012, the Foundation has distributed more than $76 million to various charitable causes, primarily through proceeds received from Tyndale House Publishers and from royalties assigned by Dr. Kenneth Taylor.

51.     The Foundation's Board of Directors has adopted the following statement of belief and policy: "Tyndale House Foundation shares the religious beliefs of Tyndale House Publishers, Inc., the entity in which it has an ownership interest, including a commitment to 'Honor God' and to act in a manner consistent with biblical principles.  Among such biblical principles is respect for the inviolable sanctity of the life of every human being as created in the image and likeness of God from the moment of conception/fertilization (cf. Jeremiah 1:5; Genesis 1:26).  Consistent with this religious belief, Tyndale House Foundation supports Tyndale House Publishers, Inc.'s omission from its employee health plan of any coverage of abortions and of drugs (e.g., Plan B, ella) or devices (e.g., intrauterine devices) that can cause the demise of an already conceived/fertilized human embryo."

52.     Of Tyndale's other shares, a small percentage is owned by Tyndale Trust, but those shares include 84% of the voting shares.

53.     Tyndale Trust was incorporated as an Illinois trust by Dr. Kenneth Taylor in 1988.

54.     The Trust is intended to help preserve and continue the biblical focus of Tyndale House Publishers' mission.  To help accomplish this goal, the Trust owns the large majority of voting shares.

55.     Trustees of Tyndale Trust are required to be the same persons as the members of the Board of Directors of Tyndale House Publishers.

56.     Trustees of the Tyndale Trust (and therefore board members of Tyndale House Publishers) are required to sign a Statement of Faith each year to show that they hold to certain religious beliefs, which are typically described as evangelical Christian beliefs.

57.     The statement of faith required of Tyndale Trust's trustees (and therefore of board members of Tyndale House Publishers), is as follows:

1.  I believe in the divine inspiration, truthfulness, and authority of both Old and New Testament Scriptures in their entirety as the only written word of God, without error in all that it affirms, and the only infallible rule of faith and practice.

2.  I believe that there is one God, eternally existent in three persons: Father, Son, and Holy Spirit.

3.  I believe in the deity of our Lord Jesus Christ, in his virgin birth, in his sinless life, in his miracles, in his atoning death, in his bodily resurrection, in his ascension to the right hand of the Father, and in his personal return in power and glory.

4.  I believe that for the salvation of lost and sinful people, regeneration by the Holy Spirit is absolutely essential.

5.  I believe in the present ministry of the Holy Spirit by whose indwelling the Christian is enabled to live a godly life.

6.  I believe in the resurrection of both the saved and the lost: they that are saved unto the resurrection of life and they that are lost unto the resurrection of damnation.

7.  I believe in the spiritual unity of believers in our Lord Jesus Christ.

58.     All of the trustees of Tyndale Trust, and all of the members of the Board of Directors of Tyndale House Publishers, have subscribed to that statement of faith.

59.     Tyndale Trust has adopted the following statement of belief and policy: "Tyndale Trust shares the religious beliefs of Tyndale House Publishers, Inc., the entity in which it has an ownership interest, including a commitment to 'Honor God' and to act in a manner consistent with biblical principles.  Among such biblical principles is respect for the inviolable sanctity of

the life of every human being as created in the image and likeness of God from the moment of conception/fertilization (cf. Jeremiah 1:5; Genesis 1:26).  Consistent with this religious belief, Tyndale Trust supports Tyndale House Publishers, Inc.'s omission from its employee health plan of any coverage of abortions and of drugs (e.g., Plan B, ella) or devices (e.g., intrauterine devices) that can cause the demise of an already conceived/fertilized human embryo."

60.     The remaining percent of Tyndale's shares, just over 3.4%, are owned by two Illinois trusts that benefit Dr. Kenneth Taylor's widow and children.  The Margaret W. Taylor Trust accrues to the benefit of Mrs. Taylor during her lifetime, and she is the sole trustee of said trust.  The trustees of the Kenneth N. Taylor Trust are Margaret W. Taylor and her sons Peter W. Taylor and Mark D. Taylor.

61.     Both the Margaret W. Taylor Trust and the Kenneth N. Taylor Trust share the beliefs of Tyndale House Publishers, Tyndale House Foundation, and Tyndale Trust, in general and with respect to Tyndale's provision of health insurance and omission of abortifacients therefrom.

62.     The trustees of the Margaret W. Taylor Trust and the Kenneth N. Taylor Trust have adopted the following statement of belief and policy: "The trustees of the Kenneth N. Taylor Trust and the Margaret W. Taylor Trust share the religious beliefs of Tyndale House Publishers, Inc., the entity in which they have an ownership interest, including a commitment to 'Honor God' and to act in a manner consistent with biblical principles.  Among such biblical principles is respect for the inviolable sanctity of the life of every human being as created in the image and likeness of God from the moment of conception/fertilization (cf. Jeremiah 1:5; Genesis 1:26).  Consistent with this religious belief, the Kenneth N. Taylor Trust and the Margaret W. Taylor Trust support Tyndale House Publishers, Inc.'s omission from its employee health plan of any coverage of abortions and of

drugs (e.g., Plan B, ella) or devices (e.g., intrauterine devices) that can cause the demise of an already conceived/fertilized human embryo."

63.  Mark D. Taylor is the President and CEO of both Tyndale House Publishers and the Foundation.  He is a trustee of the Tyndale Trust and of the Kenneth N. Taylor Trust. He is the son of Dr. Kenneth Taylor and Margaret W. Taylor, founders of the Tyndale entities.

64.  Mark Taylor is directly familiar with the facts and beliefs affirmed herein relating to Tyndale House Publishers as well as to its owners.

65.  As President and CEO of Tyndale House Publishers and the Foundation, Mark Taylor is responsible for their overall operations, including the provision of Tyndale's health insurance plan.

66.  As an employee of Tyndale, Mark Taylor is a participant in its health plan, and his wife is a dependent beneficiary of the same plan.

67.  Mark Taylor shares the religious beliefs of Tyndale House Publishers and its owners, and his constitutional and statutory rights are burdened by the Mandate to the same extent.

68.  Tyndale's owners possess religious beliefs against the government's requirement that their property and sister entity, Tyndale House Publishers, would be forced to offer immoral coverage of abortifacient drugs and devices.

69.  Tyndale's owners exercise that religious belief by virtue of their ownership, voting rights in and receipt of benefit from an entity, Tyndale House Publishers, that shares the owners' same biblical beliefs in the inviolable sanctity of innocent human life.

70.  Therefore the Mandate violates Tyndale's owners' rights in their capacity as Tyndale's owners as asserted herein.

71.  Tyndale has approximately 250 full-time employees.

72.     Tyndale provides a generous health insurance plan for its employees.

73.     Tyndale's group health plan for its employees is self-insured, and Tyndale acts as its own insurer.

74.     The plan-year for Tyndale's self-insured plan begins on October 1 of each year, including 2012–13.

75.     Consistent with the religious commitments of Tyndale and its owners, Tyndale's self-insured plan does not and has never covered abortions or abortifacient drugs or devices such as emergency contraception and intrauterine devices ("IUDs").

76.     Tyndale's self-insured plan is not subject to an Illinois state requirement to cover contraception including abortifacients.

77.     Under the PPACA, employers with over 50 full-time employees are required to provide a certain minimum level of health insurance to their employees.

78.     Many such plans must include "preventive services," which must be offered with no cost-sharing by the employee.

79.     On February 10, 2012, the Department of Health and Human Services finalized a rule (previously referred to in this Complaint as "the Mandate") that imposes a definition of preventive services to include all FDA-approved "contraceptive" drugs, surgical sterilization, and education and counseling for such services.

80.     This final rule was adopted without giving due weight to the tens of thousands of public comments submitted to HHS in opposition to the Mandate.

81.     In the category of "FDA-approved contraceptives" included in the Mandate are several drugs or devices that may cause the demise of an already-conceived but not-yet-

implanted human embryo, such as "emergency contraception" or "Plan B" drugs (the so-called "morning after" pill) as well as IUDs.

82.     The FDA approved in this same "contraception" category a drug called "ella" (the so-called "week after" pill), which studies show can function to kill embryos even after they have implanted in the uterus, by a mechanism similar to the abortion drug RU-486.

83.     The manufacturers of some such drugs, methods, and devices in the category of "FDA-approved contraceptive methods" indicate that they can function to cause the demise of an early human embryo.

84.     The Mandate also requires applicable group health care plans to pay for the provision of counseling, education, and other information for all women beneficiaries who are capable of bearing children concerning and in support of covered devices and drugs, including Plan B and ella and IUDs that cause early abortions or harm to human embryos.

85.     The Mandate applies to the first health insurance plan-year beginning after August 1, 2012.

86.     An entity cannot escape the Mandate by self-insuring; Tyndale's plan is thus subject to the Mandate even though it is self-insured.

87.     Absent relief from this Court, Tyndale is subject to the Mandate's requirement of coverage of the above-described items starting in their October 1, 2012 plan.

88.     Tyndale and its owners have a sincere conscientious religious objection to providing coverage for abortifacients and related education and counseling in Tyndale's health insurance plan.

89.     Tyndale and its owners cannot in good conscience violate their religious beliefs by providing coverage for emergency contraception, IUDs, or counseling or education in

furtherance of the same, in Tyndale's health insurance plan, including starting on October 1, 2012.

90.     The Mandate therefore imminently threatens to impose its heavy penalties, fines and lawsuits against Tyndale in violation of the beliefs and rights of Tyndale and its owners.

91.     The Mandate makes little or no allowance for the religious freedom of entities and individuals, including Tyndale and its owners, who object to paying for or providing insurance coverage for such items.

92.     An entity cannot freely avoid the Mandate by simply refusing to provide health insurance to its employees, because the PPACA imposes monetary penalties on entities that would so refuse.

93.     The exact magnitude of these penalties may vary according to the complicated provisions of the PPACA, but the fine is approximately $2,000 per employee per year for employers such as Tyndale.

94.     In addition, if Tyndale dropped insurance for its employees, such an action would not only harm Tyndale's employees, but it would harm Tyndale financially, it would harm Tyndale's ability to retain and attract qualified employees, and it would violate Tyndale's religious commitment to its core value of providing generous employee benefits.

95.     PPACA also threatens monetary penalties against Tyndale for continuing to offer its self-insured plan but continuing to omit abortifacients.

96.     The exact magnitude of these penalties may vary according to the complicated provisions of the PPACA, but the fine is approximately $100 per day per employee, with minimum amounts applying in different circumstances.

97.     The Mandate also triggers a range of enforcement mechanisms against Tyndale, including but not limited to civil actions by the Secretary of Labor or by plan participants and beneficiaries under ERISA, which would include but not be limited to relief in the form of judicial orders mandating that Tyndale violate its and its owners' sincerely held religious beliefs by providing coverage for items to which they religiously object.

98.     The lawsuit penalties that the Mandate triggers under ERISA are in no way speculative since Defendants Secretary Perez and the Department of Labor intend to fully and imminently enforce the Mandate against Tyndale.

99.     The Mandate applies not only to sponsors of group health plans like Tyndale, but also to issuers of insurance. Accordingly, Tyndale cannot avoid the Mandate by shopping for an insurance plan that accommodates their right of conscience, because Defendants have intentionally foreclosed that possibility.

100.    The Mandate does not apply equally to all religious adherents or groups.

101.    The Mandate initially offered the possibility of a narrow exemption to religious employers, but only if they meet all of the following requirements:

(1) "The inculcation of religious values is the purpose of the organization";

(2) "The organization primarily employs persons who share the religious tenets of the organization";

(3) "The organization serves primarily persons who share the religious tenets of the organization"; and

(4) The organization is a church, an integrated auxiliary of a church, a convention or association of churches, or is an exclusively religious activity of a religious order, under Internal Revenue Code 6033(a)(1) and (a)(3)(A).

The Mandate later changed this narrowed this definition to only requirement (4).

102.    Tyndale is not "religious" enough under these definitions in several respects, including because it is not a church, integrated auxiliary of a particular church, convention or association of a church, or the exclusively religious activities of a religious order.

103.    PPACA and the Mandate grant unbridled discretion to the government to create or modify these "religious employer" definitions.

104.    PPACA and the Mandate grant unbridled discretion to the government to grant exemptions to some, all, or none of the organizations meeting the Mandate's definitions of "religious employers" or any future definition.

105.    The Mandate picks and chooses among religions, religious believers and religious doctrines, including on the issue of what constitutes religion and religious exercise.

106.    The Mandate is not neutral towards religion because it allows exemptions based on religious criteria, and it refuses those exemptions to Tyndale.

107.    The Mandate fails to protect the statutory and constitutional conscience rights of religious Americans like Tyndale and its owners, even though those rights were repeatedly raised in public comments against the Mandate's regulations.

108.    The Mandate requires that Tyndale provide coverage for abortifacient methods, and education and counseling related to the same, against the conscience and in violation of the religious beliefs of Tyndale and its owners, in a manner that is contrary to law.

109.    The Mandate constitutes government-imposed coercion on Tyndale and its owners to change or violate their sincerely held religious beliefs.

110.    The Mandate exposes Tyndale to draconian fines and other penalties for refusal to change or violate its and its owners' religious beliefs.

111.    The Mandate will impose a burden on Tyndale's employee recruitment and retention efforts by creating uncertainty as to whether or on what terms they will be able to continue offering health insurance due to the prospect of suffering penalties as a result of the Mandate.

112.    The Mandate will place Tyndale at a competitive disadvantage in its efforts to recruit and retain employees, to attract Christian authors, and to maintain the confidence of churches and other religious customers who trust that the products produced by Tyndale House Publishers are created by a company that follows biblical principles.

113.    The Mandate will have a profound and adverse effect on Tyndale and how it negotiates contracts and compensates its employees.

114.    Tyndale has already expended considerable time and expense determining the application of the Mandate against its religious beliefs and its options in relation thereto.

115.    Unless relief issues from this Court, Tyndale is forced to take the Mandate into account now as it plans expenditures, including employee contracts, compensation and benefits packages, as well as potential government fines and lawsuits, for the next several years.

116.    PPACA and the Mandate are not generally applicable because they provide for numerous exemptions from their rules.

117.    For instance, the Mandate does not apply to members of a "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds. See 26 U.S.C. §§ 5000A(d)(2)(a)(i) and (ii).  Tyndale does not meet this exemption.

118.    In addition, as described above, the Mandate exempts certain churches and religious orders narrowly considered to be religious employers.  Tyndale does not meet this exemption.

119.    Furthermore, the PPACA creates a system of individualized exemptions because under the PPACA's authorization the federal government has granted discretionary compliance waivers to a variety of businesses for purely secular reasons.

120.    Also, PPACA and its Mandate do not force employers having fewer than 50 full-time employees to provide a health insurance plan to its employees at all.

121.    Additionally, the Mandate does not apply to employers with preexisting plans that are "grandfathered."

122.    Tyndale's plan is not grandfathered under PPACA, nor will its plan year starting on October 1, 2012 have grandfathered status.

123.    Tyndale's plan lacks grandfathered status because, *inter alia*, the facts described in the following five paragraphs deprive the plan of such status according to the Defendants' regulations governing grandfathered status.

124.    For financial reasons, between 2011 and 2012 in Tyndale's health insurance plan, the percentage of in-network covered charges, hospital expenses, non-routine physician fees, and mental health expenses that the plan covered was reduced from 90% to 80%, and the percentage of out-of-network coverage for such covered items was reduced from 70% to 60%.

125.    For financial reasons, between 2011 and 2012 in Tyndale's health insurance plan, the individual deductible was increased from $400 to $500, and the family deductible was raised from $400/person to $500/person with a $1000 maximum.

126.    For financial reasons, between 2011 and 2012 in Tyndale's health insurance plan, the individual in-network co-insurance limit was increased from $1,500 to $2,000 per calendar year in addition to deductible; the family in-network co-insurance limit was increased from

$3,000 to $4,000 per calendar year in addition to deductible; and out of network co-insurance limits were imposed in the amount of $4,000 per individual and $8,000 per family.

127.    For financial reasons, between 2011 and 2012 in Tyndale's health insurance plan, the maximum out-of-pocket amount for prescription drug coverage per calendar year in combined retail and mail order pharmacy claims was increased from $1,500 to $2,000 for individuals, and from $3,000 to $4,000 for families.

128.    Neither Tyndale, its plan administrator, nor its October 2011–12 health insurance plan provided a disclosure to plan participants that the plan possessed grandfathered status under PPACA (because the plan did not possess such status).  Rather, prior to the October 2011–12 plan year, Tyndale disclosed that the plan would not be grandfathered.

129.    According to the government's statistics, tens of millions of Americans in 2013 will be covered under plans where, because they possess grandfathered status, PPACA and Defendants do not subject those plans to the requirements of the Mandate.

130.    Despite Defendants' and PPACA's choice not to impose the Mandate and its required items to tens of millions of Americans in grandfathered plans, Defendants refuse to allow Tyndale's plan with less than 300 employees to be exempt from the Mandate.

131.    President Obama held a press conference on February 10, 2012, and later (through Defendants) issued an "Advanced Notice of Proposed Rulemaking" ("ANPRM") on March 21, 2012 (77 Fed. Reg. 16501–08), claiming to offer a "compromise" under which some religious non-profit organizations not meeting the above definition would still have to comply with the Mandate, but by means of the employer's insurer offering the employer's employees the same coverage for "free."

132.     This "compromise," even if clarified and enacted, is not helpful to Tyndale because, among other reasons, Tyndale is not a non-profit entity, and its plan is self-insured.

133.     The ANPRM is neither a rule, a proposed rule, nor the specification of what a rule proposed in the future would actually contain.  It in no way changes or alters the final status of the February 15, 2012 Mandate.  It does not even create a legal requirement that Defendants change the Mandate at some time in the future.

134.     On February 10, 2012, a document was also issued from the Center for Consumer Information and Insurance Oversight (CCIIO), Centers for Medicare & Medicaid Services (CMS), of HHS, entitled "Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code."

135.     Under this "Guidance," an organization that truthfully declares "I certify that the organization is organized and operated as a non-profit entity; and that, at any point from February 10, 2012 onward, contraceptive coverage has not been provided by the plan, consistent with any applicable State law, because of the religious beliefs of the organization," and that provides a specified notice to plan participants, will not "be subject to any enforcement action by the Departments for failing to cover recommended contraceptive services without cost sharing in non-exempted, non-grandfathered group health plans established or maintained by an organization, including a group or association of employers within the meaning of section 3(5) of ERISA, (and any group health insurance coverage provided in connection with such plans)," until "the first plan year that begins on or after August 1, 2013."

136.    The February 10, 2012 "Guidance" categorically disqualifies Tyndale from making use of this "extra year" because, among other reasons, Tyndale is not a non-profit entity, though the Foundation that almost entirely owns it and benefits from it is a non-profit entity. Further, Tyndale objects only to the provision of abortifacient contraceptives.

137.    On August 15, 2012, in response to litigation against the Mandate that illustrated the February 10, 2012 press conference "Guidance" was sloppily drafted and omitted a variety of organizations, Defendants used their unfettered discretion over the Mandate to issue yet another version of the "safe harbor" Guidance.

138.    Under the August 15, 2012 "Guidance," employers who object to some but not all contraception could be covered, but the "safe harbor" was still limited to non-profit entities.

139.    Thus the August 15, 2012 "Guidance" continues to categorically disqualify Tyndale from making use of this "extra year" because, among other reasons, Tyndale is not a non-profit entity, though the Foundation that almost entirely owns it and benefits from it is a non-profit entity.

140.    PPACA and the Mandate confer unfettered discretion upon Defendants to create and modify rules such as the Guidances and the ANPRM with respect to their categorization and treatment of religious entities.

141.    The Mandate, Defendants' two "Guidances," their ANPRM, and their "religious employer" definitions all omit Tyndale from any protection from the Mandate, despite the fact that the Foundation which owns Tyndale House Publishers is a non-profit religious entity, Tyndale has always existed for the religious purpose of publishing Bibles and other Christian books and providing its proceeds to the Foundation, and Tyndale and its owners share the same religious mission.

142.    Therefore while President Obama's and Defendants' ever-changing "compromises" purport to accommodate the religious beliefs of a variety of groups, none of these measures will stop the Mandate from being imposed on Tyndale's plan year beginning October 1, 2012.

143.    Any alleged interest Defendants have in providing free FDA-approved abortifacient contraception and related education and counseling without cost-sharing could be advanced through other, more narrowly tailored mechanisms that do not burden the religious beliefs of Tyndale and its owners and do not require them to provide or facilitate coverage of such items through Tyndale's health plan.

144.    Unless relief issues from this Court, the Mandate directly and imminently threatens Tyndale with its draconian penalties.

145.    Without injunctive and declaratory relief as requested herein, including preliminary injunctive relief, Tyndale and its owners are suffering and will continue to suffer irreparable harm.

146.    Tyndale and its owners have no adequate remedy at law.

## FIRST CLAIM FOR RELIEF
### Violation of the Religious Freedom Restoration Act
### 42 U.S.C. § 2000bb

147.    Plaintiffs reallege all matters set forth in paragraphs 1–146 and incorporate them herein by reference.

148.    Tyndale's and its owners' sincerely held religious beliefs prohibit them from providing coverage for abortifacients, including emergency contraception and IUDs and related education and counseling, in Tyndale's employee health plan.

149.    When Tyndale and its owners comply with their sincerely held biblical principles and Christian beliefs on abortifacients such as emergency contraception and IUDs, they exercise religion within the meaning of the Religious Freedom Restoration Act.

150.    The Mandate imposes a substantial burden on Tyndale's and its owners' religious exercise and coerces them to change or violate their sincerely held religious beliefs, or be subject to penalties and harm to their property and livelihood.

151.    The Mandate chills Tyndale's and its owners' religious exercise within the meaning of RFRA.

152.    The Mandate exposes Tyndale to lawsuits, substantial fines, and financial burdens, and pressures Tyndale and its owners by threatening their property and livelihood based on their religious exercise.

153.    The Mandate exposes Tyndale to substantial competitive disadvantages because of uncertainties about Tyndale's health insurance benefits caused by the Mandate.

154.    The Mandate furthers no compelling governmental interest and is not narrowly tailored to any compelling governmental interest.

155.    The Mandate is not the least restrictive means of furthering Defendants' stated interests.

156.    The Mandate violates RFRA.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## SECOND CLAIM FOR RELIEF
### Violation of Free Exercise Clause of the First Amendment
### to the United States Constitution

157.    Plaintiffs reallege all matters set forth in paragraphs 1–146 and incorporate them herein by reference.

158.     Tyndale's and its owners' sincerely held religious beliefs prohibit them from providing coverage for abortifacients, including emergency contraception and IUDs and related education and counseling, in Tyndale's employee health plan.

159.     When Tyndale and its owners comply with their sincerely held biblical principles and Christian beliefs on abortifacients such as emergency contraception and IUDs, they exercise religion within the meaning of the Religious Freedom Restoration Act.

160.     The Mandate is not neutral and is not generally applicable.

161.     Defendants have created categorical exemptions and individualized exemptions to the Mandate.

162.     The Mandate furthers no compelling governmental interest.

163.     Defendants have conceded the lack of a compelling interest in the Mandate by virtue of their and PPACA's voluntary exclusion and exemption of millions of Americans from the Mandate's coverage.

164.     The Mandate is not the least restrictive means of furthering Defendants' purported interests.

165.     The Mandate chills Tyndale's and its owners' religious exercise.

166.     The Mandate exposes Tyndale to lawsuits, substantial fines, and financial burdens, and pressures Tyndale and its owners by threatening their property and livelihood based on their religious exercise.

167.     The Mandate exposes Tyndale to substantial competitive disadvantages because of uncertainties about Tyndale's health insurance benefits caused by the Mandate.

168.    The Mandate imposes a substantial burden on Tyndale's and its owners' religious exercise and coerces them to change or violate their sincerely held religious beliefs, or be subject to penalties and harm to their property and livelihood.

169.    The Mandate is not narrowly tailored to any compelling governmental interest.

170.    By design, Defendants framed the Mandate to apply to some religious Americans but not to others, resulting in discrimination among religions.

171.    Defendants have created exemptions to the Mandate for some religious believers but not others based on characteristics of their beliefs and their religious exercise.

172.    Defendants designed the Mandate, the religious exemptions thereto, and the "compromise" and guidance allowances thereto, in a way that makes it impossible for Tyndale and other similar religious Americans to comply with their sincerely held religious beliefs.

173.    Defendants promulgated both the Mandate and the religious exemption/allowances with the purpose and intent to suppress the religious exercise of Tyndale and its owners and other religious Americans.

174.    The Mandate violates Tyndale's and its owners' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

WHEREFORE, Plaintiffs pray for the relief set forth below.


### THIRD CLAIM FOR RELIEF
**Violation of the Establishment Clause of the
First Amendment to the United States Constitution**

175.    Plaintiffs reallege all matters set forth in paragraphs 1–146 and incorporate them herein by reference.

176.   The First Amendment's Establishment Clause prohibits the establishment of any religion and/or excessive government entanglement with religion.

177.   To determine whether religious persons or entities like Tyndale are required to comply with the Mandate, are required to continue to comply with the Mandate, are eligible for an exemption or other accommodations, or will continue to be eligible for the same, Defendants must examine the religious beliefs and doctrinal teachings of persons or entities like Tyndale.

178.   Obtaining sufficient information for the Defendants to analyze the content of Tyndale's sincerely held religious beliefs requires ongoing, comprehensive government surveillance that impermissibly entangles Defendants with religion.

179.   The Mandate discriminates among religions and among denominations, favoring some over others, and exhibits hostility to religious beliefs.

180.   The Mandate discriminates against and among religions in refusing to accommodate or exempt a religious Bible publisher that provides nearly all its proceeds to a religious non-profit, while exempting or accommodating others.

181.   The Mandate adopts a particular theological view of what is acceptable moral behavior with respect to provision of abortifacient coverage and imposes that view upon all adherents of religion who must either conform their consciences or suffer penalty.

182.   The Mandate violates Tyndale's and its owners' rights secured to them by the Establishment Clause of the First Amendment of the United States Constitution.

WHEREFORE, Plaintiffs pray for the relief set forth below.

### FOURTH CLAIM FOR RELIEF
**Violation of the Free Speech Clause of the First Amendment
to the United States Constitution**

183.     Plaintiffs reallege all matters set forth in paragraphs 1–146 and incorporate them herein by reference.

184.     Defendants' requirement of provision of insurance coverage for education and counseling regarding abortifacient drugs and devices such as emergency contraception and IUDs forces Tyndale and its owners to speak and fund speech in a manner contrary to their religious beliefs.

185.     Defendants have no narrowly tailored compelling interest to justify this compelled speech.

186.     The Mandate violates Tyndale's and its owners' rights secured to them by the Free Speech Clause of the First Amendment of the United States Constitution.

WHEREFORE, Plaintiffs pray for the relief set forth below.

### FIFTH CLAIM FOR RELIEF
**Violation of the Due Process Clause of the
Fifth Amendment to the United States Constitution**

187.     Plaintiffs reallege all matters set forth in paragraphs 1–146 and incorporate them herein by reference.

188.     Because the Mandate sweepingly infringes upon religious exercise and speech rights that are constitutionally protected, it is unconstitutionally vague and overbroad in violation of the due process rights of Tyndale and its owners and other parties not before the Court.

189.     Persons of common intelligence must necessarily guess at the meaning, scope, and application of the Mandate and its exemptions.

190.    This Mandate lends itself to discriminatory enforcement by government officials in an arbitrary and capricious manner.

191.    PPACA and the Mandate vest Defendants with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations, in crafting "religious employer" exemptions and changing the same, in crafting and modifying further "accommodations" and additional definitions of entities that qualify for the same, and in enforcing the Mandate and crafting rules regarding the same such as through its repeatedly issued enforcement "Guidances."

192.    The Mandate is an unconstitutional violation of Tyndale's and its owners' due process rights under the Fifth Amendment to the United States Constitution.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## SIXTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act

193.    Plaintiffs reallege all matters set forth in paragraphs 1–146 and incorporate them herein by reference.

194.    Because they did not give proper notice and an opportunity for public comment, Defendants did not take into account the full implications of the regulations by completing a meaningful consideration of the relevant matter presented.

195.    Defendants did not consider or respond to the voluminous comments they received in opposition to the interim final rule.

196.    Defendants conceded upon issuance of their interim final Mandate in August 2011 that they did not intend to give meaningful consideration to subsequent comments due to the alleged need to finalize the Mandate without subsequent change from the form it took in August 2011.

197.    Defendants actually refused to give meaningful consideration to comments when it finalized its Mandate in February 2012 without change.

198.    Defendants further conceded in its March 2012 ANPRM that it should have given meaningful consideration to and not finalized its Mandate without change in February 2012, and that the Mandate needed to be amended according to concerns raised in those comments.

199.    PPACA requires that the Mandate not be imposed until a year after it is issued in final unchanged form.

200.    Yet despite Defendants' expressed intent in March 2012 to amend the Mandate in the future, which implicitly conceded that it should not have been finalized without change in February 2012, Defendants have not refrained from imposing the Mandate against Tyndale and others now, as if the August 2011 interim final rule meaningfully considered public comments.

201.    As a result of this violation, Tyndale has been prejudiced by being threatened by and subject to the Mandate's penalties now, instead of in its first plan year that commences a year after the Mandate's issuance with changes that still have not occurred.

202.    Therefore, Defendants have taken agency action not in accordance with procedures required by law, and Tyndale is entitled to relief pursuant to 5 U.S.C. § 706(2)(D) and § 553(b) & (c).

203.    In promulgating the Mandate, Defendants also failed to consider the constitutional and statutory implications of the Mandate on Tyndale and its owners and similar persons.

204.    Defendants' explanation (and lack thereof) for their decision not to exempt Tyndale and similar religious organizations from the Mandate runs counter to the evidence submitted by religious Americans during the comment period.

205.    Thus, Defendants' issuance of the Mandate was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because the Mandate fails to consider the full extent of its implications and it does not take into consideration the evidence against it.

206.    As set forth above, the Mandate violates RFRA and the First and Fifth Amendments to the U.S. Constitution.

207.    The Mandate is also contrary to the provisions of the PPACA which states that "nothing in this title"—i.e., title I of the Act, which includes the provision dealing with "preventive services"—"shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year." Section 1303(b)(1)(A).   Some drugs included as "FDA-approved contraceptives" under the Mandate cause abortions by causing the demise of human embryos before and/or after implantation.   By Executive Order, this provision prohibits Defendants from requiring abortion in Tyndale's plan.

208.    The Mandate is also contrary to the provisions of the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Public Law 110 329, Div. A, Sec. 101, 122 Stat. 3574, 3575 (Sept. 30, 2008), which provides that "[n]one of the funds made available in this Act [making appropriations for Defendants Department of Labor and Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

209.    The Mandate also violates the provisions of the Church Amendment, 42 U.S.C. § 300a-7(d), which provides that "No individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in

part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions."

210.   The Mandate is contrary to existing law and is in violation of the APA under 5 U.S.C. § 706(2)(A)f.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

A.   That this Court enter a judgment declaring the Mandate and its application to Tyndale and its plan, and others similarly situated but not before the Court, to be an unconstitutional and illegal violation of Tyndale's, its owners', and others' rights protected by RFRA, the Free Exercise, Establishment, and Free Speech Clauses of the First Amendment to the United States Constitution, the Due Process Clause of the Fifth Amendment to the United States Constitution, and the Administrative Procedure Act, and therefore invalid in any way applicable to them;

B.   That this Court enter a preliminary and a permanent injunction prohibiting Defendants from applying the Mandate to Tyndale and its plan and others similarly situated but not before the Court in a way that substantially burdens the religious belief of Tyndale and its owners, or any person, in violation of RFRA and the Constitution, and prohibiting Defendants from continuing to illegally discriminate against Tyndale and others not before the Court by requiring them to provide or cause to be provided health insurance coverage for abortifacients,

contraception, sterilization and related education and counseling to employees of entities they own or operate;

C.     That this Court award Plaintiffs court costs and reasonable attorney's fees, as provided by the Equal Access to Justice Act and RFRA (as provided in 42 U.S.C. § 1988);

D.     That this Court grant such other and further relief as to which Plaintiffs may be entitled.

Plaintiffs demand a jury on all issues so triable.

Respectfully submitted this 3rd day of December, 2013.

*Attorneys for Plaintiffs*:

_    s/ Matthew S. Bowman_

David A. Cortman, Esq.
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@alliancedefendingfreedom.org


Kevin H. Theriot, Esq.
ALLIANCE DEFENDING FREEDOM
15192 Rosewood
Leawood, KS 66224
(913) 685-8000
(913) 685-8001 (facsimile)
ktheriot@alliancedefendingfreedom.org
estanley@alliancedefendingfreedom.org

Steven H. Aden, Esq.
Gregory S. Baylor, Esq.
Matthew S. Bowman, Esq.
ALLIANCE DEFENDING FREEDOM
801 G Street NW, Suite 509
Washington, DC 20001
(202) 393-8690
(202) 237-3622 (facsimile)
saden@alliancedefendingfreedom.org
gbaylor@alliancedefendingfreedom.org
mbowman@alliancedefendingfreedom.org

**VERIFICATION OF COMPLAINT**
**PURSUANT TO 28 U.S.C. § 1746**


I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.


Executed on December 3, 2013

_____*s/ Mark D. Taylor*_____
MARK D. TAYLOR


(Original signature in possession of attorneys for Plaintiffs,
pursuant to LCvR 5.4(b)(5))

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed with the Court's Clerk by email on December 3, 2013, to be subsequently electronically served on counsel for Defendants and others who have appeared in the case when the Clerk files the amended complaint in the Court's CM/ECF system.

*s/ Matthew S. Bowman*
Matthew S. Bowman